**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BAXTER INTERNATIONAL, INC. and | ) | |
| BAXTER HEALTHCARE CORPORATION, | ) | No. 08-CV-2389 |
| | ) | |
| Plaintiffs/Counter-Defendants | ) | Hon. Blanche M. Manning |
| v. | ) | Presiding Judge |
| | ) | |
| FRESENIUS MEDICAL CARE HOLDINGS, | ) | Hon. Martin C. Ashman |
| INC. and FRESENIUS USA, INC., | ) | Magistrate Judge |
| | ) | |
| Defendants/Counter-Plaintiffs. | ) | |

**<u>BAXTER'S OPPOSITION TO FRESENIUS' MOTION TO STAY</u>**

Michael J. Abernathy
mabernathy@bellboyd.com
Sanjay K. Murthy
smurthy@bellboyd.com
Brian J. Arnold
barnold@bellboyd.com
Marron A. Mahoney
mmahoney@bellboyd.com
BELL, BOYD & LLOYD LLP
70 West Madison Street, Suite 3100
Chicago, Illinois 60602
Telephone: (312) 372-1121
Facsimile: (312) 827-8000

TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ........................................................................1

II.   STATEMENT OF FACTS ..............................................................................2

      A.    The Oakland Litigation ........................................................................2

      B.    Fresenius' Knowledge Of The Patents In This Case And Unexcused Delay
            In Filing Reexaminations ......................................................................4

III.  ARGUMENT ...................................................................................................4

      A.    The Patent Reexaminations Do Not Warrant A Stay ................................5

            1.    Two Courts Have Already Rejected Fresenius' Arguments To Stay
                  Based On The Reexaminations Of The Patents In The Oakland
                  Litigation ...................................................................................5

            2.    The Reexaminations Of The Patents In The Oakland Litigation Are
                  Still Years Away From Completion .................................................6

            3.    Inter Partes Reexamination Will Not Streamline Issues And Is A
                  Procedural Failure .......................................................................7

            4.    The Delay In Resolution If These Reexaminations Will Prejudice
                  Baxter And Weighs Against Stay ...................................................8

            5.    Money Damages Will Not Compensate Baxter ................................9

            6.    The Reexaminations Will Not Simplify The Issues ........................10

                  a.    Fresenius' Invalidity And Inequitable Conduct Theories
                        Lack   Legal Support ..........................................................10

                  b.    This Court Can Adjudicate Fresenius' Inequitable Conduct
                        Arguments .......................................................................11

                  c.    The Ultimate Result Of The Reexaminations Is Speculative ........12

            7.    The PTO's Reexamination Decisions Will Not Burden Fresenius ...........12

      B.    The Pending Appeal Before The Federal Circuit Does Not Warrant A Stay ........13

            1.    Fresenius Failed To Show A Likelihood Of Success Of Invalidity
                  Due to Obviousness .....................................................................13

            2.    The Federal Circuit's Claims Construction Does Not Affect Two
                  Of The Patents-In-Suit ..................................................................14

C.    Alternatively, Limited Discovery Should Continue Despite A Stay ....................15

IV. CONCLUSION..................................................................................................................15

TABLE OF AUTHORITIES

Page(s)

<u>CASES</u>

*Akzo N.V. v. U.S. Int'l Trade Comm'n*
808 F.2d 1471 (Fed. Cir. 1986) ........................................................................................ 11

*Alltech, Inc. v. Cenzone Tech, Inc.*
2007 WL 935516 (S.D. Cal. Mar. 21, 2007) .......................................................................... 8

*Al-Site Corp. v. VSI Int'l, Inc.*
174 F.3d 1308, (Fed. Cir. 1999) ....................................................................................... 10

*Blackhawk Molding Co. v. Portola Packaging, Inc.*
422 F. Supp. 2d 948 (N.D. Ill. 2006) ................................................................................. 11

*CFMT, Inc. v. YeildUp Int'l Corp.*
349 F.3d 1333 (Fed. Cir. 2003) ....................................................................................... 11

*Cooper Techs. Co. v. Thomas & Betts Corp.*
2008 U.S. Dist. LEXIS 25938 (E.D. Tex. Mar. 31, 2008) ................................................. 9, 12

*Ethicon, Inc. v. Quigg*
849 F.2d 1422 (Fed. Cir. 1989) ....................................................................................... 13

*Freeman v. Minn. Mining & Mfg. Co.*
661 F. Supp. 886 (D. Del. 1987)....................................................................................... 12

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l Inc.*
2005 WL 3970076 (N.D. Cal. Sept. 6, 2005) ....................................................................... 2

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l Inc.*
2006 U.S. Dist. LEXIS 29985 (N.D. Cal. May 16, 2006) ...................................................... 15

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l Inc.*
2007 U.S. Dist. LEXIS 44107 (N.D. Cal. June 6, 2007)...................................................... 3, 6

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l Inc.*
2007 WL 518804 (N.D. Cal. Feb. 13, 2007)......................................................................... 3

*Fresenius USA, Inc. v. Baxter Int'l Inc.*
No. 2008-1306 (Fed. Cir. June 2, 2008) ............................................................................. 4

*In re Am. Acad. of Sci. Tech Ctr.*
367 F.3d 1359 (Fed. Cir. 2004) ......................................................................................... 7

*In re Freeman*
30 F.3d 1459 (Fed. Cir. 1994) ......................................................................................... 13

*Kearns v. General Motors Corp.*
  94 F.3d 1553 (Fed. Cir. 1996) ........................................................................ 7

*Landis v. Am. Water Works & Elec. Co.*
  299 U.S. 248 (1936)....................................................................................... 5

*Mentor H/S, Inc. v. Med. Device Alliance, Inc.*
  244 F.3d 1365 (Fed. Cir. 2001) .................................................................... 11

*Monsanto Co. v. Parr*
  2007 U.S. Dist. LEXIS 70700 (N.D. Ind. Sept. 21, 2007) ........................... 5

*NTP, Inc. v. Research in Motion, Inc.*
  397 F. Supp. 2d 785 (E.D. Vir. 2005)............................................................ 7

*Proctor & Gamble Co. v. Kraft Foods Global, Inc.*
  No. 08-0930 (Aug. 15, 2008)....................................................................... 15

*Semiconductor Energy Lab. v. Chi Mei Otpoelectronics Corp.*
  531 F. Supp. 2d 1084 (N.D. Cal. 2007)....................................................... 11

*Soverain Software L.L.C. v. Amazon.com, Inc.*
  356 F. Supp. 2d 660 (E.D. Tex. 2005).......................................................... 5

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*
  2008 U.S. App. LEXIS 18160 (Fed. Cir. Aug. 25, 2008) ........................... 10

*Stormedia Texas, L.L.C. v. CompUSA, Inc.*
  2008 U.S. Dist. LEXIS 55690 (E.D. Tex. July 23, 2008) ............................ 9

*Telemac Corp. v. Teledigital, Inc.*
  450 F. Supp. 2d 1107 (N.D. Cal. 2006) ........................................................ 7

*Viskase Corp. v. Am. Nat'l Can Co.*
  261 F.3d 1316 (Fed. Cir. 2001) ..................................................................... 5

*Visto Corp. v. Research in Motion Ltd.*
  2007 U.S. Dist. LEXIS 76134 (E.D. Tex. Sept. 28, 2007).................... 12, 14

*Voith Paper GmbH & Co.KG v. Johnsonfoils, Inc.*
  2008 U.S. Dist. LEXIS 28983 (D. Del. Mar. 31, 2008) ............................... 5

Baxter International, Inc. and Baxter Healthcare Corporation (collectively, "Baxter"), respectfully submit this Opposition to the Motion to Stay filed by Fresenius Medical Care Holdings, Inc. and Fresenius USA, Inc. (collectively, "Fresenius").

## I.    PRELIMINARY STATEMENT

Fresenius, an adjudicated infringer of three Baxter patents, once again seeks to have a court "stay" an infringement case, so that it can continue to ignore Baxter's patent rights by selling its 2008K hemodialysis machine.  In making its most recent stay request, Fresenius recycles all of the same arguments that were considered *and rejected* by both a United States District Court less than one year ago and the United States Court of Appeals for the Federal Circuit less than two months ago.  Not surprisingly, Fresenius offers no reasons this Court should reach a different conclusion in deciding the exact same issues that have been fully briefed and argued by the parties now multiple times.

The only "new" arguments Fresenius presents in its stay request are even less persuasive than its recycled ones.  For example, Fresenius trumpets (1) the *inter partes* reexamination requests that it has filed against the patents-in-suit; and (2) the fact that Fresenius has alleged Baxter's attorneys committed inequitable conduct.  The PTO, however, has not even granted Fresenius' reexamination requests, making this stay motion entirely premature.  Nevertheless, while Fresenius touts the *inter partes* reexamination process as a way to "streamline" this litigation, it conveniently ignores that as of April 2008, *not one inter partes reexamination had been completed* through appeal since that process was created almost ten years ago.  Thus, rather than simplify issues, the *inter partes* reexamination process will delay this case indefinitely. Moreover, Fresenius' arguments that Baxter will not be prejudiced by a stay ignore the history of this litigation.  Indeed, Fresenius does not even bother to address either: (1) that a District Court

already issued an injunction finding that Fresenius' infringement is causing Baxter irreparable harm; or (2) that the Federal Circuit rejected Fresenius' attempt to "stay" that injunction.

Fresenius' claims that a stay will "save resources" or that this case is in its "early stages" are equally meritless. The parties spent the last *five years* litigating an action involving the same accused product and patents on similar technology. In connection with that litigation, the parties exchanged almost six hundred thousand pages of documents and took over sixty depositions, including all of the key inventors and other important witnesses necessary for this case. As Baxter represented to this Court at the August 18th hearing, it needs minimal discovery from Fresenius to proceed on its claims. Whatever discovery Fresenius asserts it needs pales in comparison to the discovery that has already been completed from the first case, which can easily be transferred over.

Finally, inequitable conduct is alleged in almost every patent case these days and hardly provides a compelling reason to "stay" this case indefinitely. This is especially true when, as explained below, Fresenius' inequitable conduct theory is legally flawed.

## II.　STATEMENT OF FACTS

### A.　The Oakland Litigation

In April 2003, the very day the parties were supposed to have a meeting to resolve their dispute over patents Baxter owned related to hemodialysis technology, Fresenius filed a declaratory judgment action in the Northern District of California ("Oakland Litigation"). (Cmplt. ¶ 4; Am. Answer 6.) In September 2005, Judge Sandra B. Armstrong granted Baxter's motion for summary judgment that Fresenius infringed two of the patents-in-suit.[1] Only after that adverse decision, and two years after it had started the Oakland Litigation, did Fresenius file its requests for *ex parte* reexamination of those two patents—citing prior art it knew about for

---

[1] *See Fresenius Med. Care Holdings, Inc. v. Baxter Int'l Inc.*, 2005 U.S. Dist. LEXIS 41837 (N.D. Cal. Sept. 2, 2005).

years.  *See Fresenius Med. Care Holdings, Inc. v. Baxter Int'l Inc.*, 2007 U.S. Dist. LEXIS 44107, at *6 (N.D. Cal. June 6, 2007).

After those reexamination requests were filed, the parties engaged in protracted and lengthy discovery in the Oakland Litigation, including taking an additional thirty-three depositions, producing thousands of pages of discovery, and exchanging seventeen expert reports.  Believing it would prevail in court, Fresenius went to trial—once again never mentioning the reexaminations before the PTO.  But Fresenius lost; the patents were found valid and enforceable.[2]

After Fresenius' failed validity challenge, it sought to "stay" the damages trial.  In making that request, Fresenius offered the following arguments which are virtually identical to those it makes now:  (1) that the patents in the Oakland Litigation were under reexamination and some had been "reject[ed]"; (2) that "Baxter no longer sells any of its own hemodialysis machines" and, as a result, money damages were sufficient compensation; and (3) that Fresenius had a "statistical likelihood" of prevailing on its appeal to the Federal Circuit.  (*See* Fresenius' Motion to Stay a Second Damages Trial, Ex. 1 at 7-8, 11.)  In a carefully reasoned opinion, Judge Armstrong rejected all of these arguments and denied Fresenius' request for a stay.  Notably, the court found that Fresenius' "dilatory motives could not be more apparent" and that its tactics constituted "the most blatant abuse of the reexamination process."  *Fresenius Med. Care Holdings,* 2007 U.S. Dist. LEXIS 44107, at *19-20.

In November 2007, following the damages trial in the Oakland Litigation, Baxter moved for a permanent injunction.  In opposing Baxter's motion, Fresenius, once again, made the same arguments in its motion here, namely:  (1) two patents in the first case had been "final[ly] reject[ed];" (2) Baxter was "not a direct competitor of Fresenius"; and (3) money damages were

---

[2]   *See Fresenius Med. Care Holdings, Inc. v. Baxter Int'l Inc.*, 2007 U.S. Dist. LEXIS 14528 (N.D. Cal. Feb. 12, 2007).

enough to compensate Baxter.  (*See* Fresenius' Opposition to Baxter's Motion for Entry of Permanent Injunction, Ex. 2 at 16, 20, 24.)  On April 4, 2008, Judge Armstrong granted Baxter's Motion for Entry of a Permanent Injunction, expressly rejecting all of Fresenius' arguments.

That same month, Fresenius appealed the Final Judgment in the Oakland Litigation to the Federal Circuit.  Fresenius also moved to stay the permanent injunction pending the Federal Circuit's decision, again proffering the exact same arguments:  (1) it would succeed on its appeal to show Baxter's patents were invalid; (2) Judge Armstrong's injunction order was in error because money damages were enough to compensate Baxter; and (3) Baxter was not a real competitor.   (*See* Fresenius' Motion to Stay Injunction Order Pending Appeal, Ex. 3 at 12-15.) The Federal Circuit denied Fresenius' request for a stay finding Fresenius had failed to show (1) a likelihood of success on the merits, and (2) that the balance of harms weighed in its favor. *Fresenius USA, Inc. v. Baxter Int'l Inc.*, No. 2008-1306, at 2 (Fed. Cir. June 2, 2008) (Ex. 4).

> **B.      Fresenius' Knowledge Of The Patents In This Case And Unexcused Delay In Filing Reexaminations**

Fresenius concedes that Baxter notified it of the patent applications that are at issue here years ago.  (*See* Cmplt. ¶ 11; Am. Answer 11).  In fact, Fresenius was fully aware of the patent applications at every stage and even cited portions of their prosecution history in the Oakland Litigation.  (*Id.; see also* Fresenius' Opposition to Baxter's Renewed Motion in Limine to Exclude Evidence of the '240 Application, Ex. 5 at 5 n.2.)  The patents-in-suit all issued between September 4, 2007 and April 1, 2008.  Fresenius did not request reexaminations of those patents when they issued.  Instead, after this lawsuit was filed, in July 2008, Fresenius finally requested *inter partes* reexaminations.  As of today, the PTO has not even granted any of Fresenius' reexamination requests, and thus none of reexamination proceedings has commenced.

## III.    ARGUMENT

As the party moving for a stay, Fresenius "must make out a clear case of hardship or

inequity in being required to go forward, if there is even a fair possibility that the stay for which [it] prays will work damages to someone else." *Landis v. Am. Water Works & Elec. Co.*, 299 U.S. 248, 255 (1936), *cited by Voith Paper GmbH & Co.KG v. Johnsonfoils, Inc.*, 2008 U.S. Dist. LEXIS 28983, at *4 (D. Del. Mar. 31, 2008).  Here, Judge Armstrong has already found that Fresenius' infringement is causing Baxter irreparable harm, confirming that the prejudice to Baxter far outweighs any harm to Fresenius in continuing this litigation.  Thus, Fresenius cannot make the requisite showing of "hardship or inequity" to justify a stay.

### A.     The Patent Reexaminations Do Not Warrant A Stay

The Federal Circuit has held that "[t]he court is not required to stay judicial resolution in view of the reexaminations." *Viskase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316, 1328 (Fed. Cir. 2001).  District courts have similarly refused adopt a *per se* rule that patent cases should be stayed because such a rule "would invite parties to unilaterally derail" litigation.  *Soverain Software L.L.C. v. Amazon.com, Inc.*, 356 F. Supp. 2d 660, 662 (E.D. Tex. 2005).

In assessing the propriety of a stay, courts traditionally consider "(i) whether a stay will unduly prejudice or tactically disadvantage the non-moving party; (ii) whether a stay will simplify the issues in question and streamline the trial, and (iii) whether a stay will reduce the burden of litigation on the parties and on the court."  *Monsanto Co. v. Parr*, 2007 U.S. Dist. LEXIS 70700, at *8 (N.D. Ind. Sept. 21, 2007).  Here, each of these factors overwhelmingly weighs in favor of denying Fresenius' motion.

### 1.     Two Courts Have Already Rejected Fresenius' Arguments To Stay Based On The Reexaminations Of The Patents In The Oakland Litigation

Just last year, after an adjudication that it was infringing Baxter's valid and enforceable patents, Fresenius attempted to "stay" the damages trial in the Oakland Litigation by presenting identical arguments to those it offers now.  Fresenius asserted that "the '131 and '434

reexaminations [were] already well advanced" and "any delay likely would not be lengthy." (Ex. 1 at 7-8.) "Monetary damages," according to Fresenius, were "sufficient to protect Baxter from suffering any undue prejudice or tactical disadvantage." (*Id.* at 9.)

Judge Armstrong, however, rejected all of those contentions. Recognizing that "the reexamination process may be lengthy, often taking years to run its course, and in the meantime Fresenius will be free to market and sell its purportedly infringing technology unfettered," the court determined that "[i]t is unquestionable that Baxter would be prejudiced by a stay." *Fresenius Med. Care Holdings,* 2007 U.S. Dist. LEXIS 44107, at *18 (N.D. Cal. 2007). The Oakland Litigation proceeded, resulting in a permanent injunction against Fresenius' 2008K machine.

Fresenius' arguments fared no better before the Federal Circuit. In moving for a stay, Fresenius contended that "the PTO is . . . likely to confirm that the asserted claims are invalid" and that its "[a]ppeal [i]s [l]ikely [t]o [s]ucceed." (Ex. 3 at 12, 13.) Fresenius, again, claimed that Baxter is "not a 'head-to-head' competitor" and that it, not Baxter, "will suffer significant harm if the injunction is not stayed." (*Id.* at 14, 16.) The Federal Circuit rejected Fresenius' "stay" request finding that Fresenius demonstrated neither a likelihood of success on the merits nor "that the harm factors weigh strongly in its favor." (Ex. 4 at 2.) Fresenius does not, and indeed cannot, offer any reasons why this Court's consideration of these issues should be any different from Judge Armstrong's or the Federal Circuit's. If anything, those prior decisions from two separate courts demonstrate exactly why this Court should deny Fresenius' motion.

> **2.    The Reexaminations Of The Patents In The Oakland Litigation Are Still Years Away From Completion**

Contrary to Fresenius' assertion that the reexaminations of the patents from the Oakland Litigation are "well underway" and "likely to be completed soon" (Mem. 14), little has changed since Judge Armstrong denied its motion for stay in June 2007 and the Federal Circuit rejected

these same arguments a few months ago.  In fact, PTO reexamination of the patents from the Oakland Litigation will take at least another two or three more years to complete.  *See Telemac Corp. v. Teledigital, Inc.*, 450 F. Supp. 2d 1107, 1110 (N.D. Cal. 2006).  Any appellate proceeding to the Federal Circuit would further extend the process, adding at least another eighteen months.  *See id.* at 1110.  Based on "reality and past experience," the district court in *NTP, Inc. v. Research in Motion, Inc.*, 397 F. Supp. 2d 785 (E.D. Vir. 2005), accurately described how time consuming this process can be:

> Even in the unlikely event that all final office actions were taken in the next few months, NTP, if not satisfied, could appeal the PTO's findings. Reality and past experience dictate that ***several years might very well pass*** from the time when a final office action is issued by the PTO to when the claims are finally and officially "confirmed" after appeals.  *See, e.g., In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359 (Fed. Cir. 2004).

*Id.* at 788 (emphasis added).  Consequently, the same arguments that failed to warrant a stay in June 2007 and April 2008 likewise fail to support a stay now.[3]

### 3.    *Inter Partes* **Reexamination Will Not Streamline Issues And Is A Procedural Failure**

Fresenius heavily relies on the *inter partes* reexaminations of the patents-in-suit to bolster its arguments for a stay.  At the August 18th Hearing, this Court expressed skepticism about the PTO's ability to timely carry out the reexamination process.  (*See* Mem. 5 n.5).  As it turns out, this Court was right to question the PTO's ability to act on Fresenius' requests in a timely fashion.  In April 2008, the Institute for Progress completed a study exposing the inefficiencies plaguing *inter partes* reexamination.  *See* Institute for Progress, Reexamining *Inter partes*

---

[3]    In any event, the outcome of the reexaminations of the patents from the Oakland Litigation cannot impact the validity of the patents-in-suit here because the Federal Circuit has explicitly recognized that "[b]y statutory and common law, each patent establishes ***an independent and distinct property right***."  *Kearns v. General Motors Corp.*, 94 F.3d 1553, 1555 (Fed. Cir. 1996) (emphasis added).  Thus, Fresenius cannot argue that any determination on the patents from the Oakland Litigation could be used for *res judicata* against the patents-in-suit.

Reexam (2008) (Ex. 6).   According to the study, as of April 2008, **not one** *inter partes* reexamination decision has proceeded through appeal to the end of the process since this process was created almost **ten years ago**.  (*Id.* at 1).

The minimum time frame for any reexamination is at least two years.  Yet when the patentee actually defends its rights, like Baxter will here, the "average pendency for an un-appealed *inter partes* reexam is more than 3.5 years."   (*Id.* at 5.)   Assuming that a reexamination did reach a final resolution, "the average pendency for appealed cases ( . . . assuming no rework) is between 5 and 8 years (60-97 months)!"  *Id.* at 5.  The study further warned that "these estimates may be highly conservative" because "the only three *inter* partes reexam cases that have received a BPAI [Board of Patent Appeals and Interferences] decision all require further "rework" and are subject to further appeal."  *Id.* at 5.

As Fresenius admits, "Baxter will participate in the [reexamination] proceedings." (Mem. 5.)  Thus, the reexamination process will likely last up to eight years.  Allowing a stay pending the *inter partes* reexamination would indefinitely delaying resolution of Baxter's infringement claims.  Such a delay would vitiate Judge Armstrong's finding that Fresenius' continued infringement is causing Baxter irreparable harm, and instead, would grant Fresenius, an adjudicated infringer of three patents, a "license to infringe."

### 4.     The Delay In Resolution Of These Reexaminations Would Prejudice Baxter And Weighs Against Stay

"When a party moves to stay litigation pending PTO reexamination, the non-moving party may be unduly prejudiced by the lapse of time during reexamination, which could result in loss of evidence and the fading of witness memory."  *Alltech, Inc. v. Cenzone Tech, Inc*., 2007 U.S. Dist. LEXIS 19989, at *8 (S.D. Cal. Mar. 21, 2007) (citations omitted).   Thus, courts

routinely decline to stay litigations when faced with the threat of such a delay.[4]  Fresenius cannot

dispute that the *inter partes* reexaminations could cause an eight-year delay, significantly

prejudicing Baxter.

### 5.     Money Damages Will Not Compensate Baxter

As discussed above, Fresenius' argument that money damages will fully compensate

Baxter for any injury has already ***failed twice*** before both Judge Armstrong and the Federal

Circuit.  In fact, despite Fresenius' current characterization of Baxter as "no longer [a] head-to-

head competitor[]" (Mem. 11), in April 2008, Judge Armstrong reached the opposite conclusion

in granting Baxter's Motion for Entry of a Permanent Injunction:  "In this case, Baxter and

Fresenius are head-to-head competitors in the same market."  (Ex. 8 at 4.)  According to the

court, "[a]llowing Fresenius to continue to infringe would irreparably harm Baxter's reputation

and goodwill as an innovator, threaten Baxter's extensive investments in research and

development, and potentially encourage other companies to infringe Baxter's intellectual

property."  (*Id.* at 4.)  These harms, Judge Armstrong determined, "are all forms of irreparable

injury that cannot be easily and readily quantified through a simple monetary award."  (*Id.* at 5.)

When Fresenius renewed this argument to the Federal Circuit to support its Motion to Stay the

Injunction Order Pending Appeal and for Expedited Appeal (Ex. 3 at 14-15), a three judge panel

found that "Fresenius has not demonstrated in the motion papers that the harm factors weigh

strongly in its favor."  (Ex. 4 at 2.)[5]

---

[4]     *See Stormedia Texas, L.L.C. v. CompUSA, Inc.*, 2008 U.S. Dist. LEXIS 55690, at *6 (E.D. Tex. July 23, 2008) ("[T]he potential delay for an indefinite period would likely prejudice [patentee]. . . . This factor weighs against a stay . . . ."); *Cooper Techs. Co. v. Thomas & Betts Corp.*, 2008 U.S. Dist. LEXIS 25938, at *3-4 (E.D. Tex. Mar. 31, 2008) (same).

[5]     Moreover, the patents are scheduled to expire in 2011.  An eight-year stay will deprive Baxter of any opportunity to enforce its patent rights.  *See Cooper Techs Co. v. Thomas & Betts Corp.*, 2008 U.S. Dist. LEXIS 25938, at *3-4 (Mar. 31, 2008) ([T]he potential delay for an indefinite period would likely prejudice [patentee].  This factor weighs against a stay of the [infringement] proceedings.") (citations omitted).

6.    **The Reexaminations Would Not Simplify The Issues**

a.    **Fresenius' Invalidity And Inequitable Conduct Theories Lack Legal Support**

Fresenius also argues that its "requests for reexamination are strong on the merits" because "Baxter purposefully made selective disclosures to the PTO in an attempt to mislead the patent examiner." (Mem. 10.) According to Fresenius, "[w]hen the PTO finally realizes in the reexamination how it was previously misled by Baxter, it will almost certainly reject the '730 patent." (*Id.*) Fresenius premises these invalidity and inequitable conduct arguments on the alleged withholding of certain pages of a CMS 08 Handbook. As Fresenius reluctantly admits, however, Baxter submitted the ***entire*** CMS 08 Handbook to the examiner.[6] (*Id.* at 10 n.9.) Consequently, its invalidity and inequitable conduct arguments ignore Federal Circuit precedent and are legally untenable.

First, the Federal Circuit has emphasized that the "burden [of proving invalidity] is especially difficult when the prior art was before the PTO examiner during prosecution of the application." *Al-Site Corp. v. VSI Int'l, Inc.*, 174 F.3d 1308, 1323 (Fed. Cir. 1999) (citation omitted). Second, such prior art cannot establish Baxter's inequitable conduct. To render Baxter's patents unenforceable due to inequitable conduct, Fresenius "must prove by clear and convincing evidence" that Baxter "(1) made an affirmative misrepresentation of a material fact, failed to disclose material information, or submitted of false material information, and (2) intended to deceive the PTO." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 2008 U.S. App. LEXIS 18160, at *16, 19 (Fed. Cir. Aug. 25, 2008). Fresenius offers no legal authority for its argument that a prior art reference submitted to the examiner is grounds for an inequitable

---

[6]    Fresenius is forced to make this baseless inequitable conduct charge because it has no invalidity defense. Baxter submitted all of Fresenius' arguments in the Oakland Litigation regarding the teachings of the prior art, all of its expert reports, and invalidity contentions to the PTO. As the Court can see from the face of the patents-in-suit, all of that information was considered by the Examiner before the patents were issued.

conduct determination.  In fact, the Federal Circuit has repeatedly held otherwise.  In *Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1482 (Fed. Cir. 1986), for example, the court determined that an inventor had not committed inequitable conduct when the examiner had the relevant references "before him throughout the examination process." *Id.*; *see also Blackhawk Molding Co. v. Portola Packaging, Inc.*, 422 F. Supp. 2d 948, 964 (N.D. Ill. 2006) (same).

Fresenius' suggestion that Baxter's arguments to the examiner constitute inequitable conduct are equally unfounded.  Indeed, under well-established Federal Circuit precedent, an applicant's "attempt[s] to distinguish the [invention] from the prior art does not constitute a material omission or representation."  *See, e.g., Akzo*, 808 F.2d at 1482; *see also Blackhawk Molding*, 422 F. Supp. 2d 948; *Semiconductor Energy Lab. v. Chi Mei Otpoelectronics Corp.*, 531 F. Supp. 2d 1084, 1099 (N.D. Cal. 2007) ("[A]ssertion that [patentee] somehow duped the examiner into misinterpreting [the prior art] when the examiner was able to perform his or her own independent analysis of the reference cannot support an inequitable conduct defense.").[7] As a result, not only does its inequitable conduct argument lack any legal foundation, Fresenius has cited no authority that an inequitable conduct charge is grounds for stay.

### b.    This Court Can Adjudicate Fresenius' Inequitable Conduct Arguments

This Court also is completely qualified to make an inequitable conduct determination: "Inequitable conduct is an equitable issue committed to the discretion of the district court." *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1377 (Fed. Cir. 2001). Consequently, "[w]ith or without the PTO's assistance, the Court will be able to rule on the issue

---

[7]    *See also CFMT, Inc. v. YeildUp Int'l Corp.*, 349 F.3d 1333, 1342 (Fed. Cir. 2003) (because "[a]n applicant cannot prove unexpected results [*i.e.* non-obviousness] with attorney argument and bare statement without objective evidentiary support," such arguments are not "highly material to the examiner's actions"); *Blackhawk Molding*, 422 F. Supp. 2d at 963 (accused statements of patentee's counsel "appear[ed] to be nothing more than attorney argument," thus defendant failed to establish the requisite materiality).

that could be decided by the PTO reexamination process." *Freeman v. Minn. Mining & Mfg. Co.*, 661 F. Supp. 886, 888 (D. Del. 1987). A stay pending the PTO's reexamination, therefore, is unnecessary to simplify the issues here. *Id.*

c.        <strong>The Ultimate Result Of The Reexaminations Is Speculative</strong>

Fresenius further argues that the reexaminations may result in cancellation of or amendment to some or all of the patents' claims. Courts, however, have rejected this reasoning. *See Visto Corp. v. Research in Motion Ltd.*, 2007 U.S. Dist. LEXIS 76134, at *4 (E.D. Tex. Sept. 28, 2007). Because "it is also likely that some of the patent's claims will survive reexamination," courts have acknowledged that "waiting for the completion of the reexamination proceedings may only simplify the case to a limited degree." *Cooper Techs. Co. v. Thomas & Betts Corp.,* 2008 U.S. Dist. LEXIS 25938, at *4; *Visto Corp.*, 2007 U.S. Dist. LEXIS 76134, at *4.

Moreover, Fresenius' argument that "there is at least an 89% chance that the PTO will find some or all of the claims . . . invalid" (Mem. 6) is totally misleading. The study Fresenius cites for this "fact" includes numerous reexaminations ***where the patentee failed to participate*** in the process at all. In fact, the patentee failed to either respond to the PTO or file an appeal in 20 of the 26 *inter partes* reexaminations Fresenius' relies upon for this statistic. (*See* Ex. 7.) Consequently, "this factor is speculative and does not support a stay." *Cooper Techs.*, 2008 U.S. Dist. LEXIS 25938, at *4; *see also Visto Corp.,* 2007 U.S. Dist. LEXIS 76134, at *4.

7.        <strong>The PTO's Reexamination Decisions Will Not Burden Fresenius</strong>

Fresenius also highlights the potential expense of litigating Baxter's infringement claims concurrently with the PTO's reexaminations of the Oakland Litigation patents and the patents-in-suit. As previously discussed, any expense of this case pales in comparison to the resources already expended over the last five years. Nonetheless, the Federal Circuit has affirmed the propriety of simultaneous litigation and PTO reexamination, noting that challenging validity in a

12

court and requesting PTO reexamination "are concepts not in conflict." *See Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1429 (Fed. Cir. 1989) (citation omitted). Indeed, because "the district court and the PTO can consider different evidence" and "take different approaches in determining invalidity," "different results between the two forums may be entirely reasonable." *Id.* at 1428-29.

Nor will the result of the reexaminations require this Court to re-litigate Baxter's infringement claims. Fresenius asserts—without citing any legal authority—that "there is a very high likelihood that the Patents in Suit would have to be re-litigated absent a stay." (Mem. 11.) To the contrary, it is virtually guaranteed that this litigation will conclude years ***before*** the reexamination proceedings. [8] Based on the procedural delays plaguing the *inter partes* reexamination process, proceeding with Baxter's claims in this forum will achieve a final resolution with greater expediency and far less expense. Indeed, as explained above, because the parties have already spent five years in litigation involving the same accused product and patents from the same family, the discovery needed here is far less than a typical patent case.

**B.　　The Pending Appeal Before The Federal Circuit Does Not Warrant A Stay**

Like the patent reexaminations, the pending appeal of the Oakland Litigation before the Federal Circuit similarly does not warrant a stay.

**1.　　Fresenius Failed To Show A Likelihood Of Success Of Invalidity Due To Obviousness**

Fresenius already presented its obviousness arguments to the Federal Circuit when it requested a stay of Judge Armstrong's permanent injunction. And the Federal Circuit unequivocally questioned the viability of this theory: "Without prejudicing the ultimate

---

[8]　　The doctrines of *res judicata* and *collateral estoppel* would bar further litigation on these same issues. *See In re Freeman*, 30 F.3d 1459 (Fed. Cir. 1994) (collateral estoppel prevented patentee from arguing a claim construction during reexamination after having full opportunity to litigate identical issue before the district court).

disposition of this case by the merits panel, we determine that Fresenius has not met its burden of showing the requisite likelihood of success on appeal." (Ex. 4 at 2.) Ignoring that decision, Fresenius now proclaims that the "Federal Circuit's opinion will also likely establish that many of the elements claimed in the patents-in-suit were well known, standard features of prior hemodialysis machines." (Mem. 13.) Not surprisingly, Fresenius fails to explain why the Federal Circuit—after reaching the opposite conclusion only months ago—now is "likely" to completely accept its obviousness argument. Thus, Fresenius' assertion that the Federal Circuit's opinion "will eliminate the need to establish those facts in this case and will narrow the issues before this Court" (Mem. 13) is pure speculation, refuted by the appellate record, and does not support a stay. *See Visto Corp.*, 2007 U.S. Dist. LEXIS 76134, at *4 (where factor "is speculative . . . . it does not support a stay")[9].

> **2.      The Federal Circuit's Claims Construction Would Not Affect Two Of The Patents-In-Suit**

Fresenius further contends that the Federal Circuit's construction of the claim term "time variable profile," "is expected to be directly relevant to the claim construction in this case." (Mem. 13.) As Fresenius admits, however, that term only appears in two of the patents-in-suit: the '340 and '892 Patents. (Mem. 12-13.) Thus, any claim construction by the Federal Circuit would have only limited relevance and does not warrant completely staying the entire litigation.[10]

---

[9]     Fresenius additionally admits that "[t]he appeal is fully briefed now and will likely soon be decided." (Mem. 14.) The parties expect a decision by the Federal Circuit by early 2009. Fact discovery in this case, however, is scheduled to last at least nine months. In the unlikely event the Federal Circuit decision does have any relevance here, the parties will have sufficient time to adjust trial strategies accordingly with little cost or delay.

[10]     In any event, Fresenius' new arguments on the "time variable profile" limitation actually contradict its own previous admissions. Indeed, recognizing that Fresenius was taking inconsistent positions, Judge Armstrong rejected its argument: "Fresenius' cannot contend that the 'time-variable profile' limitation must be construed one way to avoid infringement and then argue for another construction of the claim limitation to invalidate the patent."

**C.    Alternatively, Limited Discovery Should Continue Despite A Stay**

As discussed, staying this litigation pending the resolution of any reexaminations could take up to eight years and would unavoidably prejudice Baxter.  Should the Court decide that a stay is appropriate under these circumstances, however, Baxter proposes that it follow the approach taken in *Proctor & Gamble Co. v. Kraft Foods Global, Inc.*, No. 08-0930 (N.D. Cal. Aug. 15, 2008) (Ex. 9), where the court ordered "limited deposition discovery . . . to mitigate the potentially prejudicial effects of a stay." *Id.* at 2.  Here, similar deposition discovery would be appropriate.

**IV. CONCLUSION**

For the foregoing reasons, Fresenius' motion to stay this case indefinitely should be denied.

Dated: September 4, 2008                    Respectfully submitted,


                                            By:  _s/Sanjay K. Murthy_____
                                                 Michael J. Abernathy
                                                 mabernathy@bellboyd.com
                                                 Sanjay K. Murthy
                                                 smurthy@bellboyd.com
                                                 Brian J. Arnold
                                                 barnold@bellboyd.com
                                                 Marron A. Mahoney
                                                 mmahoney@bellboyd.com
                                                 BELL, BOYD & LLOYD LLP
                                                 70 West Madison Street, Suite 3100
                                                 Chicago, Illinois  60602
                                                 Telephone: (312) 372-1121
                                                 Facsimile: (312) 827-8000

                                                 ATTORNEYS FOR PLAINTIFFS

---

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l Inc.*, 2006 U.S. Dist. LEXIS 29985, at *60-61 (N.D. Cal. May 16, 2006). Thus, a modification to Judge Armstrong's claim construction is unlikely.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on September 4, 2008 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Fed. R. Civ. P. 5(b)(3). Any other counsel of record will be served by electronic mail, facsimile and/or overnight delivery.

Dated: September 4, 2008

Respectfully submitted,

By: */s Sanjay K. Murthy*

# EXHIBIT 1

1  Juanita R. Brooks, SBN 75934, brooks@fr.com
   Todd G. Miller, SBN 163200, miller@fr.com
2  Fish & Richardson P.C.
   12390 El Camino Real
3  San Diego, CA 92130
   Telephone:  (858) 678-5070
4  Facsimile:   (858) 678-5099

5  Mathias W. Samuel, pro hac vice, samuel@fr.com
   Michael E. Florey, pro hac vice, florey@fr.com
6  Thomas S. McClenahan, SBN 203204, mcclenahan@fr.com
   Michael J. Pape, pro hac vice, pape@fr.com
7  Fish & Richardson P.C.
   60 South Sixth Street, Suite 3300
8  Minneapolis, MN 55402
   Telephone:  (612) 335-5070
9  Facsimile:   (612) 288-9696

10 Attorneys for Plaintiffs/Counterclaim Defendants
   Fresenius Medical Care Holdings, Inc. and Fresenius USA, Inc.

11
   *Additional counsel listed on the signature page*
12

13                    UNITED STATES DISTRICT COURT

14                    NORTHERN DISTRICT OF CALIFORNIA

15                            OAKLAND DIVISION

16 FRESENIUS MEDICAL CARE HOLDINGS,        Case No. C 03-01431 SBA (EDL)
   INC., a New York corporation; and FRESENIUS
17 USA, INC., a Massachusetts corporation,   **FRESENIUS'S NOTICE OF MOTION
                                             AND MOTION TO STAY A SECOND
18              Plaintiffs and Counterdefendants,  DAMAGES TRIAL PENDING
                                             RESOLUTION OF LIABILITY ISSUES;
19         v.                                MEMORANDUM OF POINTS &
                                             AUTHORITY IN SUPPORT THEREOF**
20 BAXTER INTERNATIONAL, INC., a
   Delaware corporation; and BAXTER         Date:  June 5, 2007
21 HEALTHCARE CORPORATION, a                Time:  1:00 p.m.
   Delaware corporation,                    Place:  Courtroom 3, 3rd Floor
22                                          Judge:  Hon. Saundra Brown Armstrong
              Defendants and Counterclaimants.
23

24

25

26

27

28
                                    FRESENIUS'S NOTICE OF MOTION AND MOTION TO STAY A
                                    SECOND DAMAGES TRIAL PENDING RESOLUTION OF
                                    LIABILITY ISSUES; MEMORANDUM OF POINTS & AUTHORITY
                                    IN SUPPORT THEREOF
                                    Case No. C 03-01431 SBA (EDL)1

<b><u>NOTICE OF MOTION</u></b>

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

　　　　PLEASE TAKE NOTICE that on June 5, 2007 at 1:00 p.m., or as soon thereafter as the matter may be heard before United States District Court Judge Saundra Brown Armstrong, in Courtroom 3 of the United States Courthouse located at 1301 Clay Street, Oakland, California, Plaintiffs Fresenius Medical Care Holdings, Inc. and Fresenius USA, Inc. (collectively, "Fresenius") will move the Court for a stay of a second damages trial.

　　　　Fresenius requests that the Court stay a second damages trial until reexamination proceedings regarding U.S. Patent Nos. 6,248,131 ("the '131 patent"), 5,247,434 ("the '434 patent"), and 5,744,027 ("the '027 patent") have concluded, or until all liability issues have been resolved by the Federal Circuit. This motion is based on this Notice of Motion and Motion, the points and authorities set forth below, the accompanying declaration of Limin Zheng and exhibits thereto, any reply papers which may be filed, the pleadings filed in this matter, and the remainder of the Court's file in this matter.

<b><u>POINTS AND AUTHORITIES IN SUPPORT OF MOTION</u></b>

**I.　　SUMMARY OF ARGUMENT**

　　　　Given the current posture of this case and the recent determinations of the Reexamination Unit of the Patent Office that twelve of the fifteen claims being asserted by Baxter are obvious, conducting a damages trial now simply does not make sense. Since the jury rendered its verdict on June 30, 2006, finding each of the fifteen claims invalid and claims 5 and 7 of the '476 patent not infringed,[1] the Patent Office determined that each of the asserted claims of the '131 patent (claims 1-3 and 13-16) and the '434 patent (claims 26-31) are not patentable because they are obvious. The

---

[1] The jury also found claims 7 and 14-16 of the '027 patent invalid both as anticipated and obvious. Baxter did not challenge those findings in its post trial motions. Presumably, Baxter does not intend to challenge those findings on appeal.

1

Patent Office's analysis and conclusions are set forth in separate opinions attached as Exhibits A and B, respectively, to the Zheng Declaration filed with this motion. Both opinions are well-reasoned and provide multiple, independent grounds in support of the rejections. While Baxter is challenging the opinions, unless it persuades the Patent Office to change its mind or appeals the decision, these claims stand rejected and should not form the basis of a damages trial.

Fresenius also expects that it will appeal at least some of the Court's orders in this case to the Federal Circuit. Among the issues Fresenius intends to appeal are certain claim constructions—a notoriously treacherous area subject to frequent reversals and appellate alterations. While it is impossible to predict the exact outcome on appeal, given the large number of claims at issue, it is reasonable to assume that the Federal Circuit's review of this case will change the makeup of the case for at least some of the claims. Furthermore, the patent statute and case law make clear that liability issues are ripe for appeal even without a damages determination because definitively deciding invalidity and infringement would conserve judicial resources in assessing damages.

Thus, given the high likelihood that a damages trial based on the fifteen claims currently being asserted by Baxter will be moot in view of the reexaminations and the likely result of a Federal Circuit appeal, the most efficient use of the Court's and the parties' time and energy is to wait until the reexaminations and appeal are resolved before conducting a damages trial. If all of the asserted claims are found invalid and/or not infringed, no damages trial will be necessary at all. If some of the asserted claims remain, an abbreviated damages trial can be conducted at that time. For all of these reasons, Fresenius respectfully asks the Court to stay a second damages trial pending resolution of the liability issues.

## II.    BACKGROUND

### A.    The Status and Findings of the Reexaminations

On November 22, 2005, the Patent Office granted Fresenius's request for *ex parte* reexamination of the '131 patent. The Patent Office confirmed that a substantial new question of patentability was raised by the prior art cited by Fresenius in its request as to claims 1-25 of the

2

'131 patent in view of the "Sarns Manual, either alone or in combination with either Lichtenstein [U.S. Pat. No. 4,370,983] or the CMS 08 Handbook or Brochure."  (Zheng Decl., Ex. C.)  In response to the grant of reexamination, on February 10, 2006, Baxter filed a 32-page Patent Owner's Statement setting forth extensive arguments why the claims were valid over the cited prior art.  (Zheng Decl., Ex. D.)  Nonetheless, despite having fully considered the arguments made by Baxter, on November 16, 2006, the Patent Office issued a First Non-Final Office Action rejecting claims 1-25 as obvious.  (Zheng Decl., Ex. A.)  The Patent Office rejected each of the claims on multiple, independent grounds.  (*Id.*)

On November 22, 2005, the Patent Office also granted Fresenius's request for *ex parte* reexamination of the '434 patent.  The PTO confirmed that a substantial new question of patentability was raised by the prior art cited by Fresenius in its request as to claims 1-34 of the '434 patent, stating: "[a] reasonable examiner would consider Kerns [U.S. Pat. No. 4,756,706], Rubalcaba [U.S. Pat. No. 4,898,578], Lichtenstein, the Sarns Manual, and the CMS 08 Handbook/Brochure are important in making a decision of patentability of claims 1-34 of the Peterson ['434] patent."  (Zheng Decl., Ex. E  at 2.)  In this case, Baxter chose not to file a Patent Owner's Statement.  On December 22, 2006, the Patent Office issued a First Non-Final Office Action rejecting claims 12-19 and 26-34 as obvious.  (Zheng Decl., Ex. B.)  These rejections include all claims of the '434 patent asserted by Baxter at trial.  The Patent Office rejected each of the claims on multiple, independent grounds.  (*Id.*)

These determinations by the Patent Office's Central Reexamination Unit should be given substantial deference by the Court.  When it reorganized the reexamination process in July 2005, the Patent Office went to great lengths to ensure reexaminations were conducted by teams of its best examiners.  Patent Office Press Release #05-38, "USPTO Improves Process for Reviewing Patents" (July 29, 2005).[2]  These "20 highly skilled primary examiners who have a full understanding of reexamination practice and relevant case law [were assigned to] concentrate solely on

3

1  reexamination" in order to "enhance the quality and reduce the time of reexaminations" to less than

2  two years, on average. *Id.*

3      The Patent Office now also has before it Fresenius's request for *ex parte* reexamination of

4  claims 7, 10 and 11 of the '027 patent.[3]  (Zheng Decl., Ex. F.)  On April 17, 2007, Fresenius filed a

5  request for reexamination of independent claim 7 of the '027 patent and dependent claims 10 and

6  11, which depend from claim 7.  At trial, the jury found independent claim 7 anticipated by the

7  Seratron system and Baxter chose not to move for judgment as a matter of law or a new trial with

8  respect to that finding.  Dependent claim 11 merely adds the requirement that the device have a user

9  interface that comprises a touch screen.  Since numerous prior art references clearly show that this

10  claim is obvious, and since Baxter itself admitted at trial that its invention was more than "simply

11  slapping on a touch screen on a medical device"—thereby acknowledging the obviousness of claims

12  that, like claim 11, do *not* recite anything more than attaching a touch screen to a medical device—it

13  seems certain that the outcome of this reexamination will be a determination by the Patent Office

14  that claim 11 is also obvious.  (Zheng Decl., Ex. G at 156:1-4.)

15  **III.    ARGUMENT**

16      **A.    Legal Standards for Stays of Proceedings**

17      Courts have inherent authority to manage their dockets and stay proceedings when

18  appropriate, and a decision to grant a stay is within the sound discretion of the Court.  *Rohan ex rel.*

19  *Gates v. Woodford*, 334 F.3d 803, 817 (9th Cir. 2003); *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1426-

20  27 (Fed. Cir. 1988).

21

22

23

24

---

25  [2] Available at http://www.uspto.gov/web/offices/com/speeches/05-38.htm; also attached as Exhibit
    H to Zheng Decl.

26  [3] At trial, the jury delivered a verdict that claims 7, 14, 15 and 16 of the '027 patent were invalid
    as anticipated; Baxter did not challenge that finding.  Fresenius, therefore, filed its

27  reexamination request to focus on claim 11 – the only claim asserted by Baxter to have survived
    post-trial motions.

28

4

**B.      The Fact That Twelve of the Fifteen Asserted Claims Currently Stand Rejected By The Patent Office Strongly Supports A Stay Of Damages**

### 1.   Legal Standards for Stays Pending Reexamination

"Courts have inherent power to manage their dockets and stay proceedings, including the authority to order a stay pending conclusion of a PTO reexamination." *Ethicon*, 849 F.2d at 1426-27 (citations omitted).  The decision of whether to grant a stay pending reexamination of a patent is within the court's discretion.  *Viskase Corp. v. Am. Nat'l Can Co.*, 261 F.3d 1316, 1328 (Fed. Cir. 2001).  When considering a motion to stay pending reexamination, courts consider the following factors: "(1) whether discovery is complete and whether a trial date has been set; (2) whether a stay will simplify the issues in question and trial of the case; and (3) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party."  *See Nanometrics, Inc. v. Nova Measuring Instruments, Ltd.*, 2007 WL 627920, at *2 (N.D. Cal. Feb. 26, 2007) (Armstrong, J.) (citing *Telemac Corp. v. Teledigital, Inc.*, 450 F. Supp. 2d 1107, 1110 (N.D. Cal. 2006)) (granting stay).  "Essentially, courts determine whether the benefits of a stay outweigh the inherent costs based on these factors."  *EchoStar Tech. Corp. v. TiVo, Inc.*, 2006 WL 2501494, at *1 (E.D. Tex. Jul. 14, 2006).

This district has noted the "liberal policy in favor of granting motions to stay proceedings pending the outcome of USPTO reexamination or reissuance proceedings."  *ASCII Corp. v. STD Entertainment USA, Inc.*, 844 F. Supp. 1378, 1381 (N.D. Cal. 1994) (granting stay of proceedings pending reexamination or reissuance before the request for reexamination was filed with the PTO).  Less than two months ago, this Court itself granted a stay when the Patent Office granted a request to reexamine the patent-in-suit.  *See Nanometrics*, 2007 WL 627920, at *1.  This is in accordance with the general view:  "[i]ndeed, '[c]ourts have routinely stayed infringement actions pending the outcome of reexamination proceedings.'"  *Middleton, Inc. v. Minn. Mining and Mfg. Co.*, 2004 WL 1968669, at *3 (S.D. Iowa Aug. 24, 2004) (finding "there is no question that a district court in which an infringement action has been filed has the discretion to stay the infringement action pending the outcome of the reexamination proceeding") (citations omitted).  In particular, where, as

5

1   here, the Patent Office has already rejected twelve of the fifteen asserted claims, "the likelihood that

2   the PTO's reexamination and expertise would assist the Court in determining patent validity, *or*

3   *potentially eliminating the need to try the action . . . increase[s] significantly.*"  *Ricoh Co. v.*

4   *Aeroflex Inc.*, 2006 WL 3708069, at *4 (N.D. Cal. Dec. 14, 2006) (granting stay when Patent Office

5   issued initial office action rejecting claims) (emphasis added).

### 2. Trial on Infringement Issues Is Scheduled for October 2007; Granting a Stay Will Conserve Judicial Resources

7          A second trial on infringement of claims 5 and 7 of the '476 patent is currently scheduled for

8   October 2007.  While the parties have already expended a great deal of effort and resources in this

9   matter, including conducting a nine-day trial in June 2006, there is no reason for the parties to

10  conduct a damages trial now, when the jury's findings on damages will very likely be rendered

11  moot by subsequent events.  *See Ricoh*, 2006 WL 3708069, at *6 ("Undoubtably [sic] the parties

12  have spent considerable time and resources thus far—substantial discovery has been conducted and

13  the parties have submitted witness lists and lengthy summary judgment motions. Yet far more time

14  and resources remain to be spent before this matter is concluded.") (granting stay).

15         This district very recently cited studies revealing that during reexamination the Patent Office

16  "changes some claims in approximately 64% of the cases" and "cancels all claims in approximately

17  12% of the cases."  *Telemac*, 450 F. Supp. 2d at 1110.  Thus, three out of every four proceedings

18  result in changes to the reexamined patents, statistics that "suggest that in a typical case there is a

19  substantial probability a reexamination will have a major impact on the issues to be resolved in the

20  litigation."  *KLA-Tencor Corp. v. Nanometrics, Inc.*, 2006 WL 708661, at *4 (N.D. Cal. Mar. 16,

21  2006) (internal quotations omitted).  Here, given the high likelihood that either no claims or

22  substantively amended claims will reemerge from the Patent Office—especially since the Patent

23  Office has already rejected twelve of the fifteen asserted claims—this Court will be faced with

24  reassessing its decisions and orders in the damages issues yet to be decided.  As this district

25  recognized in *Ricoh*, proceeding to trial in these circumstances could result in "a tremendous waste

6

of the time and resources of all those involved." *Ricoh*, 2006 WL 3708069, at \*5.  Granting the stay

will ensure that the court consider the remaining issues only once, if at all.

### 3.  Granting a Stay Will Likely Simplify the Issues Remaining to be Tried

Should the Patent Office confirm that the asserted claims under reexamination are not

patentable, then there will not be any need for further damages proceedings.  In that event, "the

reexamination proceeding would control the infringement suit."  *Standard Havens Prods., Inc. v.*

*Gencor Indus., Inc.*, 1993 WL 172432, at \*1 (Fed. Cir. May 21, 1993) (internal quotations omitted).

As the Federal Circuit in *Standard Havens* held, the claims "would thereby immediately become

inoperative.  In addition, if a final decision of unpatentability means the patent was void *ab initio*,

then damages would also be precluded."  *Id*.  Such a result would plainly simplify the remaining

issues.

More to the point, however, is the duplication of effort that will be necessitated if any

asserted claims emerge from reexamination in an amended form.  If this occurs, then the

infringement and damage analyses may have to be done again, in light of the new claims.

> [35 U.S.C.] Sections 307 and 252 shield those who deem an adversely held patent
> to be invalid; if the patentee later cures the infirmity by reissue or reexamination,
> the making of substantive changes in the claims is treated as an irrebuttable
> presumption that the original claims were materially flawed.  Thus the statute
> relieves those who may have infringed the original claims from liability during the
> period before the claims are validated.

*Bloom Eng'g Co., Inc. v. North Am. Mfg. Co., Inc.*, 129 F.3d 1247, 1249 (Fed. Cir. 1997).

Therefore, further damages proceedings based on any currently asserted claim not identical to

whatever claim may or may not emerge from reexamination would be for naught.  This factor thus

favors a stay.

### 4.  A Stay Pending Reexamination Will Not Result In a Lengthy Delay or Tactical Disadvantage to Baxter

Under 35 U.S.C. § 305, reexaminations must be conducted with "special dispatch."  Here,

the '131 and '434 reexaminations are already well advanced, with first office actions rejecting the

asserted claims, and Baxter's responses filed last month.  The issues presented in the recently filed

'027 request for reexamination are limited to the patentability of claims 7, 10 and 11 – questions easily disposed of based on the Seratron art in combination with numerous prior art medical devices teaching touch screens.  For this reason, any delay likely would not be lengthy, and should be viewed as reasonable under the circumstances – certainly not arising to a tactical disadvantage for Baxter.  "Although the stay may delay the Court's determination as to the defendant's counterclaim of invalidity . . . , it would not be for such a protracted or indefinite period to constitute an abuse of discretion."  *See Gould v. Control Laser Corp.*, 705 F.2d 1340, 1341-42 (Fed. Cir. 1983) (noting that entry of a stay pending reexamination does not last so long as to constitute an abuse of discretion because:  (1) by statute the PTO reexamination must proceed with special dispatch; and (2) stays to enable reexamination do not foreclose review on the merits by federal courts); *Nanometrics*, 2007 WL 627920, at *3 ("Mere delay, without more though, does not demonstrate undue prejudice.").  This factor, too, weighs in favor of a stay.

### 5. A Stay of a Damages Trial Will Not Prejudice Baxter – Money Damages Are More Than Adequate To Protect Baxter's Interests

Baxter is not currently selling any products covered by the asserted patents; indeed, Baxter no longer sells any of its own hemodialysis machines at all.  Courts have found that "money damages is an adequate remedy for any delay in redress" where the patentee was not "selling or actively licensing goods or services related to" the patent-in-suit.  *Gioello Enterprises, Ltd. v. Mattel, Inc*., 2001 WL 125430 (D. Del. Jan. 29, 2001); *see also Emhart Indus., Inc. v. Sankyo Seiki Mfg. Co., Ltd.*, 1987 WL 6314, at *2 (N.D. Ill. Feb. 2, 1987) (finding that "notwithstanding plaintiff's argument that monetary damage will not compensate for its losses, this *is* a suit for money damages and plaintiff has never sought preliminary injunctive relief from the Court") (emphasis in original); *Middleton*, 2004 WL 1968669, at *9 (Plaintiff "is not currently selling products related to the patent in issue and would be entitled to any money damages if infringement is ultimately found.  Ultimately, the Court finds this is sufficient to protect Middleton from suffering any undue prejudice or a clear tactical disadvantage.").

8

Here, should the Patent Office ultimately uphold the validity of the asserted claims, Baxter would be entitled to monetary damages for the entire period of any infringement.[4] This potential damage award, which Fresenius is clearly in a position to be able to pay, is sufficient to protect Baxter from suffering any undue prejudice or tactical disadvantage. *See, e.g., Ricoh*, 2006 WL 3708069, at *3 ("Moreover, Ricoh has indicated that it is not seeking lost profits, but instead is seeking reasonable royalty damages. As a result, the Court finds that a stay would not significantly prejudice Ricoh's potential remedies."). The availability of a wholly adequate remedy at law—the only type of relief sought by Baxter at trial—disposes of any notion that Baxter will suffer prejudice if a stay is granted. *See, e.g., Nanometrics*, 2007 WL 627920, at *3 ("Assuming the PTO does not cancel or substantively change the [patent-in-suit], [patentee's] potential recovery of damages will not be affected by the re-examination proceeding. [Patentee] will be able to recover for any infringement that occurs prior to" the patent's expiration.) (internal citations omitted); *Broadcast Innovation, LLC v. Charter Commc'n, Inc.*, 2006 WL 1897165, at *10-*11 (D. Colo. Jul. 11, 2006) ("This factor is best summarized by one question: *do the Plaintiffs have an adequate remedy at law?* Because they do, this factor weighs heavily in favor or [sic] staying the case. The Plaintiffs seek *only* monetary damages. . . . [M]onetary relief – the only relief Plaintiffs seek – is fully capable of restoring Plaintiffs to the *status quo ante*." (emphasis in original).) Finally, the Patent Office's rejection of several asserted claims of the '434 and '131 patents significantly diminishes any prejudice Baxter might otherwise suffer. *See Ricoh*, 2006 WL 3708069, at *2 ("In light of the PTO's rejection of the specific claims at issue and the PTO's relatively quick turnaround, the Court finds the previous finding of risk of prejudice to be significantly lessened."). Thus, all of the factors militate toward granting a stay pending reexamination.

---

[4] Note that substantive amendment of the claims during reexamination precludes any damages based on the reexamined claims. *See, e.g., Fortel Corp. v. Phone-Mate, Inc.*, 825 F.2d 1577 (Fed. Cir. 1987) (holding that any claim for damages as to acts occurring prior to issuance of a reexamination certificate are extinguished except as to claims that are confirmed without substantive change).

9

FRESENIUS'S NOTICE OF MOTION AND MOTION TO STAY A
SECOND DAMAGES TRIAL PENDING RESOLUTION OF
LIABILITY ISSUES; MEMORANDUM OF POINTS & AUTHORITY
IN SUPPORT THEREOF
Case No. C 03-01431 SBA (EDL)

Moreover, at least two courts have concluded that a party in Fresenius's situation would suffer irreparable harm if damages were not stayed pending reexamination. In *Bausch & Lomb, Inc. v. Alcon*, 914 F. Supp. 951, 952 (W.D.N.Y. 1996), the district court stayed court proceedings pending the PTO's reexamination of a patent, noting that "one possible scenario could result in irreparable harm to Alcon: if this Court finds that the '607 [patent] is not invalid and that Alcon has infringed it, and orders Alcon to pay damages to B&L for such infringement, then Alcon would have no ability to recover those damages if at a later date the PTO determined that the '607 patent is invalid." *See also Everything for Love.com, Inc. v Tender Loving Things, Inc.*, 2006 WL 2091706, at \*4 (D. Ariz. Jul. 21, 2006) ("If Plaintiff acquires a judgment against Defendant for infringement, and the '980 patent is subsequently held invalid by the PTO, there exists the possibility of irreparable harm to Defendant as noted [in *Bausch & Lomb*]."). Here, too, Fresenius would be unable to recover any damages it pays to Baxter if the Patent Office later invalidates the patents-in-suit during reexamination. Accordingly, staying a damages trial pending the result of the reexamination process is fully appropriate in this situation.

**C.     The Fact That an Appeal Is Likely Favors a Stay of Damages**

**1.     Legal Standards Regarding Staying a Damages While an Appeal is Pending**

In patent cases, liability issues are appealable even without a damages determination. *In re Calmar, Inc.* 854 F.2d 461, 464 (Fed. Cir. 1988) ("the purpose of the legislation . . . allowing interlocutory appeals in patent cases was to *permit* a stay of a damages trial" (emphasis in original)). Under 35 U.S.C. § 1292(c)(2), the Federal Circuit has jurisdiction to consider any judgment that "is final except for an accounting"—a term that the court has interpreted as "refer[ring] to infringement damages pursuant to 35 U.S.C. § 284." *Special Devices, Inc. v. OEA, Inc.*, 269 F.3d 1340, 1343 n.2 (Fed. Cir. 2001); *see also Mendenhall v. Barber-Greene Co.*, 26 F.3d 1573, 1581 (Fed. Cir.1994) ("The purpose of § 1292(c)(2) is to permit district courts to stay and possibly avoid a burdensome determination of damages."). Several courts have stayed damages trials while liability appeals were pending. *See, e.g.*, *Cordis Corp. v. Boston Scientific Corp.*, 431 F. Supp. 2d 461, 464 (D. Del.

10

1    2006) (holding that it was "prudent to address the damages issues only after the liability issues have

2    been finally resolved through appeal, so as to prevent any further delay in the ultimate resolution of

3    this litigation."); *Bott v. Four Star Corp.*, 807 F.2d 1567 (Fed. Cir. 1986) (remanded on other

4    grounds); *Central Soya Co., Inc. v. Geo. A. Hormel & Co.*, 723 F.2d 1573 (Fed. Cir. 1983).

5    Congress's purpose in enacting the statute was to avoid "'the large expenses frequently involved in

6    such accountings and the losses incurred where recoveries were ultimately denied by reversal of

7    decrees on the merits.'"  *Calmar*, 854 F.2d at 464 (quoting *McCullough v. Kammerer Corp.*, 331

8    U.S. 96, 98 (1947)).

9         **2.    Fresenius's Likely Appeal of Liability Issues Justifies Staying a Damages
               Trial**

10

11        In this instance, independent of the reexamination proceedings, Fresenius intends to appeal

12   several rulings to the Federal Circuit.  Among these rulings are the Court's claim constructions.

13   Since the Supreme Court announced in *Markman v. Westview Instruments*, 517 U.S. 370 (1996),

14   that claim construction is a legal issue reviewed *de novo* on appeal, approximately half of all district

15   court claim constructions have been reversed or altered on appeal.  *See Cybor Corp. v. FAS Techs.,*

16   *Inc.*, 138 F.3d 1448, 1476 (Fed. Cir. 1988) ("this reversal rate [of *Markman* rulings], hovering near

17   50%, is the worst possible") (Rader, J., dissenting); *see also* Kimberly Moore, *Markman Eight*

18   *Years Later: Is Claim Construction More Predictable?*, 9 Lewis & Clark L. Rev. 231, 246 (2005)

19   (finding a "continued rise in reversal rates five years after the *Cybor Corp* decision"); Christian

20   Chu, *Empirical Analysis of the Federal Circuit's Claim Construction Trends*, 16 Berkeley Tech.

21   L.J. 1075, 1112, 1131-33 (2001) (Federal Circuit altered 51% of district court claim constructions

22   between 1998 and 2000).

23        Simply given the statistical likelihood that these rulings will be altered or reversed, it would

24   be most prudent to await the outcome of Fresenius's expected appeal of liability issues before

25   proceeding to a damages trial.  *See Cordis*, 431 F. Supp. 2d at 464.  Conversely, it would be

26   wasteful and contrary to the statute's intentions to determine damages based on the case's current

27

28
                                              11

1 posture only to have the underlying liability rulings overturned or changed by the Federal Circuit.

2 Such a result would squander both the Court's and the parties' time and resources. *See Calmar*, 854

3 F.2d at 464. Accordingly, staying the damages determination while Fresenius's appeal runs its

4 course is the most sensible approach at this juncture in the litigation.

5 **IV. CONCLUSION**

6 For the reasons set forth above, Fresenius respectfully requests that the Court stay a second

7 damages trial until reexamination proceedings have concluded or until all liability issues have been

8 resolved by the Federal Circuit.

9

10 Dated: April 19, 2007               FISH & RICHARDSON P.C.

11

12                      By: /s/ Mathias W. Samuel
                           Mathias W. Samuel

13

14                      Attorneys for Plaintiffs/Counterclaim
                     Defendants

15                      FRESENIUS MEDICAL CARE HOLDINGS,
                     INC. AND FRESENIUS USA, INC.

16

17

18 *Additional counsel*:

19 Thomas M. Melsheimer, pro hac vice, melsheimer@fr.com
Fish & Richardson P.C.
1717 Main Street, Suite 5000

20 Dallas, TX 75201
Telephone: (214) 747-5070

21 Facsimile: (214) 747-2091

22 John N. Farrell, SBN 99649, farrell@fr.com
Limin Zheng, SBN 226875, zheng@fr.com

23 Fish & Richardson P.C.
500 Arguello Street, Suite 500

24 Redwood City, CA 94053
Telephone: (650) 839-5070

25 Facsimile: (650) 839-5071

26

27

28

                                         12

Pursuant to General Order No. 45, Section X(B) regarding signatures, I attest under penalty of perjury that concurrence in the filing of this document has been obtained from Mathias W. Samuel.

Dated: April 19, 2007     FISH & RICHARDSON P.C.
                          By:  \s\ *Limin Zheng*
                               Limin Zheng

                          Attorneys for Defendants/Counter-claimants
                          FRESENIUS MEDICAL CARE HOLDINGS,
                          INC. d/b/a FRESENIUS MEDICAL CARE
                          NORTH AMERICA and FRESENIUS USA,
                          INC.

1

## **TABLE OF CONTENTS**

2
**Page**

3  NOTICE OF MOTION ........................................................................................... 1

4  POINTS AND AUTHORITIES IN SUPPORT OF MOTION ..................................... 1

5  I.  SUMMARY OF ARGUMENT ...................................................................... 1

6  II.  BACKGROUND ........................................................................................... 2

7  A.  The Status and Findings of the Reexaminations .................................... 2

8  III.  ARGUMENT ................................................................................................ 4

9  A.  Legal Standards for Stays of Proceedings ................................................ 4

10
11  B.  The Fact That Twelve of the Fifteen Asserted Claims Currently
Stand Rejected By The Patent Office Strongly Supports A Stay Of
Damages ...................................................................................................... 5

12  1.  Legal Standards for Stays Pending Reexamination ..................... 5

13
14  2.  Trial on Infringement Issues Is Scheduled for October
2007; Granting a Stay Will Conserve Judicial Resources ........... 6

15  3.  Granting a Stay Will Likely Simplify the Issues Remaining
to be Tried ..................................................................................... 7

16
17  4.  A Stay Pending Reexamination Will Not Result In a
Lengthy Delay or Tactical Disadvantage to Baxter .................... 7

18  5.  A Stay of a Damages Trial Will Not Prejudice Baxter –
Money Damages Are More Than Adequate To Protect
Baxter's Interests .......................................................................... 8

19
20  C.  The Fact That an Appeal Is Likely Favors a Stay of Damages ............ 10

21  1.  Legal Standards Regarding Staying a Damages While an
Appeal is Pending ...................................................................... 10

22
23  2.  Fresenius's Likely Appeal of Liability Issues Justifies
Staying a Damages Trial ............................................................ 11

24  IV.  CONCLUSION ........................................................................................... 12

25
26
27
28

i

1

<b><u>TABLE OF AUTHORITIES</u></b>

2

<b><u>Page(s)</u></b>

3

<u>Cases</u>

4

*ASCII Corp. v. STD Entertainment USA, Inc.*,
    844 F. Supp. 1378 (N.D. Cal. 1994) ............................................. 5

5

6

*Bausch & Lomb, Inc. v. Alcon*,
    914 F. Supp. 951 (W.D.N.Y. 1996) ............................................. 10

7

*Bloom Eng'g Co., Inc. v. North Am. Mfg. Co., Inc.*,
    129 F.3d 1247 (Fed. Cir. 1997) ................................................. 7

8

9

*Bott v. Four Star Corp.*,
    807 F.2d 1567 (Fed. Cir. 1986) ................................................. 11

10

*Broadcast Innovation, LLC v. Charter Commc'n, Inc.*,
    2006 WL 1897165, at *10 (D. Colo. Jul. 11, 2006) .................... 9

11

12

*Central Soya Co., Inc. v. Geo. A. Hormel & Co.*,
    723 F.2d 1573 (Fed. Cir. 1983) ................................................. 11

13

*Cordis Corp. v. Boston Scientific Corp.*,
    431 F. Supp. 2d 461 (D. Del. 2006) .......................................... 11

14

15

*Cybor Corp. v. FAS Techs., Inc.*,
    138 F.3d 1448 (Fed. Cir. 1988) ................................................. 11

16

*EchoStar Tech. Corp. v. TiVo, Inc.*,
    2006 WL 2501494, at *1 (E.D. Tex. Jul. 14, 2006) ................... 5

17

18

*Emhart Indus., Inc. v. Sankyo Seiki Mfg. Co., Ltd.*,
    1987 WL 6314, at *2 (N.D. Ill. Feb. 2, 1987) ........................... 8

19

*Ethicon, Inc. v. Quigg*,
    849 F.2d 1422 (Fed. Cir. 1988) ............................................... 4, 5

20

*Everything for Love.com, Inc. v Tender Loving Things, Inc.*,
    2006 WL 2091706, at *4 (D. Ariz. Jul. 21, 2006) ..................... 10

21

22

*Fortel Corp. v. Phone-Mate, Inc.*,
    825 F.2d 1577 (Fed. Cir. 1987) ................................................. 9

23

*Gioello Enterprises, Ltd. v. Mattel, Inc.*,
    2001 WL 125430 (D. Del. Jan. 29, 2001) ................................. 8

24

25

*Gould v. Control Laser Corp.*,
    705 F.2d 1340 (Fed. Cir. 1983) ................................................. 8

26

27

ii

28

**TABLE OF AUTHORITIES (cont'd.)**

**Page(s)**

*In re Calmar, Inc.*
854 F.2d 461 (Fed. Cir. 1988)............................................................................ 10, 11, 12

*KLA-Tencor Corp. v. Nanometrics, Inc.*,
2006 WL 708661, at *4 (N.D. Cal. Mar. 16, 2006) ............................................. 6

*Markman v. Westview Instruments*,
517 U.S. 370 (1996)................................................................................................. 11

*McCullough v. Kammerer Corp.*,
331 U.S. 96 (1947)................................................................................................... 11

*Mendenhall v. Barber-Greene Co.*,
26 F.3d 1573 (Fed. Cir.1994)................................................................................ 10

*Middleton, Inc. v. Minn. Mining and Mfg. Co.*,
2004 WL 1968669, at *3 (S.D. Iowa Aug. 24, 2004)...................................... 5, 8

*Nanometrics, Inc. v. Nova Measuring Instruments, Ltd.*,
2007 WL 627920, at *2 (N.D. Cal. Feb. 26, 2007) (Armstrong, J.) ............... 5, 8, 9

*Ricoh Co. v. Aeroflex Inc.*,
2006 WL 3708069, at *4 (N.D. Cal. Dec. 14, 2006) ...................................... 6, 9

*Rohan ex rel. Gates v. Woodford*,
334 F.3d 803 (9th Cir. 2003).................................................................................. 4

*Special Devices, Inc. v. OEA, Inc.*,
269 F.3d 1340 (Fed. Cir. 2001) ............................................................................ 10

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.*,
1993 WL 172432, at *1 (Fed. Cir. May 21, 1993)............................................... 7

*Telemac Corp. v. Teledigital, Inc.*,
450 F. Supp. 2d 1107 (N.D. Cal. 2006) ........................................................... 5, 6

*Viskase Corp. v. Am. Nat'l Can Co.*,
261 F.3d 1316 (Fed. Cir. 2001).............................................................................. 5

**Treatises**

Chu, C., *Empirical Analysis of the Federal Circuit's Claim Construction Trends*,
16 Berkeley Tech. L.J. 1075 (2001)..................................................................... 11

Moore, K., *Markman Eight Years Later: Is Claim Construction More Predictable?*,
9 Lewis & Clark L. Rev. 231 (2005) ................................................................... 11

iii

## <u>TABLE OF AUTHORITIES (cont'd.)</u>

<u>Page(s)</u>

**<u>Rules, Statutes, and Regulations</u>**

35 U.S.C. § 1292 ................................................................................................... 10

35 U.S.C. § 284 ..................................................................................................... 10

35 U.S.C. § 305 ....................................................................................................... 7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 2**

1   Juanita R. Brooks, SBN 75934, brooks@fr.com
    Todd G. Miller, SBN 163200, miller@fr.com
2   Fish & Richardson P.C.
    12390 El Camino Real
3   San Diego, CA 92130
    Telephone:  (858) 678-5070
4   Facsimile:  (858) 678-5099

5   Mathias W. Samuel, pro hac vice, samuel@fr.com
    Michael E. Florey, pro hac vice, florey@fr.com
6   Thomas S. McClenahan, SBN 203204, mcclenahan@fr.com
    Fish & Richardson P.C.
7   60 South Sixth Street, Suite 3300
    Minneapolis, MN 55402
8   Telephone:  (612) 335-5070
    Facsimile:  (612) 288-9696
9
    Limin Zheng, SBN 226875, zheng@fr.com
10  S. Kameron Parvin, SBN 232349, parvin@fr.com
    Fish & Richardson P.C.
11  500 Arguello Street, Suite 500
    Redwood City, CA 94053
12  Telephone:  (650) 839-5070
    Facsimile:  (650) 839-5071
13
    Attorneys for Plaintiffs/Counterclaim Defendants
14  Fresenius Medical Care Holdings, Inc. and Fresenius USA, Inc.

15

16                  UNITED STATES DISTRICT COURT

17                 NORTHERN DISTRICT OF CALIFORNIA

18                        OAKLAND DIVISION

| | |
|---|---|
| 19  FRESENIUS MEDICAL CARE HOLDINGS, INC., a New York corporation; and FRESENIUS | Case No. C 03-01431 SBA (EDL) |
| 20  USA, INC., a Massachusetts corporation, | **FRESENIUS' OPPOSITION TO BAXTER'S MOTION FOR ENTRY OF PERMANENT INJUNCTION – REDACTED** |
| 21           Plaintiffs and Counterdefendants, | |
| 22      v. | |
| 23  BAXTER INTERNATIONAL, INC., a Delaware corporation; and BAXTER | |
| 24  HEALTHCARE CORPORATION, a Delaware corporation, | Hearing Date:        February 5, 2008 |
| 25           Defendants and Counterclaimants. | Hearing Time:               1:00 p.m. Judge:    Hon. Saundra Brown Armstrong Courtroom:                         3 |
| 26 | |

27

28

**TABLE OF CONTENTS**

Page(s)

I.   INTRODUCTION ..................................................................................... 1

II.  ARGUMENT ........................................................................................... 3

A.  Baxter Is Not Entitled To An Injunction Because It Has Not
Established Any Of The Injunction Factors Required Under eBay
And The Traditional Standards For Equitable Relief ........................... 3

   1.  Baxter Agreed Prior To Trial That It Was Not Seeking To
   Build A Record To Support An Injunction Motion .................... 4

   2.  The Public Interest Would Be Greatly Disserved By An
   Injunction .................................................................................. 6

      a.  The Annual Demand For New Hemodialysis
      Machines Is Over 16,000 Per Year And Rising;
      The Fresenius 2008K Is The Only Machine That
      Can Meet That Demand ............................................... 6

      b.  Baxter Has Not Offered Any Proof That The Market
      Demand For New Hemodialysis Machines Will Be
      Met If Fresenius Is Enjoined From Selling The
      2008K Machine ............................................................ 8

      c.  Fresenius Cannot Simply "Bring Back" The 2008H ..... 10

      d.  Even If Gambro or B. Braun's Machines Make It
      To Market, Those Machines Lack Critical
      Treatment Features Offered By The Fresenuis
      2008K ........................................................................... 11

      e.  Several Other Considerations Also Suggest That
      The Public Interest Would Be Disserved By An
      Injunction .................................................................... 13

   3.  Baxter's Action's Demonstrate That It Has Not Been
   Irreparably Harmed, And That It Has Adequate Remedies
   Available At Law ....................................................................... 15

      a.  Baxter No Longer Practices The Patents In Suite ....... 16

      b.  Baxter Has Shown A Willingness To License Its
      Patents To Others In The Hemodialysis Machine
      Market, Including Fresenius ........................................ 17

**TABLE OF CONTENTS**

Page(s)

      c.    Baxter Has Allowed A Significant Amount of Time To Pass Without Seeking An Injunction To Stop Fresenius Or Other Manufacturers From Infringing Its Technology........................................................19

      d.    Monetary Damages Are Adequate To Compensate Baxter For Any Future Infringement ...........................20

    4.    The Balance of Hardship Favors The Denial Of An Injunction ................................................................20

B.    An Ongoing Royalty, At The Rate Set By The Jury, Is Appropriate Under The Facts Of This Case..........................21

C.    If The Court Does Grant An Injunction, The Court Should Also Grant A Stay Pending Appeal ...................................23

III.    CONCLUSION    ........................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*America Dairy Queen Corp. v. Brown-Port Co.,*
621 F.2d 255 (7th Cir. 1980).................................................................. 16

*Amoco Prod. Co. v. Village of Gambell, Alaska,*
480 U.S. 531 (1987)................................................................................ 16

*Arthocare Corp. v. Smith & Nephew, Inc.,*
315 F. Supp. 2d 615 (D. Del. 2004)....................................................... 11

*Atari Corp. v. Sega of America Inc.,*
869 F. Supp. 783 (N.D. Cal. 1994) ........................................................ 20

*Bionx Implants, Inc. v. Innovasive Devices, Inc.,*
45 F. Supp. 2d 75 (D. Mass 1999) ......................................................... 11

*Bloom Engineering Co. v. N. America Manufacturing Co.,*
129 F.3d 1247 (Fed. Cir. 1997) .............................................................. 14

*Contra Windsurfing International, Inc. v. AMF, Inc.,*
782 F.2d 995 (Fed. Cir. 1986)................................................................. 21

*eBay Inc. v. MercExchange, L.L.C.,*
126 S. Ct. 1837 (2006) ................................................................ 3, 4, 13, 15

*E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.,*
835 F.2d at 278 (Fed. Cir. 1987) ............................................................ 24

*Foster v. American Machine & Foundry Co.,*
492 F.2d 1317 (2d Cir. 1974) ................................................................. 18

*GTE Products Corp. v. Kennametal, Inc.,*
772 F. Supp. 907 (W.D. Va. 1991) ......................................................... 24

*High Tech Medical Instrumentation, Inc. v. New Image Industrial, Inc.,*
49 F.3d 1551 (Fed. Cir. 1995) .......................................................... 17, 19

*Hybritech Inc. v. Abbott Laboratoriess,*
4 U.S.P.Q. 2d 1001 (C.D. Cal. 1987), aff'd, 849 F.2d 1446 (Fed. Cir. 1988).............................. 6

*IMX, Inc. v. LendingTree, LLC,*
469 F. Supp. 2d 203 (D. Del. 2007) ....................................................... 18

*Innogenetics, N.V. v. Abbott Laboratories,*
2007 U.S. Dist. LEXIS 3148 (W.D. Wis. Jan. 12, 2007).......................... 6

*KSR International Co. v. Teleflex Inc.,*
127 S. Ct. 1727 (2006) ............................................................................ 23

*Lyons Partnership, L.P. v. Morris Costumes, Inc.,*
243 F.3d 789 (4th Cir. 2001).................................................................. 16

iii

# TABLE OF AUTHORITIES

**Page(s)**

*MercExchange, L.L.C. v. eBay, Inc.,*
500 F. Supp. 2d 556 (E.D. Va. 2007) ............................................................... 4, 15, 19, 20

*Nerney v. New York, N.Y. & H.R. Co.,*
83 F.2d 409 (2d Cir. 1936) .......................................................................................... 19

*Nutrition 21 v. U.S.,*
930 F.2d 867 (Fed. Cir. 1991) ................................................................................ 4, 20

*Ortho Pharm. Corp. v. Genetics Institute, Inc.,*
52 F.3d 1026 (Fed. Cir. 1995) ...................................................................................... 18

*PGBA, LLC v. U.S.,*
389 F.3d 1219 (Fed. Cir. 2004) .................................................................................... 19

*Paice LLC v. Toyota Motor Corp.,*
504 F.3d 1293 (Fed. Cir. 2007) .................................................................................... 21

*Polymer Techs. V. Bridwell,*
103 F.3d at 974 ................................................................................................ 14, 17, 19

*Praxair, Inc. v. ATMI, Inc.,*
479 F. Supp. 2d 440 (D. Del. 2007) .............................................................................. 17

*R.R. Comm'n v. Pullman Co.,*
312 U.S. 496 (1941) ....................................................................................................... 3

*Rondeau v. Mosinee Paper Corp.,*
422 U.S. 49 (1975) ............................................................................................ 4, 15, 20

*Standard Havens Products, Inc. v. Gencor Industrial, Inc.,*
897 F.2d 511 (Fed. Cir. 1990) ...................................................................................... 23

*T.J. Smith & Nephew Ltd. v. Consolidated Medical Equip., Inc.,*
821 F.2d 646 (Fed. Cir. 1987) ................................................................................ 17, 19

*Verizon Services Corp. v. Vonage Holdings Corp.,*
503 F.3d 1295 (Fed. Cir. 2007) .................................................................................... 10

*Wienberger v. Romero-Barcelo,*
456 U.S. 305 (1982) .................................................................................................... 3, 6

*z4 Techs., Inc. v. Microsoft Corp.,*
434 F. Supp. 2d 437 (E.D. Tex. 2006) .......................................................................... 16

FRESENIUS' OPPOSITION TO BAXTER'S MOTION FOR ENTRY OF
PERMANENT INJUNCTION –REDACTED
Case No. C 03-01431 SBA (EDL)

# TABLE OF AUTHORITIES

                                                                    **Page(s)**

**State Cases**

*Paice LLC v. Toyota Motor Corp.*,
No. 2:04-CV-211-DF, 2006 WL. 2385139 (E.D. Tex. Aug. 16, 2006)........................... 15, 18, 20

*Voda v. Cordis Corp.*,
No. CIV-03-1512-L, 2006 WL. 2570614 ............................................................... 4, 16

**Docketed Cases**

*Finisar Corp. v. DirectTV Group, Inc.*,
Civil Action No. 1:05-CV-00264 (E.D. TX July 6, 2006)(Florey Dec. Ex. 14)........................ 21

**Statutes**

35 U.S.C. § 283 ............................................................................................. 3

# I.    INTRODUCTION

The proposed permanent injunction sought by Baxter Healthcare Corporation ("Baxter") is unjustified and threatens the health and well-being of potentially hundreds of thousands of seriously ill patients.  Hemodialysis machines are life-saving medical devices.  In the United States alone, over 500,000 people suffer from end-stage renal disease.  More than 350,000 of these people undergo some form of kidney dialysis treatment.  These numbers are continually increasing as the population ages and as associated risk factors drive up the chances of kidney failure.  Of the patients currently undergoing dialysis, approximately nine out of ten (or 320,000) receive hemodialysis treatments from machines in hemodialysis clinics.  Each of these patients requires treatment at least three times a week, with each treatment lasting four to five hours.  Because the number of patients is increasing, in 2008 clinics will require an increased number of new hemodialysis machines to treat these new patients.

The hemodialysis machines that deliver these life-saving treatments must be workhorses; they are often in use around-the-clock.  It is imperative that these machines be safe and reliable.  The most reliable hemodialysis machines typically have a life cycle of 7-9 years.  This means that 10% to 15% of the nation's stock of hemodialysis machines must be replaced each year simply to maintain the same level of treatment.  In 2008 clinics will both need to replace machines at the end of life-cycle, and also acquire additional new machines to treat the increasing patient load.  All together, in 2008 clinics in the United States will require approximately 16,000 new hemodialysis machines to keep their patients alive.

Historically, Fresenius has been the company that clinics look to for safe, reliable hemodialysis machines.  Of the patients undergoing clinical hemodialysis therapy, approximately 70%-75% percent of them are treated on Fresenius machines.  Fresenius has been the market leader in hemodialysis since 1997 – long before the 2008K machine was ever introduced on the market.  The reason for Fresenius' success in hemodialysis is that it has focused considerable time, money, and resources into the development, manufacture, and servicing of superior machines.  As a result, Fresenius has built up and consolidated its reputation as offering the most innovative, reliable, and most importantly, safe hemodialysis machines available in the world.

FRESENIUS' OPPOSITION TO BAXTER'S MOTION FOR ENTRY OF
PERMANENT INJUNCTION –REDACTED
Case No. C 03-01431 SBA (EDL)

Baxter has now asked this Court for an injunction to prevent Fresenius from making and selling the 2008K, which has been on the market for over seven years.  The Fresenius 2008K is the only hemodialysis machine manufactured in the United States, and its sales currently account for over 95% of all the new machines sold in this country.  By seeking to shut down Fresenius, Baxter would put all clinics in this country at the mercy of two European manufacturers.  Baxter itself cannot make any machines because it closed its U.S. hemodialysis manufacturing operations in 2005.  That leaves only Gambro, which makes hemodialysis machines in Italy, and B. Braun, which makes hemodialysis machines in Germany, as potential suppliers.

But in its Injunction Motion Baxter provides not one shred of evidence that Gambro or B. Braun have the manufacturing capacity or wherewithal to supply the 16,000 new hemodialysis machines that U.S. clinics will need next year to treat patients.  This lack of evidence is hardly surprising -- Gambro and B. Braun combined have never sold more than 2,800 hemodialysis machines in the U.S. in a single year.  Baxter also fails to mention that until a few months ago, Gambro was banned from bringing hemodialysis machines into the U.S. due to quality and safety issues at its Italian manufacturing plant.  Nor does Baxter discuss the fact that Fresenius' 2008K has important medical features that the Gambro and B. Braun machines do not offer.

In seeking this injunction, Baxter is asking the Court to gamble with the lives and well-being of all the patients currently undergoing hemodialysis treatments and the many more patients that will need such treatment in the coming years.  The Court should decline this invitation.  Fresenius is the only company with the demonstrated ability to manufacture large volumes of safe, reliable machines in the United States for delivery to U.S. clinics.

The Court also should consider that since Baxter filed its injunction motion, the special re-examination panel of the USPTO has issued _final_ rejections of all asserted claims of the '434 and '131 patents.  This panel is made up of three supervisory examiners.  After considering multiple rounds of *ex parte* briefing and argument from Baxter, the panel issued detailed, fifty-plus page opinions holding all asserted claims of Baxter's two key patents to be invalid.  Baxter may still go to the Board Of Patent Appeals, but when Baxter previously appealed virtually identical claims the

FRESENIUS' OPPOSITION TO BAXTER'S MOTION FOR ENTRY OF
PERMANENT INJUNCTION –REDACTED
Case No. C 03-01431 SBA (EDL)

1   Board affirmed the examiner's rejection in a lengthy opinion.  In short, it is only a matter of time
2   before all asserted claims of the '434 and '131 patents are without any legal effect.

3           Baxter is wrong to ask the Court to remove a life-saving medical device from the market
4   based on patent claims that stand finally rejected, and where Baxter has no ability to manufacture
5   machines to replace those that would be enjoined.  The Court should deny Baxter's motion, and
6   instead set an ongoing royalty at the rate awarded to Baxter by the jury in the damages trial.

7   **II.    ARGUMENT**

8           **A.    Baxter Is Not Entitled To An Injunction Because It Has Not Established**
                    **Any Of The Injunction Factors Required Under eBay And The Traditional**
9                   **Standards For Equitable Relief**

10          A permanent injunction is not an automatic remedy for patent owners.  *See* 35 U.S.C. §
11  283 ("[C]ourts ... *may* grant injunctions in accordance with the principles of equity ...")
12  (emphasis added).  Instead, injunctive relief is an extraordinary remedy that must be carefully
13  considered – especially in cases where, as here, the grant of an injunction would have a severe and
14  detrimental impact on the public good.  *See Wienberger v. Romero-Barcelo*, 456 U.S. 305, 312
15  (1982) ("[C]ourts of equity should pay particular regard for the public consequences in employing
16  the extraordinary remedy of injunction.") (citing *R.R. Comm'n v. Pullman Co.*, 312 U.S. 496, 500
17  (1941)).

18          While the decision to grant or deny injunctive relief is within the Court's discretion, the
19  Supreme Court has made it clear that "such discretion must be exercised consistent with
20  traditional principles of equity, in patent disputes no less than in other cases governed by such
21  standards." *eBay Inc. v. MercExchange, L.L.C.*, 126 S. Ct. 1837, 1841 (2006).  Therefore, Baxter
22  must satisfy the traditional four-factor test before the Court may grant an injunction.  *Id.* at 1839.
23  Namely, Baxter must prove "(1) that it has suffered an irreparable injury; (2) that remedies
24  available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that,
25  considering the balance of hardships between the plaintiff and defendant, a remedy in equity is
26  warranted; *and* (4) that the public interest would not be disserved by a permanent injunction." *Id.*
27  (emphasis added).  Notably, the test for injunctive relief is conjunctive.  *See id.*  Accordingly,
28  Baxter must establish each of the factors to obtain an injunction.  *See Voda v. Cordis Corp.*, No.

1  CIV-03-1512-L, 2006 WL 2570614, at *5 (denying a permanent injunction because plaintiff failed

2  to prove two of the four factors).

3        Baxter bears the burden of proof on each of the injunction factors – a burden that Baxter

4  freely admits.  [Baxter Br. at 4]; *see also eBay*, 126 S. Ct. at 1841; *Rondeau v. Mosinee Paper*

5  *Corp.*, 422 U.S. 49, 62-63 (1975).  But rather than offering particularized, case specific evidence

6  to support its position, Baxter instead relies on generic harms that are present in almost every

7  patent infringement context.[1]  This form of "proof" is insufficient.  *See Nutrition 21 v. U.S.*, 930

8  F.2d 867, 872 (Fed. Cir. 1991) (vacating a preliminary injunction where the plaintiff had offered

9  "no more than [attorney] argument inappropriately invoking decisions where, unlike here, an

10  adequate supporting record had been made."; *see also MercExchange, L.L.C. v. eBay, Inc.*, 500 F.

11  Supp. 2d 556, 569 (E.D. Va. 2007) ("[A] permanent injunction shall only issue if plaintiff carries

12  its burden of establishing that … the ***case specific facts warrant entry of an injunction***.")

13  (emphasis added).  With no specific proof before the Court, Baxter's motion is defective on its

14  face.

        **1.    Baxter Agreed Prior To Trial That It Was Not Seeking To Build A**
        **Record To Support An Injunction Motion**

17        As explained above, a party seeking the extraordinary remedy of a permanent injunction

18  has the burden to provide the Court with specific, particularized facts relating to each of the four

19  injunction factors.  Especially in a case involving life-saving medical equipment, the Court needs a

20  fully developed evidentiary record in order to be able to effectively and justly exercise its

21  discretion to grant or deny the injunction.  Prior to the recent damages trial, Fresenius became

22  concerned that Baxter would seek to rely solely on evidence from the damages trial to support an

23  injunction, without allowing the parties to develop a full record for the Court's consideration.

24        To head off this problem, Fresenius raised the issue with the Court through a Motion *In*

25  *Limine* prior to trial.  In both its brief and at the pretrial hearing, Baxter repeatedly denied it was

26  trying to use the trial to build an evidentiary record for injunctive relief.  Indeed, counsel for

---

[1]  *See, e.g.*, Baxter Br. at 4 (direct competitors); 6 (reputation); 10 (monetary damages "generally considered inadequate in patent cases."); 13 (public interest in strong patent system).

Baxter explicitly stated that <u>no</u> evidence relating to the public interest or balance of hardship factors would be included in the trial:

> The Court: [To Mr. Abernathy] Well, are you planning on introducing any evidence relating to injunctive relief in this trial?
>
> **The Court: Baxter has indicated they have no intention of offering any evidence relative – relative to injunction relief in this trial so why are you filing this motion?**
>
> **Ms. Brooks: Well, actually they said both things.**
>
> **The Court: [To Mr. Abernathy] Well, are you planning on introducing any evidence relating to injunctive relief in this trial?**
>
> **Mr. Abernathy: <u>Your Honor, in terms of public interest [and] the balancing factors, no, Your Honor</u>.**
>
> **The Court: What does that mean? Yes or no? Are you planning or are you not planning to introduce evidence relevant only to injunctive relief?**
>
> **Mr. Abernathy: Only to injunctive relief, no, Your Honor.**
>
> **The Court: Okay. The motion is denied as moot.**

Pretrial Hearing Tr. at pp. 13-14 (emphasis added).

As can be seen above, Baxter represented to the Court that it would not introduce <u>any</u> evidence relating to the public interest or balancing of hardship injunction factors, and that it would not introduce <u>any</u> evidence relating only to injunctive relief. Despite these clear promises, Baxter's entire injunction Motion is based on evidence from the damages trial, plus "evidence" from the first trial, which had nothing to do with injunctive relief, or materials such as expert reports which are equally unrelated to injunctive relief.

Baxter has not put in a single Declaration in support of its injunction motion, nor has it made any effort to create the extensive, case-specific evidentiary record the Court needs to even consider granting an injunction. Instead, Baxter is attempting exactly what it previously promised not to do; it is arguing that evidence recycled from portions of the case unrelated to injunctive relief is sufficient to support an injunction. In light of Baxter's pre-trial promises, the Court should deny Baxter's injunction motion based on its failure to put before the Court any specific evidence that is directly related to the four key factors that govern permanent injunctions. To the

FRESENIUS' OPPOSITION TO BAXTER'S MOTION FOR ENTRY OF PERMANENT INJUNCTION –REDACTED
Case No. C 03-01431 SBA (EDL)

extent the Court considers Baxter's recycled evidence, Fresenius explains below why it fails to satisfy any of the four *eBay* factors.

### 2. The Public Interest Would Be Greatly Disserved By An Injunction

Hemodialysis machines are vital to the lives and well-being of several hundred thousand end-stage renal disease patients undergoing hemodialysis therapy in the United States every day. If these patients do not receive regular hemodialysis treatments, their health will suffer and they could potentially die. Therefore, the public interest in this case is significant and must be carefully examined in the overall injunction analysis. *See Wienberger*, 456 U.S. at 312.

Fresenius' 2008K machines are the primary source of these life-saving hemodialysis treatments, accounting for about 95% of all new machines sold in the U.S. over the past two years. McCarthy Dec. ¶¶6, 8. The 2008K is a state-of-the-art machine that is highly reliable and has had no significant FDA recalls or other safety or quality issues since it was first introduced in 2000. As a threshold issue, the Court must examine whether other companies have the capacity to manufacture and distribute enough hemodialysis machines to meet the growing demand in the U.S. market. The Court should also consider whether any putative supplier of alternative devices offers a machine that is as safe, effective, and reliable as the 2008K machine. *See Hybritech Inc. v. Abbott Labs.*, 4 U.S.P.Q.2d 1001, 1015 (C.D. Cal. 1987), *aff'd*, 849 F.2d 1446 (Fed. Cir. 1988); *Innogenetics, N.V. v. Abbott Laboratories*, 2007 U.S. Dist. LEXIS 3148, at *1-2 (W.D. Wis. Jan. 12, 2007) (granting an injunction, but only after an evidentiary showing that the patent owner could meet the public's demand).[2]

### a. The Annual Demand For New Hemodialysis Machines Is Over 16,000 Per Year And Rising; The Fresenius 2008K Is The Only Machine That Can Meet That Demand

Worldwide, approximately 1.2 million people suffer from end-stage renal disease ("ESRD"). In the United States alone, 320,000 ESRD patients were treated by in-center hemodialysis machines last year. McCarthy Dec. ¶ 5. The number of patients requiring

---

[2] The court in *Innogenetics* also noted that the medical test at issue was not time-critical, so that even if there was a short-term shortage in supply, the public safety would not be threatened. *Id.* at *2. Here, the situation is dramatically different, as hemodialysis treatments are required three

FRESENIUS' OPPOSITION TO BAXTER'S MOTION FOR ENTRY OF
PERMANENT INJUNCTION –REDACTED
Case No. C 03-01431 SBA (EDL)

1  hemodialysis treatments is growing by about three to five percent each year due to the aging

2  population and associated health factors such as diabetes and high blood pressure. McCarthy Dec.

3  ¶ 4. According to the National Kidney Foundation, the number of kidney failure patients in the

4  United States will likely double in the next ten years. A vast majority of ESRD patients,

5  approximately 90%, receive hemodialysis treatments in a clinical setting. Florey Dec. Ex. 1 at 14.

6  Each of these hemodialysis patients requires treatment approximately three times a week, and each

7  session lasts about four to five hours. *Id*. Ex. 2 at p. 4; McCarthy Dec. ¶ 10.

8       This means that the hemodialysis machines in clinics are in constant use, providing an

9  average of 10-20 hours of operating time, and 2-4 treatments per day. McCarthy Dec. ¶ 10.

10  Based on this extensive usage, hemodialysis machines are known to have an average lifespan of

11  roughly seven to nine years. McCarthy Dec. ¶ 4. After such time, older machines are retired and

12  new machines are purchased to replace them. This creates a recurring demand for new machines

13  of between ten and fifteen percent annually. *Id*. Demand for new machines also tends to increase

14  every year because the clinics must add new machines to keep up with the rising number of ESRD

15  patients requiring hemodialysis treatments. *Id*.

16       Fresenius, with its 2008K model, is ready to meet the recurring and rising demand for new

17  hemodialysis machines. Year after year, Fresenius has consistently met the market's increasing

18  need for new machines – providing approximately 10,700 2008K machines in 2005, 13,700

19  machines in 2006, and 15,500 machines in 2007. Slater Dec. ¶ 10. Fresenius is fully capable of

20  manufacturing, marketing, delivering, and servicing all 16,000 or more of the new hemodialysis

21  machines that will be required in 2008 and beyond. *Id*., McCarthy Dec. ¶ 3. Fresenius

22  manufactures these machines in its Walnut Creek, California facility, and has produced and

23  delivered nearly forty thousand 2008K machines over the past three years. *Id*. An injunction,

24  however, would prohibit Fresenius from providing these life-saving devices to the clinics and the

25  patients who need them.

26

27

---

28  times a week for every hemodialysis patient, and delaying those treatments could result in serious
health consequences or even death.

7       FRESENIUS' OPPOSITION TO BAXTER'S MOTION FOR ENTRY OF
PERMANENT INJUNCTION –REDACTED
Case No. C 03-01431 SBA (EDL)

**b.** **Baxter Has Not Offered Any Proof That The Market Demand For New Hemodialysis Machines Will Be Met If Fresenius Is Enjoined From Selling The 2008K Machine**

Baxter's request that the supply of these life-saving medical devices be cut off is reckless and dangerous. If hemodialysis clinics are unable to purchase new machines, patients and patient care will suffer dramatically. No other company that is approved to sell hemodialysis machines in the U.S. market has the demonstrated capacity to manufacture and deliver 16,000 safe and reliable machines if the Court enjoins the 2008K. Therefore, an injunction would very likely cause a shortage of hemodialysis machines, and would greatly harm the public's health and safety.

In its brief, Baxter asserts that no public health concerns exist because there are two other machines on the market that can meet the gap in market demand – the Gambro Phoenix and the B. Braun Dialog. [Baxter Br. at 14.] Baxter offers no proof of this alleged capacity – it merely cites to a snippet of trial testimony to the effect that B. Braun and Gambro sell hemodialysis machines. Baxter offers no sworn Declaration from anyone at B. Braun or Gambro attesting to their ability to make and deliver the many thousands of machines that U.S. clinics will need next year.

Nor could they credibly do so. Over the last two years only Fresenius and B. Braun have sold new hemodialysis machines to U.S. clinics. Fresenius has met 90%-95% of the requirements of U.S. clinics during this time. McCarthy Dec. ¶¶ 6, 8. That means that B. Braun has at most supplied 5%-10% of the market. *Id.* If Fresenius is enjoined from making and selling the 2008K, B. Braun would have to immediately and significantly increase its manufacturing capabilities to meet the demand for new machines. Put in real terms, B. Braun would have to go from delivering approximately 500 machines in the U.S. to manufacturing and delivering approximately 16,000 machines in the coming year – about a 3200% increase in production. McCarthy Dec. ¶¶ 3, 8. Baxter has not offered a single shred of evidence that B. Braun, a small niche player located in Germany, will be able to make this enormous leap and supply the entire U.S. market.

But even if B. Braun could somehow increase its manufacturing and sales capabilities, its machine uses a touch screen user interface, which Baxter believes infringes the patents in suit. Trial Tr. at 225; 343-344. As such, Baxter may very well attempt to exclude those machines from the market as well. *Id.* If on the other hand Baxter decides not to go after B. Braun, it would be a

FRESENIUS' OPPOSITION TO BAXTER'S MOTION FOR ENTRY OF
PERMANENT INJUNCTION –REDACTED
Case No. C 03-01431 SBA (EDL)

1   strange and entirely inequitable result for this Court to enjoin the 2008K – for which Fresenius

2   will pay a reasonable royalty – while Baxter allows a different infringing manufacturer to continue

3   its sales without having paid any royalty to Baxter.  Trial Tr. at 227.

4       Gambro cannot be relied upon to meet the market demand either.  In January of 2006, the

5   FDA banned Gambro's Phoenix machine from being imported into the United States due to

6   serious problems at the Gambro manufacturing facility in Medolla, Italy.  Florey Dec. Exs. 3, 4;

7   Trial Tr. at 381.  This import ban was in effect for over 20-months, and was lifted only a few

8   months ago.  Although the ban has been officially lifted, it is not clear that Gambro has resumed

9   its Phoenix sales in the U.S.  In a recent letter from Gambro management, the company states that

10  it "will begin selling new Phoenix devices as quickly as possible," but it does not give a specific

11  date for when that will occur.  *Id.* at Ex. 5.

12      Even when Gambro was allowed to sell in the United States, its Phoenix machine never

13  accounted for more than approximately 18% of new machines delivered to clinics.  McCarthy

14  Dec. ¶ 7.  Gambro would need to go from supplying zero machines in the U.S. to supplying 100%

15  of the market – a number six times greater than it has ever supplied historically to U.S. clinics.  On

16  top of this, Gambro's manufacturing plant in Medolla, Italy was recently hit by strikes and labor

17  unrest which briefly closed the plant.  Florey Dec. Ex. 6.  Nothing in the record remotely suggests

18  that Gambro – a company recently banned from importing the Phoenix machine into the U.S. due

19  to manufacturing irregularities – has the manufacturing capacity to make over 16,000 Phoenix

20  machines in Italy and deliver them to U.S. clinics.

21      Finally, Baxter states that it "sell[s] hemodialysis machines in the market today."  Baxter

22  Br. at 14.  In the context of capacity to supply the market, this representation is false.  Baxter is

23  simply a non-exclusive distributor of the Phoenix machine that Gambro makes at its troubled

24  Italian plant.  Florey Dec. Ex. 7.  Baxter closed its hemodialysis manufacturing plant in the U.S.

25  and has no capacity to make a single machine for U.S. clinics.  *Id.*, Trial Tr. at 218-219.  Because

26  the Phoenix has been banned from the U.S. market, Baxter has had no Phoenix machines to

27

28

1  distribute. Even now that the import ban has been lifted, it does not appear that Baxter is actually

2  offering Phoenix machines for delivery.[3]

3          **c.**      **Fresenius Cannot Simply "Bring Back" The 2008H**

4          In its one-paragraph discussion of the public interest, Baxter also argues that because

5  Fresenius's damages expert pointed to the 2008H as a non-infringing alternative in the context of

6  the hypothetical negotiation, Fresenius can now simply bring back the 2008H in place of the

7  2008K.[4] Fresenius discontinued commercial manufacture of the 2008H over two years ago.

8  Slater Dec. ¶ 4. Key parts for the 2008H are obsolete and can no longer be sourced. *Id.* at ¶¶ 4-7.

9  Furthermore, the technology in hemodialysis machines has advanced significantly since the

10  introduction of the 2008H nearly 15 years ago. Trial Tr. at 454-455. To assure state of the art

11  patient care Fresenius would need to incorporate many additional features into the 2008H. Florey

12  Dec. Ex. 8. While Fresenius can eventually design, develop and bring to market a hemodialysis

13  machine that does not use a touch screen, the issue is how long those efforts will take.[5] Baxter's

14  suggestion that Fresenius can simply flip a switch and begin making 2008H machines again is not

15

16

17  [3] The renal products page of Baxter's Website lists only dialyzers and hemodialysis software.
There is no mention that any hemodialysis machine can be obtained from Baxter.

18  http://www.baxter.com/products/renal/hemodialysis/index.html
[4] This argument vividly demonstrates how Baxter is attempting to rely on inapposite evidence

19  from prior portions of the case, instead of providing evidence that actually relates to the
injunction factors. The issue addressed in the reports of both sides' damages experts was the

20  options that existed at the time of the hypothetical negotiation -- August of 2000 -- almost
eight years ago. At that time, Fresenius was only making the 2008H, and was not making the

21  2008K. It is absolutely true that at the time of the hypothetical negotiation Fresenius could
have kept making the 2008H, or more accurately, as Prof. Rubinfeld testified, could have made

22  an updated and improved machine that incorporated many features of both the 2008H and the
2008K, but without a touch screen.

23  [5] Fresenius could conceivably have a non-touchscreen replacement for the 2008K designed,
validated, and if necessary submitted for FDA approval, within 9 months. If FDA approval is

24  required, it would typically take 3 additional months following submission of the 510(k)
application. Kay Dec. ¶¶ 6-8. However, Fresenius would have no control over that timing.

25  *Id.* If the Court enters an injunction it should stay it for the longer of either (i) 9 months (if no
FDA approval is required) or (ii) until FDA approves the redesigned machine for sale if

26  submission is required. This will guarantee an uninterrupted supply of machines to the
market, and will comply with the Federal Circuit's recent *sua sponte* observation that

27  injunctive relief not be used to put a defendant out of business. *Verizon Servs. Corp. v.
Vonage Holdings Corp.*, 503 F.3d 1295, 1311 n.12 (Fed. Cir. 2007)(Patent owner "did not

28  have a cognizeable interest in putting [defendant] out of business.")

                        10     FRESENIUS' OPPOSITION TO BAXTER'S MOTION FOR ENTRY OF

1  true.  If the Court enjoins manufacture and sale of the 2008K, Fresenius will not be in a position to

2  sell 2008H machines instead.  Clinics and patients will simply go without machines.

### d. Even If Gambro or B. Braun's Machines Make It To Market, Those Machines Lack Critical Treatment Features Offered By The Fresenius 2008K

5  Another deficiency in Baxter's motion is that it fails to account for the differences between

6  the Fresenius 2008K machine and the two competitor machines that Baxter claims can fill the gap

7  if the 2008K becomes unavailable.  To successfully negate any potential disservice to the public

8  good, Baxter must also prove that the alternative machines are safe, effective, and reliable, and

9  that those machines are in fact acceptable alternatives such that they are capable of providing the

10  same level of treatment to the patients.  *See Bionx Implants, Inc. v. Innovasive Devices, Inc.*, 45 F.

11  Supp. 2d 75, 79 (D. Mass 1999); *see also Arthocare Corp. v. Smith & Nephew, Inc.*, 315 F. Supp.

12  2d 615, 622 (D. Del. 2004) (granting an injunction because there were reasonable alternatives

13  available in the market, and because there was "no reason to believe that these [alternative devices

14  would] pose medical risks to patients").

15  Here, the Gambro Phoenix or Braun Dialog are not reasonable alternatives to the 2008K.

16  The 2008K is well-known for its advanced features, safety record, and reliability, and it is

17  preferred by most clinics and physicians for these very reasons.  McCarthy Dec. ¶ 5; Hymes Dec.

18  ¶ 13; Shapiro Dec. ¶¶ 4-5.  The 2008K has a number of therapeutic options and safety features,

19  which help to ensure that patients receive the most comprehensive hemodialysis treatment

20  available.  Florey Dec. Ex. 8.  For example, the 2008K has the following features <u>not</u> found on the

21  Gambro Phoenix or Braun Dialog:

22  *       Acute patients are treated using a different protocol than chronic renal failure patients.  Whereas chronic patients are treated for 4-5 hours, it is generally thought that acute renal failure patients benefit from a longer, slower treatment protocol known as SLED (Sustained low-efficiency dialysis).  These treatments last 8-12 hours, and use a lower dialysate flow rate (approximately 100-200 ml/min.  The Phoenix and the Dialog cannot provide low dialysate flow rates.  The 2008K can operate safely at rates as low as 100ml/min.

26  *       Over time the patient's access blood vessel can become partially blocked or occluded, causing the patient to receive less dialysis therapy than intended by the physician.  The inappropriately low blood flow in the malfunctioning vascular access can lead to it becoming completely clotted, which is a serious complication that often requires a surgical intervention to remedy.  Problems with the patient's blood access cause approximately 50% of the dialysis-related patient hospitalizations each year, and create a

11    FRESENIUS' OPPOSITION TO BAXTER'S MOTION FOR ENTRY OF PERMANENT INJUNCTION –REDACTED
Case No. C 03-01431 SBA (EDL)

burden for the health care budget. The Fresenius 2008K can perform an automatic access flow analysis to measure the patient's blood access flow in order to provide an early indicator of any access issues that can often be remedied prior their becoming severe. Neither the Gambro Phoenix nor the B. Braun Dialog offer this feature.

\*       If the dialysate temperature is higher than the patient's body temperature, the patient will absorb and retain heat from the dialysate. This causes the patient's autonomic system to dilate the blood vessels, which in turn causes blood pressure to drop, potentially making the patient hypotensive. Using its built-in Blood Temperature Monitor, the Fresenius 2008K machine can monitor dialysate and body temperature during the treatment and adjust dialysate temperature to be either net neutral or slightly negative (cool the patient), thus reducing the number of hypotensive episodes. The Gambro Phoenix and the B. Braun Dialog lack this important functionality.

\*       The 2008K is also able to perform On-Line Clearance. Each dialysis treatment results in the removal of a finite amount of waste from the patient's blood stream. Urea removal or clearance is an important measure of the efficiency of this blood cleansing. Historically, the adequacy of the prescribed dialysis treatment is measured once a month using pretreatment and post treatment blood samples for urea. The 2008K incorporates the technology for continuous measurement of treatment efficacy throughout each and every treatment. This means that instead of waiting until the end of a month to learn that a prescription change is needed, the doctors can be alerted to deficiencies in urea removal (which can be due to alterations in blood flow, vascular access function, time of treatment, dialysate flow rate, needle placement and dialyzer selection), and make adjustments in a timely manner. Braun does not offer a similar feature. The calculator integrated in the Dialog system from Braun is not based on real time clearance measurements. Gambro offers an optional feature called DiaScan for the Phoenix machine. However, this feature is not linked to an algorithm like the OLC feature on the 2008K, which provides the clinician with a visual indication by means of a status light if the therapy goal is not achieved.

\*       The Fresenius 2008K incorporates a technology for monitoring of fluid removal called Blood Volume Monitoring (BVM). The BVM module monitors changes in the patient's hematocrit, which correlates to the rate of mobilization of fluid from the tissues and intravascular space. This reduces the chance that the patient will be left with excess fluid after the treatment, or that he will experience cramps and hypotension during the dialysis. A competing technology is available (Crit-Line), but it is not integrated into the dialysis machine and electronic record, and utilizes more expensive machines and disposable supplies.

Dr. Hymes Dec. ¶¶ 10-12; Dr. Shapiro Dec. ¶ 5; Dr. Ross Dec. ¶¶ 4-7; Schlaeper Dec. ¶¶ 3-9.

If the 2008K is enjoined, doctors and patients will lose access to these important therapy options. This would diminish the quality of care for hemodialysis patients, and would therefore be detrimental to the public health. It would also be antithetical to the public interest to prevent doctors and clinics from buying a machine with these enhanced medical features simply because the machine also happens to include an infringing touch screen.

Furthermore, the safety and reliability of the Gambro Phoenix going forward can best be described as dubious. Even after new Phoenix machines were banned from the U.S., Phoenix

FRESENIUS' OPPOSITION TO BAXTER'S MOTION FOR ENTRY OF
PERMANENT INJUNCTION –REDACTED
Case No. C 03-01431 SBA (EDL)

1    machines that had previously been sold were subject to a Class II recall.[6] Florey Dec. Ex. 9. If

2    any new quality or safety issues arise, or if any of Gambro's past problems reoccur, clinics could

3    be left with no source of new hemodialysis machines at all.[7]

4        These public interest factors simply weigh too heavily to justify enjoining a complex, life-

5    saving machine because it includes a single infringing component. *eBay*, 126 S. Ct. at 1842

6    ("When the patented invention is but a small component of the product the companies seek to

7    produce … an injunction may not serve the public interest.") (Kennedy, J., joined by Stevens,

8    Souter, and Breyer, JJ. concurring). Clinics and patients need the Fresenius 2008K machine.

9          **e.**      **Several Other Considerations Also Suggest That The Public**
                 **Interest Would Be Disserved By An Injunction**

10

11        In addition to the lack of proof offered by Baxter with respect to the supply or safety of

12    other hemodialysis machines to meet the market demand, several other considerations also suggest

13    that the public interest would be disserved by an injunction in this case. First, all of the claims at

14    issue from the '434 and '131 patents have been finally rejected as obvious in reexamination

15    proceedings before the Patent Office.[8] Florey Dec. Exs. 12 at p. 51, 13 at p. 46. In an independent

16    review by the highly specialized Central Reexamination Unit, a panel of three supervisory

17    examiners found that (1) the asserted claims of the '434 and '131 patents are obvious in view of

18    certain prior art combinations Fresenius presented at trial; *and* (2) all those asserted claims are

19    invalid in view of several other prior art combinations. *Id.* The Reexamination Unit made this

20    final determination <u>after</u> considering extensive *ex parte* briefing from Baxter, as well as much of

21    the pleadings record from this case.

22

23    [6]   Gambro also received FDA Warning Letters in connection with its blood tubing sets and its Prismaflex System for ICU renal patients. Florey Dec. Exs. 10, 11.

24    [7]   Another disservice to the public interest associated with an injunction against the 2008K would be the effective monopoly on bloodlines granted to Gambro as a result. The Phoenix uses a

25    proprietary and dedicated Gambro bloodline cassette system that can ***only*** be used with the Phoenix. This means that if a clinic purchases a Phoenix machine, it *must* purchase *all* of its

26    bloodlines for those machines from Gambro as well. This harms not only the clinics that are forced to purchase these matching disposables, but also several other third party companies such

27    as Medisystems that make and sell the non-proprietary bloodlines used with 2008K.
[8]   Fresenius has also filed a request for *ex parte* reexamination of claims 7, 10, and 11 of the '027

28    patent and is awaiting the PTO's response. The '027 is a divisional of the '434 patent and is therefore likely to suffer the same fate as the '434 in reexamination.

1    On remand from the Supreme Court, the district court in *eBay* recognized the negative

2    effect on the injunction analysis of even a ***non-final*** obviousness rejection during reexamination –

3    an effect which is only amplified where, as here, the rejections have been made final:

> Here, although the 265 patent is presently valid and enforceable, the court must recognize
> that such patent never underwent a "second look" review by the PTO and that interim
> findings from the PTO during reexamination have twice indicated that every claim in the
> 265 patent is invalid as obvious. Although this court does not ground its opinion in
> speculation regarding the final outcome of such reexamination, it would be futile to
> attempt to craft forward looking equitable relief without considering foreseeable future
> events. *See Polymer Techs. v. Bridwell*, 103 F.3d at 974 (recognizing that courts should
> consider if the defendant "has *or will soon* cease the allegedly infringing activities")
> (emphasis added). Thus, the court deems it proper to consider the nature of the patent, as
> well as repeated indications from the PTO that such patent is invalid as obvious, when
> considering the public's interest in protecting the patent holder through injunctive relief.

10   *eBay*, 500 F. Supp. 2d at 586 (emphasis added).

11   While there is certainly a public interest in preserving the integrity of the patent system and

12   a patent owners' rights to exclusivity, those rights should only be protected where the patents are

13   in fact valid and enforceable. *See id.* The final obviousness rejections of the '131 and '434

14   patents during reexamination, which only occurred recently (November 21 and December 14,

15   2007, respectively), strongly suggest that the asserted claims are invalid and should never have

16   been granted in the first place.[9]

17   Second, an injunction against the 2008K would create a variety of unnecessary burdens on

18   clinics that had previously used only Fresenius machines, thus wasting time and resources that

19   could otherwise be devoted to patient care. There are approximately 3000 clinics in the U.S. that

20   use Fresenius machines exclusively. McCarthy Dec. ¶¶ 11-12. There are significant clinical

21   advantages to using only one model of hemodialysis machine in a given facility. Each

22   manufacturer's machine has different feature sets, operating instructions, cleaning protocols and

23   maintenance requirements. Nurses and technicians are provided extensive training on how to

24   properly operate and maintain a given type of machine. When all clinic personnel are trained on

25   and operate a single model of hemodialysis machine, they become extremely proficient and

26

---

27   [9] If the claims are changed in any substantive manner as a result of the reexamination proceeding,
Fresenius is relieved from any liability on the original, non-amended claims, thus precluding

28   Baxter from receiving any remedy. *See Bloom Eng'g Co. v. N. Am. Mfg. Co.*, 129 F.3d 1247,
1249 (Fed. Cir. 1997).

experienced at properly operating that machine.  This allows them to spend more time on patient care, and reduces mistakes and human error.  Dr. Hymes Dec. ¶¶ 6,8; Dr. Shapiro Dec. ¶ 6.

If the Court issues an injunction against the 2008K, these clinics will be forced to purchase new machines from either Gambro or B. Braun, assuming any additional devices are even available.  The clinics will then have to spend a significant amount of time and money in re-training their staff on a new line of machines.  Dr. Hymes Dec. ¶¶ 7, 9.  This would have an effect not only on the clinic owners and operators, but also on the nurses and technicians who would have to learn how to operate and maintain entirely new machines.  Even more importantly, preventing clinics that have standardized on the 2008K from buying more would have an adverse effect on patient care:

    *    Each treatment involves preparation of the machine, including stringing of blood lines, setting of alarm limits, adjustment of fluid removal rate, monitoring of vital signs, insertion of needs in the patients vascular access, adjustment of blood flow, administration of medications through special ports on the lines, return of blood to the patient, and cleaning of the machine. Each of these steps has the potential for error and harm to the patient. Using different machines with different user interfaces, alarm sounds and signals, blood flow and fluid removal controls, blood line configuration, and sterilization routines increases the opportunity for confusion, mistakes and injury.

    *    Part of the monitoring of patient vital signs, completion of medical records, and documentation of medication administration is linked via the computer system of the clinic to the electronics of the 2008K machine. Substitution of another machine would require either the substitution of hand written records, or a complete redesign of the FMC information system which is intended to bring the advantages (safety, completeness, timeliness and accuracy) of an electronic medical record to the chairside of each patient.

Dr. Hymes Dec. ¶¶ 6, 8-9; Dr. Shapiro Dec. ¶ 6.

Over 70% of the installed base of hemodialysis machines in the U.S. are Fresenius machines.  McCarthy Dec. ¶ 5.  It would be contrary to the public interest to force clinics and doctors who prefer these machines to force some of their patients to switch to another, less reliable machine.  Dr. Hymes Dec. ¶ 14; Dr. Shapiro Dec. ¶¶ 4-6.

> **3.**    **Baxter's Actions Demonstrate That It Has Not Been Irreparably Harmed, And That It Has Adequate Remedies Available At Law**

Baxter bears the burden of proving that it would be irreparably harmed absent an injunction.  *See eBay*, 126 S. Ct. at 1841; *Rondeau*, 422 U.S. at 62-63.  Baxter has failed to meet this burden.  Instead, Baxter cites several cases decided prior to *eBay* and points to harms that are

FRESENIUS' OPPOSITION TO BAXTER'S MOTION FOR ENTRY OF
PERMANENT INJUNCTION –REDACTED
Case No. C 03-01431 SBA (EDL)

1   generic to any patent owner whose patent has been infringed.  Put more simply, Baxter is

2   attempting to rely on a <u>presumption</u> of irreparable harm rather than actually proving it.  This it

3   cannot do because, following *eBay*, there is no longer a presumption of irreparable harm upon a

4   finding of infringement.  *See eBay*, 126 S. Ct. at 1840; *see also z4 Techs., Inc. v. Microsoft Corp.*,

5   434 F. Supp. 2d 437, 440 (E.D. Tex. 2006); *Paice LLC*, 2006 WL 2385139, at *4 ("The *eBay*

6   decision demonstrates that no presumption of irreparable harm should automatically follow from a

7   finding of infringement."); *Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 545 (1987)

8   (holding that a presumption of irreparable harm in the context of an injunction analysis "is

9   contrary to traditional equitable principles").

10                  **a.      Baxter No Longer Practices The Patents In Suit**

11          Almost the entire basis for Baxter's claim for irreparable harm is that it is a competitor in

12  the field of hemodialysis machines.  This simply is not true.  Baxter's brief is disingenuous in

13  stating that Baxter and Fresenius are "fierce competitors for the sale of hemodialysis machines."

14  [Baxter Br. at 2; 4-6.]  While Baxter at one time was in fact a competitor in the field of

15  hemodialysis machines, the injunction analysis must focus on the parties' *current status* in the

16  market.  *See Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 799 (4th Cir. 2001) ("A

17  prospective injunction is entered only on the basis of current, ongoing conduct that threatens

18  future harm.").  At present, Baxter does not have a hemodialysis machine on the market, and is not

19  a direct competitor of Fresenius in the hemodialysis machine field.  Rather, Baxter is merely a

20  distributor for the Gambro Phoenix machine.[10]  Florey Dec. Ex. 7; Trial Tr. at 192, 218-219.

21          As stated in Gambro's 2005 Annual Report, "Baxter ceased its own manufacturing of HD

22  machines and entered a distribution and promotion agreement to sell and distribute Gambro's HD

23  machines and directly related disposables."  Florey Dec. Ex. 1 at p. 15.  Baxter's decision to cease

24  its manufacturing activities is highly probative of whether it will be irreparably harmed by

25

26  _____
    [10] Regardless of the current relationship between Baxter and Gambro, Baxter cannot rely on any
27  harm that may befall Gambro in support of its claim for irreparable injury.  *See Voda v. Cordis
    Corp.*, No. CIV-03-1512-L, 2006 WL 2570614, at *5 (W.D. Okla. Sept. 5, 2006) (holding that any
28  alleged irreparable harm to a non-party was irrelevant, even if the non-party would have had
    standing to sue); *see also Am. Dairy Queen Corp. v. Brown-Port Co.*, 621 F.2d 255, 257-58 (7th
    Cir. 1980) (same).

FRESENIUS' OPPOSITION TO BAXTER'S MOTION FOR ENTRY OF
                            PERMANENT INJUNCTION –REDACTED
                            Case No. C 03-01431 SBA (EDL)

Fresenius' manufacture and sale of the 2008K because, "[a]lthough a patentee's failure to practice an invention does not necessarily defeat the patentee's claim of irreparable harm, *the lack of commercial activity by the patentee is a significant factor in the calculus.*" *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1556 (Fed. Cir. 1995) (emphasis added).[11]   Moreover, even a patent owner that is competing must still provide case-specific evidence proving that it actually will suffer irreparable harm. *See Praxair, Inc. v. ATMI, Inc.*, 479 F. Supp. 2d 440, 443-44 (D. Del. 2007) (denying injunction against head-to-head competitor because the patent owner failed to prove "precisely what market share, revenues, and customers [the patent owner had] lost to [the defendant]").

### b. Baxter Has Shown A Willingness To License Its Patents To Others In The Hemodialysis Machine Market, Including Fresenius

Since it acquired these patents in 2000, Baxter has demonstrated a willingness to license the patents to its so-called competitors on multiple occasions.  This fact severely undermines Baxter's claim that it has been irreparably injured because it shows that Baxter is willing to forgo its right to exclude others – as long as the price is right.[12]  *See Polymer Tech.*, 103 F.3d at 975 (irreparable harm is clearly negated when "the patentee was willing to forgo its right to exclude by licensing the patent"); *see also High Tech Med.*, 49 F.3d at 1557 (noting that a patent owner's offer to license a defendant makes "clear that [the plaintiff] is willing to forgo its patent rights for compensation ... [and] that any injury suffered by [the plaintiff is] compensable in damages"); *see also T.J. Smith & Nephew Ltd. v. Consolidated Med. Equip., Inc.*, 821 F.2d 646, 648 (Fed. Cir. 1987) (licensing is "incompatible with the emphasis on the right to exclude").

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[11] Although Baxter no longer sells hemodialysis machines, it still maintains significant sales of disposable hemodialysis products.  Baxter has offered no evidence showing that sales of the hemodialysis products it still offers have declined while the 2008K has been on the market.
[12] Mr. Keeley's testimony to the contrary at trial [*see* Baxter's Br. at 6], while perhaps true in his opinion, is completely undercut by Baxter's pre-suit and post suit negotiations with Fresenius. 2006 Trial Tr. at 335.  These negotiations also belie Baxter's statement that "Baxter has not, and will not, acquiesce to Fresenius' use of the inventions." [Br. at 14.]  The truth is that Baxter has

1

2

3

4

5            *See IMX, Inc. v. LendingTree, LLC*, 469 F. Supp. 2d 203, 225 & n.24 (D. Del.

6 2007). Baxter has also allowed B. Braun to sell its Dialog hemodialysis machine, which has a

7 touch screen user interface, unchallenged for almost 9 years, even though Baxter believes it is

8 infringing. Trial Tr. at 343-344. Baxter cannot argue irreparable harm in light of its allowing the

9 only two other hemodialysis companies in the U.S. market to practice the patents in suit.

10        Before this litigation even began, Fresenius and Baxter were involved in licensing

11 negotiations that would have obviated the need for what has turned out to be a long and costly

12 litigation for both parties. It wasn't until those negotiations broke down that Fresenius was forced

13 to file this lawsuit. 2006 Trial Tr. at 335.[13] Fresenius and Baxter have discussed licensing both

14 following the close of evidence, and following Baxter's filing of its injunction motion. While the

15 negotiations failed because Baxter insisted on way more money than Fresenius believed the

16 technology was worth, the fact that they even occurred shows Baxter will not be irreparably

17 harmed if Fresenius is not enjoined. *MercExchange*, 500 F. Supp. 2d at 572-73; *see also Paice*

18 *LLC v. Toyota Motor Corp.*, No. 2:04-CV-211-DF, 2006 WL 2385139, at *5 (E.D. Tex. Aug. 16,

19 2006) (finding that post-trial offers to license suggest monetary relief rather than injunctive relief

20 is appropriate).[14]

21        The only real value to Baxter of an injunction now would be to strengthen its position in

22 further negotiations with Fresenius. But courts have long recognized that this is not an appropriate

23 reason to issue an injunction. *See Foster v. American Mach. & Foundry Co.*, 492 F.2d 1317, 1324

24 (2d Cir. 1974) ("An injunction … is not intended as a club to be wielded by a patentee to enhance

25 _____

26 always been willing to license Fresenius if Fresenius would agree to pay an exorbitant amount of
money that far exceeds the fair value of the technology.

27 [13] This testimony was elicited by Baxter. Mr. Abernathy asked Mr. Powell "And isn't it true that
Baxter offered Fresenius a licensing arrangement?" Mr. Powell answered "Yes."

28

FRESENIUS' OPPOSITION TO BAXTER'S MOTION FOR ENTRY OF
PERMANENT INJUNCTION –REDACTED
Case No. C 03-01431 SBA (EDL)

his negotiating stance."); *see also Nerney v. New York, N.Y. & H.R. Co.*, 83 F.2d 409, 411 (2d Cir. 1936) ("And where … it is recognized that the only real advantage to a plaintiff in granting the injunction would be to strengthen its position in negotiating a settlement, an injunction should not issue.").

### c. Baxter Has Allowed A Significant Amount Of Time To Pass Without Seeking An Injunction To Stop Fresenius Or Other Manufacturers From Infringing Its Technology

Baxter's motion for an injunction comes over nine months after this Court granted judgment as a matter of law that Fresenius' 2008K machine infringes Baxter's valid patents, and conveniently follows a jury award of damages that was substantially lower than Baxter was seeking. In fact, the amount of past damages awarded by the jury is the most likely explanation for why Baxter now claims there are no adequate remedies available at law. This nine-month delay is significant, and suggests that Baxter will not be irreparably harmed by any continued infringement. *See High Tech Med.*, 49 F.3d at 1557. Baxter also delayed in initially filing suit against Fresenius. Baxter was well aware of Fresenius' 2008K machines since the time Baxter purchased the patents in 2000, but it never chose to file suit. And even after the suit had begun, Baxter never sought a preliminary injunction against the 2008K. *MercExchange*, 500 F. Supp. 2d at 573("if patent owner's "true goal was to defend its right to exclude, it would likely have at least *attempted* to stop [defendant] … from further improving its foothold on the market during the lengthy litigation period."); *see also PGBA, LLC v. U.S.*, 389 F.3d 1219, 1229-31 (Fed. Cir. 2004); *T.J. Smith*, 821 F.2d at 648 (recognizing that delay in seeking preliminary injunction is inconsistent with patent holder's right to exclude).

In sum, courts deny injunctive relief where the patent owner does not compete with the infringer by practicing the patents in suit; where the patent owner has shown a willingness to license others under the patents; and where the patent owner has delayed in bringing suit or in seeking an injunction. *See Polymer Techs.* (noting that "[e]ach of these circumstances would appear to negate irreparable harm"), 103 F.3d at 974; *see also High Tech Med.*, 49 F.3d at 1557;

---

[14] Fresenius' view of the value of the technology has been justified, as the amounts Fresenius offered Baxter for a license prior to the litigation and after trial were consistent with the actual

*T.J. Smith*, 821 F.2d at 648. Here, all three of these facts, especially when taken together, strongly demonstrate that Baxter will not be irreparably harmed by the denial of an injunction. *See Atari Corp. v. Sega of Am. Inc.*, 869 F. Supp. 783, (N.D. Cal. 1994)

### d.  Monetary Damages Are Adequate To Compensate Baxter For Any Future Infringement

An injunction is not appropriate if money damages will adequately compensate Baxter for any future use of the technology by Fresenius. *See Rondeau*, 422 U.S. at 59-60; *see also Paice*, 2006 WL 2385139, at *5 ("Irreparable harm lies only where injury cannot be undone by monetary damages."). Here, monetary damages are essentially a bird in the hand for Baxter – allowing it to collect a percentage of every sale made by the market leader in hemodialysis machines. *See MercExchange*, 500 F. Supp. 2d at 583 (recognizing that an ongoing royalty applied to a large base of infringing products represents an adequate remedy at law for a patent owner that does not practice the patented technology).

At the damages trial, the jury had no trouble weighing all of the evidence and determining an appropriate rate for Fresenius' past infringement. If Baxter's motion for an injunction is properly denied, this ongoing royalty will continue to accrue and will be paid by Fresenius until the patents expire in 2011. Since there is no doubt that Fresenius is financially stable and will be able to pay this ongoing royalty, and there is no reason to believe such an ongoing royalty would be difficult to administer, monetary damages are an appropriate remedy in this case. *See Nutrition 21*, 930 F.2d at 871.

### 4.  The Balance of Hardships Favors The Denial Of An Injunction

Baxter cannot claim that it will face any hardship if an injunction is denied because it no longer practices the patents in suit and will be adequately compensated for any future infringement through an ongoing royalty at the rate set by the jury. Fresenius and its employees, on the other hand, will suffer significant harm if an injunction is granted. The 2008K is the primary product Fresenius manufactures at its factory in Walnut Creek, California.[15] An injunction against the 2008K would nearly idle that entire facility for some period of time, leading to lay-offs of

_____

amount the jury awarded.

1   manufacturing employees and disruption of supplier relations. Slater Dec. ¶¶ 8-9. Further, as

2   discussed above, Fresenius-owned clinics would be harmed due to the lack of availability of the

3   2008K – the machine that all nurses and technicians in those clinics are trained to use.[16]

### B.   An Ongoing Royalty, At The Rate Set By The Jury, Is Appropriate Under The Facts Of This Case

The appropriate remedy to compensate Baxter for any future sale by Fresenius of the

2008K is an ongoing royalty at the rate set by the jury in the damages trial. Having already argued

and lost its bid for a 7% royalty on both machines and disposables before a jury, Baxter now asks

the Court to award it over $1000 per machine for its touch screen patents. After hearing all of the

evidence from both Fresenius and Baxter, and after considering the Court's instructions as to the

law, the jury awarded Baxter a *reasonable* royalty of 1.7% per machine for Fresenius' use of the

touch screen technology, as well as a royalty on disposables. These amounts represent full

compensation to Baxter for Fresenius' past infringement.

Baxter has failed to offer any valid reason why the rates awarded by the jury to compensate

it for Fresenius' past infringement are insufficient to compensate it for any future infringement.

To determine a proper ongoing royalty rate, courts have generally conducted a time-shifted

*Georgia-Pacific* analysis that takes current facts and circumstances into consideration. *Finisar*

*Corp. v. DirectTV Group, Inc.*, Civil Action No. 1:05-CV-00264 (E.D. TX July 6, 2006)(Florey

Dec. Ex. 14). In its recent *Paice* decision, the Federal Circuit ruled that determination of a post-

verdict running royalty is for the Court if the parties are unable to agree. *Paice LLC v. Toyota*

*Motor Corp.*, 504 F.3d 1293, 315-1316 (Fed. Cir. 2007). However, the *Paice* court was careful to

note that while the district court may consider additional evidence, "[t]he district court may

determine that [the jury's award] is, in fact, an appropriate rate going forward." *Id.* at 1315.

---

[15] Fresenius makes its dialyzers at a facility in Utah.

[16] An injunction would also result in an unfair loss of market share for Fresenius because, unlike many patent infringers, Fresenius did not build up its entire hemodialysis business and market position around the touch screen interface. *Contra Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986). Rather, Fresenius became the market leader in 1997, when it was selling the non-infringing 2008H machine. McCarthy Dec. ¶ 6. It would be unfair to take away Fresenius' customer base by enjoining the highly innovative 2008K machine because one component infringes Baxter's touch screen user interface patent.

FRESENIUS' OPPOSITION TO BAXTER'S MOTION FOR ENTRY OF
PERMANENT INJUNCTION –REDACTED
Case No. C 03-01431 SBA (EDL)

1     In its brief, Baxter first re-argues the same evidence it presented to the jury. The jury fully

2  and fairly considered this evidence, and there is no reason for the Court to re-weigh it. Realizing

3  this, Baxter postulates three "new" facts that it asserts should radically change the royalty rate on a

4  forward-looking basis. While it may be appropriate for the Court to consider these "new"

5  circumstances, none should have any effect on the conclusion that the jury reached.[17]

6     First, the fact that the 2008H is no longer manufactured and sold by Fresenius has no

7  bearing on the reasonable royalty analysis. Fresenius manufactured the highly-regarded 2008H

8  machine for 13 years; continuing its production and sale for several years after the introduction of

9  the 2008K. The 2008K itself was a substantial improvement on the 2008H, but it also included

10  many of the same technologies that were developed for the 2008H model. Trial Tr. at 464. Dr.

11  Rubinfeld, Fresenius' damages expert, testified that in the hypothetical negotiation, the parties

12  would have looked at the profit differential between the 2008H machine and the 2008K machine,

13  and then decide how to divvy up the profits based on the incremental improvement that was

14  properly attributable to the patented touch screen feature. [Trial Tr. at 620:18-621:5; 623:20-

15  624:14; 632:12-633:21.]

16     Baxter claims that Dr. Rubinfeld's testimony at trial "was premised upon the 2008H being

17  a commercially viable non-infringing alternative" to the 2008K, and therefore, that his analysis is

18  now inapplicable to an ongoing royalty. [Baxter Br. at 22.] This is not true. In fact, during cross-

19  examination, Dr. Rubinfeld explained just the opposite – that his damages theory was not

20  dependent on the 2008H being a non-infringing alternative to the 2008K, but that he took into

21  consideration the additional features of the 2008K over the 2008H. [Trial Tr. at 648:21-649:12.]

22  Dr. Rubinfeld further explained that if the 2008H *was not* an acceptable non-infringing alternative,

23  his estimates for damages would actually have been too high. [Trial Tr. at 651:21-652:2.]

24     Second, Baxter's alleged re-entry into the hemodialysis field is based upon an

25  announcement that it plans to work with two other companies to develop a *home* hemodialysis

26

---

27  [17] The only "new" circumstance that would have any effect on the ongoing royalty is Baxter's exit
from the hemodialysis machine market, which would create a downward effect on the royalty rate.

28  At the hypothetical negotiation in 2000, when Baxter made a competitive machine, Baxter had
much more incentive to value its right to exclude by asking for a higher royalty rate.

FRESENIUS' OPPOSITION TO BAXTER'S MOTION FOR ENTRY OF
PERMANENT INJUNCTION –REDACTED
Case No. C 03-01431 SBA (EDL)

1  machine. [Baxter Br. at 22]; Murthy Dec. Ex. 6. The 2008K is sold to *clinics*. Additionally,

2  Baxter fails to mention that its planned release date for the new machine is not until 2011, which is

3  when the patents in suit <u>expire</u>. Finally, Baxter asserts – in the context of setting a reasonable

4  ongoing royalty for *the patents-in-suit* -- that it has an established policy of excluding others from

5  practicing its inventions. [Baxter Br. at 23.] But the "additional evidence" Baxter cites is another

6  case Baxter has filed against Fresenius involving patents relating to *peritoneal* dialysis.[18] As to

7  the patents-in-suit, the truth remains that Baxter has stopped practicing them and has granted

8  rights to a competitor, Gambro, to practice them instead. Trial Tr. at 192.

9       Baxter has not offered any new evidence proving that an ongoing royalty to compensate it

10  for any future infringement should be higher than the royalty awarded by the jury for Fresenius'

11  past infringement. The Court, the parties, and the jurors expended considerable time and effort

12  conducting a trial that was exclusively focused on the issue of a reasonable royalty. The fruit of

13  that labor is valuable, and should apply on a go-forward basis.

14      **C.**    **If The Court Does Grant An Injunction, The Court Should Also Grant A Stay Pending Appeal**

15

16       Although Fresenius does not agree that an injunction is an appropriate equitable remedy in

  this case, if the Court does decide to grant an injunction, Fresenius respectfully asks for a stay
17
  pending appeal. The four traditional equitable factors considered in determining whether a stay
18
  should be granted are: 1) the relative likelihood of success on the merits of the appeal; 2) the harm
19
  to the patent owner if an injunction is stayed; 3) the harm to the infringer if an injunction is
20
  immediately granted; and 4) the public interest. *See Std. Havens Prods., Inc. v. Gencor Indus.,*
21
  *Inc.*, 897 F.2d 511, 512 (Fed. Cir. 1990). Here, each of the *Standard Havens* factors favor a stay.
22
       Fresenius has a strong chance of succeeding on the merits of its appeal to the Federal
23
  Circuit. In particular, the original jury verdict of obviousness, the Supreme Court's clarification
24
  (and lessening) of the obviousness standard in *KSR International Co. v. Teleflex Inc.*, 127 S. Ct.
25

26  --------

27  [18] This argument is a red herring – one that Baxter likely raises solely in an attempt to paint Fresenius as a serial infringer of Baxter's technologies, which simply is not true. The nine-patent case is in its very early stages and Fresenius is firm in its belief, and has so asserted, that it does

28  not infringe any of the patents at issue. Moreover, Baxter only owns four of the nine asserted patents – it is a licensee of the remainder.

1727 (2006), and the PTO's final rejections of all asserted claims of both the '131 and '434

patents in reexamination, all suggest that these patents will eventually be found invalid as obvious.

As discussed above, the public interest and the harm factors all tip decidedly against an injunction.

*See, GTE Prods. Corp. v. Kennametal, Inc.*, 772 F. Supp. 907, 920 (W.D. Va. 1991) (granting stay

pending appeal due to serious concern that patent owner would be unable to fill the gap between

supply and demand created by the injunction); *E.I. DuPont de Nemours & Co. v. Phillips*

*Petroleum Co.,* 835 F.2d at 278. (Fed. Cir. 1987).

## III.    CONCLUSION

For the foregoing reasons, Fresenius respectfully asks the Court to deny Baxter's motion

for a permanent injunction and instead award an ongoing royalty at the rate set by the jury in the

damages trial.


Dated:  January 15, 2008                        FISH & RICHARDSON P.C.



                                                By:  s/ Michael E. Florey
                                                      Michael E. Florey

                                                Attorneys for Plaintiffs/Counterclaim
                                                Defendants
                                                FRESENIUS MEDICAL CARE HOLDINGS,
                                                INC. AND FRESENIUS USA, INC.


10779759.doc

FRESENIUS' OPPOSITION TO BAXTER'S MOTION FOR ENTRY OF
PERMANENT INJUNCTION –REDACTED
Case No. C 03-01431 SBA (EDL)

# EXHIBIT 3

2008-1306

---

# United States Court of Appeals
# for the Federal Circuit

---

Fresenius Medical Care Holdings, Inc.,
and Fresenius USA, Inc.

*Plaintiffs-Appellants,*

v.

Baxter International, Inc., and
Baxter Healthcare Corp.,

*Defendants-Appellees.*

---

Appeal from the United States District Court for Northern District of
California in case no. C-03-01431, Judge Saundra B. Armstrong.

---

## FRESENIUS' MOTION TO STAY INJUNCTION ORDER
## PENDING APPEAL AND FOR EXPEDITED APPEAL

---

| Juanita R. Brooks | Robert Hillman | Michael E. Florey |
|---|---|---|
| FISH & RICHARDSON P.C. | FISH & RICHARDSON P.C. | Deanna J. Reichel |
| 12390 El Camino Real | 225 Franklin Street | FISH & RICHARDSON P.C. |
| San Diego, CA 92130 | Boston, MA 02110 | 3300 RBC Plaza |
| Telephone: (858) 678-5070 | Telephone: (617) 542-5070 | 60 South Sixth Street |
| Facsimile: (858) 678-5099 | Facsimile: (617) 542-8906 | Minneapolis, MN 55402 |
| | | Telephone: (612) 335-5070 |
| | | Facsimile: (612) 288-9696 |

April 28, 2008

# LISTING OF EXHIBITS

| | |
|---|---|
| Exhibit A | Excerpts From The Trial Transcripts Of The June 2006 Jury Trial Before the Honorable Judge Saundra Brown Armstrong Of The United States District Court For The Northern District of California |
| Exhibit B | Declaration of Patrick McCarthy In Support Of Fresenius' Opposition To Baxter's Motion For Entry Of Permanent Injunction, January 15, 2008 |
| Exhibit C | National Kidney Foundation A to Z Health Guide |
| Exhibit D | Declaration of Glenn Slater In Support Of Fresenius' Opposition To Baxter's Motion For Entry Of Permanent Injunction, January 15, 2008 |
| Exhibit E | Declaration of Jeffrey L. Hymes In Support Of Fresenius' Opposition To Baxter's Motion For Entry Of Permanent Injunction, January 15, 2008 |
| Exhibit F | Declaration of Dr. Warren B. Shapiro In Support Of Fresenius' Opposition To Baxter's Motion For Entry Of Permanent Injunction, January 15, 2008 |
| Exhibit G | U.S. Patent No. 5,744,027 (PX 6) |
| Exhibit H | Special Verdict Form From The June 2006 Jury Trial Before the Honorable Judge Saundra Brown Armstrong Of The United States District Court For The Northern District of California, June 30, 2006 |
| Exhibit I | Order Granting Baxter's Renewed Judgment as a Matter of Law, February 13, 2007 |
| Exhibit J | U.S. Patent No. 6,284,131 (PX 7) |
| Exhibit K | U.S. Patent No. 5,247,434 (PX 1) |
| Exhibit L | 3M Sarns Perfusion System 9000 Operators Manual Subsequent Edition (PX 342) |
| Exhibit M | Rau: Ergonomics and Aspects of its Application in Medicine (PX 117) |
| Exhibit N | *Ex Parte* Communication from Reexamination of U.S. Patent No. 6,284,131, November 21, 2007 |
| Exhibit O | *Ex Parte* Communication from Reexamination of U.S. Patent No. 5,247,434, December 14, 2007 |

| Exhibit P | *Ex Parte* Communication from Reexamination of U.S. Patent No. 5,247,434, April 3, 2008 |
| Exhibit Q | *Ex Parte* Communication from Reexamination of U.S. Patent No. 6,284,131, March 17, 2008 |
| Exhibit R | *Ex Parte* Communication from Reexamination of U.S. Patent No. 5,744,027, March 28, 2008 |
| Exhibit S | Order Granting Baxter Healthcare Corporation's Motion for Entry of Permanent Injunction, April 4, 2008 |
| Exhibit T | Fresenius' Opposition To Baxter's Motion For Entry of Permanent Injunction – Redacted, January 15, 2008 |
| Exhibit U | Declaration of Janet Kay In Support Of Fresenius' Opposition To Baxter's Motion For Entry Of Permanent Injunction, January 15, 2008 |
| Exhibit V | Special Verdict Form From The October 2007 Jury Trial Before the Honorable Judge Saundra Brown Armstrong Of The United States District Court For The Northern District of California, October 29, 2007 |
| Exhibit W | Baxter News Release, July 21, 2005 |
| Exhibit X | Excerpts From The Trial Transcripts Of The October 2007 Jury Trial Before the Honorable Judge Saundra Brown Armstrong Of The United States District Court For The Northern District of California |

# TABLE OF CONTENTS

**Page**

I.    Introduction.............................................................................1

II.   The Facts And Proceedings Below..........................................2
      A.    The Hemodialysis Process and the Enjoined
            Machines.......................................................................2
      B.    The District Court's Grant Of JMOL Was
            Seriously In Error ........................................................4
            1.    The Conventional Features Were In the
                  Prior Art.............................................................4
            2.    Motivation to Combine Was Established ..........7
      C.    The Reexamination Rejections Confirm
            Invalidity .....................................................................8
      D.    The District Court Improperly Granted an
            Injunction and an  Excessive Ongoing Royalty...........9

III.  Argument...............................................................................10
      A.    Legal Standards...........................................................10
      B.    The April 4, 2008 Order Should Be Stayed
            Pending Appeal...........................................................11
            1.    The Appeal Is Likely to Succeed ....................12
            2.    Reexamination Is Likely To Succeed ..............13
            3.    The Balance of Harms Strongly Favors
                  Fresenius ..........................................................14
      C.    The Court Should Also Expedite the Appeal............19

IV.   Conclusion ............................................................................20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agrizap, Inc. v. Woodstream Corp.,*
  Nos. 2007-1415, -1421 (Fed. Cir. Mar. 28, 2008) ............................ 8

*E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.,*
  835 F.2d 277(Fed. Cir. 1987) ........................................................ 11

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.,*
  49 F.3d 1551(Fed. Cir. 1995) ........................................................ 16

*Hilton v. Braunskill,*
  481 U.S. 770 (1987) ..................................................................... 11

*Hybritech, Inc. v. Abbott Labs.,*
  4 USPQ2d 1001 (C.D. Cal. 1987) ................................................... 18

*KSR International Co. v. Teleflex, Inc.,*
  127 S.Ct. 1727 (2007) .............................................................. 8, 13

*Leapfrog Enters., Inc. v. Fisher-Price. Inc.,*
  485 F.3d 1157 (Fed. Cir. 2007) ........................................................ 8

*MercExchange, L.C.C. v. eBay, Inc.,*
  500 F. Supp. 2d 556 (E.D. Va. 2007) ......................................... 15, 16

*Paice LLC v. Toyota Motor Corp.,*
  No. 2:04-CV-211-DF, 2006 WL 2385139
  (E.D. Tex. Aug. 16, 2006) ............................................................ 16

*Power Controls Corp. v. Hybrinetics, Inc.,*
  806 F.2d 234 (Fed. Cir. 1986) ....................................................... 19

*Std. Havens Prods., Inc. v. Gencor Indus., Inc.,*
  897 F.2d 511 (Fed. Cir. 1990) ................................................... 11, 14

ii

## **TABLE OF AUTHORITIES (cont'd)**

**Page(s)**

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007) ........................................................19

*Wienberger v. Romeo-Barcelo*,
    456 U.S. 305 (1982) .........................................................................18

## I.   Introduction

In this patent controversy over life-sustaining medical devices, the district court rejected summary judgment motions by both sides and thus confirmed the presence of material factual disputes.  After the jury resolved those disputes and returned a verdict finding all Baxter's asserted claims invalid, however, the district court granted JMOL, improperly reversing the jury and its own earlier rulings.

After then conducting a damages trial before a new jury which resulted in an award that was much less than Baxter demanded, the court again improperly ignored the jury with its April 4, 2008 imposition of an injunction and draconian ongoing royalty rate.  First, having apparently viewed an injunction as "all but inevitable" since the determination that the patents were infringed, the district court granted an injunction against Fresenius' sale of the market-leading 2008K hemodialysis machine, effective January 1, 2009, despite the fact that Baxter does not manufacture or otherwise provide alternatives to that product.  Second, the court imposed a post-verdict royalty rate on machines and collateral sales of unpatented disposable components that is radically higher than the rates implicit in the jury's findings.

To provide meaningful relief from the district court's errors, Fresenius asks this Court to stay enforcement of the April 4, 2008 order until the appeal is finally resolved and expedite the appeal process to ensure completion by January 1, 2009.

1

## II.    The Facts And Proceedings Below

### A.    The Hemodialysis Process and the Enjoined Machines

A normal kidney has two main functions—to dispose of metabolic waste and to dispose of excess water that builds up in the blood. If the kidneys cannot function, the toxins and water accumulate and the person will die within weeks. [*See* Ex. A, at 212:20-13:5.] To prevent death from this toxin and water build-up, patients with failing kidneys must receive hemodialysis treatment, in which a hemodialysis machine is used to remove the patient's entire blood supply, pass it through a disposable device called a dialyzer to remove the toxins and excess water, and return the purified blood to the patient. [Ex. A, at 212-13, 483:3-84:9.]

Approximately 500,000 patients in the United States suffer from end-stage renal (or kidney) disease and, of these patients, 320,000 depend on regular hemodialysis treatment. [Ex. B, ¶¶ 5, 10; Ex. C, at 4.] While Baxter manufactures no hemodialysis machines at all, Fresenius is the leading developer, manufacturer, and supplier of safe and reliable hemodialysis machines, including the 2008K series, that are used in thousands of clinics across the U.S. to provide necessary life-sustaining treatment every day. [Ex. B, ¶¶ 3, 6, 8; Ex. D, ¶ 10.] The 2008K machine is known for its advanced features, safety record, and reliability, and is preferred by physicians and other medical professionals for these reasons. [Ex. B, ¶ 5; Ex. E, ¶ 13; Ex. F, ¶¶ 4-5.] In fact, the 2008K is far and away the leading

hemodialysis machine in the United States, making up over 90% of the market in recent years, and Fresenius has sold nearly 40,000 of these machines over the past three years. [Ex. B, ¶¶ 4, 6, 8; Ex. D, ¶¶ 6, 8, 10.]

The Fresenius 2008K machines are so prevalent that there are about 3000 clinics in the U.S. that use them exclusively. [Ex. B, ¶¶ 11-12.] The use of a single type of hemodialysis machine in a clinic provides a number of significant advantages. Each type of machine has different features, instructions, and cleaning and maintenance requirements, and clinic nurses and technicians are provided extensive training on how to operate a particular type of machine, allowing them to become familiar and proficient with its proper operation. [Ex. E, ¶¶ 6, 8; Ex. F ¶ 6.] This training and familiarity is critical because preparing a machine for each patient treatment involves a number of steps, including stringing of bloodlines, setting alarm limits, adjusting fluid removal rate, monitoring of vital signs, adjusting of blood flow rate, and setting up the return of blood to the patient. [Ex. E, ¶¶ 6, 8-9; Ex. F, ¶ 6.] With each step comes the potential for error, and using different machines with different user interfaces and other features only increases that risk. [*Id.*] The use of one specific type of machine helps to reduce errors and allows more time for patient care. [*Id.*] For the thousands of clinics that are standardized on the current 2008K, these advantages will be lost if the injunction forces Fresenius to redesign the 2008K.

3

If the district court's injunction order is not stayed, Fresenius will be forced to immediately undertake a redesign process to have any chance of settling on a redesigned machine, submitting it for FDA approval, and receiving clearance to sell it in time to ensure an uninterrupted supply of hemodialysis machines to the clinics and patients that depend on them. But this process will be costly and disruptive to Fresenius and harmful to clinics standardized on the current 2008K.

**B.     The District Court's Grant Of JMOL Was Seriously In Error[1]**

Each claim on appeal is divided into two parts, with the first part reciting conventional features of hemodialysis machines and the second part reciting use of a touch screen for data input and control. In granting JMOL, the district court ruled first that the conventional features were not proved to have been in the prior art, and second that there would have been no motivation to combine a touch screen with those conventional features. Both rulings were in error.

**1.     The Conventional Features Were In the Prior Art**

The conventional features were so clearly in the prior art that the district court's conclusion to the contrary is essentially inexplicable. For example, with respect to '027 claim 11, the conventional features are recited in claim 7, from which claim 11 depends. [Ex. G.] Claim 11 specifies simply that a "touch screen"

---

[1]  Although Fresenius will raise other issues on appeal, this motion focuses primarily on the likelihood that this Court will reverse the district court's JMOL reversal of the jury's obviousness verdict.

4

is used as the "data input device" added by unasserted claim 10 to provide data to the controller of the machine set forth in claim 7. The jury found claim 7 to be anticipated, and Baxter did not challenge that finding. [Ex. H; Ex I, at 6.] The sole explanation offered by the court for its finding that the anticipated features of claim 7 were not prior art when identically incorporated into dependent claim 11 was that the claim 7 features were not separately "addressed" by Fresenius' witnesses in connection with claim 11. [Ex. I, at 19].

Equally flawed were the court's rulings that the conventional elements of the '131 and '434 claims were not in the prior art. In each of those patents the conventional elements are recited in part (a) of the main claim and the touch screen and its functions are recited in part (b). Element (a) of '131 independent claim 1 simply requires "a dialystate delivery system for supplying dialysate to a hemodialyzer, the dialysate-delivery system comprising at least one unit selected from the group consisting of "four units", one of which is a "dialysate-preparation unit" and a second of which is a "dialysate-circulation unit." [Ex. J.] "Dialysate" is a liquid that is circulated to the dialyzer to cleanse the blood. Every dialysis machine since at least the 1970s has required a "unit" to prepare the dialysate and a "unit" to circulate it. Part (a) of '131 claim 1 was thus necessarily in prior art, since only one of the four recited units was required. As Mr. Kelly, a named inventor on the Baxter patents, conceded, "every hemodialysis machine has to have

5

dialysate to work and has to have some way of circulating the dialysate through a dialysate circuit." [Ex. A, at 700:11-03:9]. Yet the court ruled to the contrary:

> Fresenius has not identified any testimony from Causey where he specifically analyzes element (a). Fresenius further argues that by identifying the Cobe C3 Manual as invalidating prior art with respect to claims in the '131 patent that are dependent on claim 1, Causey implicitly identified the Cobe C3 Manual as meeting element (a) of claim 1 as well. This argument is vague at best and fails to identify substantial evidence given to the jury as required.

[Ex. I, at 13.]

The district court also ruled that the Seratron manual, which was in evidence and plainly disclosed all the elements of '131 claim 1(a), was "problematic" because "there was no testimony connecting it to the '131 patent," and therefore improperly found that Fresenius had not presented substantial evidence that element (a) was in the prior art." [*Id.*]

The asserted independent claim of the '434 patent is claim 26, part (a) of which is:

> A hemodialysis machine comprising:
> (a)    means for controlling a dialysate parameter selected from a group consisting of dialysate temperature and dialysate concentration, and means for delivering the dialysate to a dialysate compartment of a hemodialyzer;

[Ex. K.] Just as with the '131 claim 1, the district court ruled that Fresenius had not provided substantial evidence that element (a) was in the prior art. Again, this

6

ruling was contrary to the undisputed evidence of record. Indeed, inventor Tom

Kelly admitted the presence of element (a) of '434 claim 26 in the prior art:

> Q.    You're not saying that there were not means for controlling a
> dialysate parameter selected from a group consisting of temperature
> and concentration, you are not saying that didn't exist before your
> work on the System 1000?
> A.    That's correct.

[Ex A, at 973:16-20.]

## 2.    Motivation to Combine Was Established

The "no motivation to combine" prong of the JMOL ruling was also in error.

The evidence showed that the claimed use of a touch screen for data entry and

control was well-known. [*Id.* at 468:13-25, 443:6-11.] As acknowledged in the

patents themselves, touch screen use for medical devices in general was well-

established, and Fresenius presented evidence of use of a touch screen with data

entry and control features in the analogous Sarns heart-lung perfusion machine.

[Ex. K, at 8:21-35; Ex. L, at F298971; Ex. A, at 815:5-17.] Furthermore, in a prior

art publication, Dr. Rau, an expert on touch screen user interfaces for medical

devices, suggested that a touch screen could be used in "extracorporeal dialysis"

[i.e., hemodialysis]. [Ex. M, at F067208; Ex. A, at 598:23-99:2.]

In addition to the fact that Fresenius demonstrated a motivation to combine

the touch screen with a hemodialysis machine, after the district court's JMOL

decision, the Supreme Court held in *KSR International Co. v. Teleflex, Inc.*, 127

S.Ct. 1727 (2007), that proof of motivation to combine was no longer a rigid requirement for establishing obviousness. Under *KSR*, the obviousness inquiry is more flexible and requires a common sense evaluation of whether the elements of the claimed combination play essentially the same roles they played in the prior art and were thus natural candidates to be brought together, as the elements in this case were. *Id.* at 1739-40 ("[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."); *see also Agrizap, Inc. v. Woodstream Corp.*, Nos. 2007-1415, -1421, slip op. at 11 (Fed. Cir. Mar. 28, 2008); *Leapfrog Enters., Inc. v. Fisher-Price. Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007). For this reason alone the district court's analysis was in error.

## C.    The Reexamination Rejections Confirm Invalidity

Baxter's patents are also currently in reexamination proceedings at the PTO, and the PTO shares the jury's opinion that Baxter's claims are invalid. In these *ex parte* reexamination proceedings, the PTO issued final office actions rejecting all '434 and '131 asserted claims on multiple grounds, including that the claims are obvious in view of prior art combinations that Fresenius presented at trial. [Ex. N, at 51; Ex. O, at 46.] Baxter then filed responses after final rejection making further arguments based on the district court's JMOL, but the PTO maintained its

8

rejections and found that these arguments were not persuasive. [Exs. P and Q.] Baxter has now appealed these rejections to the Board. Also, in reexamination proceedings on the '027 patent, the examiner has issued a first office action rejection of all claims under reexamination. [Ex. R.]

### D.    The District Court Improperly Granted an Injunction and an Excessive Ongoing Royalty

The district court's injunction order fares no better than its JMOL order— both ignore relevant law and facts. The district court essentially acknowledged that it was following the pre-*eBay* law by stating that Fresenius should have known "that an injunction was *all but inevitable*" since the JMOL order. [Ex. S, at 7 (emphasis added).] And in analyzing the equitable factors and balancing the harms to Baxter, Fresenius, and the public, the district court ignored certain important facts and misstated others. On the issue of irreparable harm to Baxter, the district court supported its finding with statements about Fresenius and Baxter being "head-to-head competitors in the same market" and supposed harm to "Baxter's reputation as an innovator," ignoring the critical fact that Baxter *does not even make* hemodialysis machines. [*Id.* at 5-7.] And in analyzing the potential harm that an injunction would cause Fresenius, the district court discounted the fact that Fresenius would be forced to undertake a time-consuming and expensive design-around process. Finally, the district court failed to adequately address the public interest. First, it did not address the harm that 3000 clinics will face if they are

9

forced to use a machine other than the 2008K. Second, in setting the injunction to take effect on January 1, 2009, it did not assure an uninterrupted supply of hemodialysis machines. Fresenius had informed the court that it could conceivably have a design-around machine prepared for FDA submission within nine months, but that FDA approval could take at least three additional months—time that the court did not account for.[2] [Ex. T, at 10 n.5; Ex. U, ¶ 6-8.]

In addition to erroneously granting the injunction, the district court, with no analysis, awarded an interim royalty rate to Baxter that is orders of magnitude higher than that awarded by the jury. For a seven-year period, the jury awarded a lump sum $14,266,000 in damages, which is equivalent to a rate of less than 2% on machines and 0.007% on unpatented disposables. [Ex. V.] But the district court awarded an arbitrary ongoing rate of 10% on machines and 7% on disposables that bears no relation to the jury's award, increasing the rate on the disposables by one thousand percent.

## III.    Argument

### A.    Legal Standards

This Court evaluates four factors in determining whether to stay an injunction pending appeal: (1) the applicant's likelihood of success on the merits;

---

[2] The district court's assertion that Fresenius "concede[d] that allowing it nine months to redesign 'will guarantee an uninterrupted supply of machines'" is therefore inaccurate and quotes Fresenius' injunction opposition brief out of context. [Ex. S, at 8; Ex. T, at 10 n.5.]

(2) whether the applicant will be irreparably harmed without a stay; (3) whether a stay will substantially injure the other parties involved; and (4) the public interest. *Std. Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 512 (Fed. Cir. 1990). These factors essentially merge into two—the movant's chances for success on appeal and weighing the equities as they affect the parties and the public. *E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.*, 835 F.2d 277, 278 (Fed. Cir. 1987). Analysis of these factors involves a sliding scale in which, as the harm factors tip further in the movant's favor, the requirement for showing likelihood of success is correspondingly lower. *See Hilton v. Braunskill*, 481 U.S. 770, 778 (1987); *Std. Havens*, 897 F.2d at 513.

### B.    The April 4, 2008 Order Should Be Stayed Pending Appeal

All the *Standard Havens* factors strongly favor Fresenius. Fresenius is highly likely to succeed on the merits in showing that both the jury and the PTO were correct in finding the asserted claims invalid, and the balance of the equities weighs heavily in favor of a stay. If the injunction order is not stayed, Fresenius will be forced to implement an expensive and unnecessary design-around process and clinics that use only 2008K machines will be forced to purchase a different machine, losing all the advantages of standardization. In contrast, a stay will cause Baxter no harm—it does not manufacture machines under its own patent and will be more than adequately compensated through damages. Therefore, the injunction

11

order should be fully stayed pending appeal and not take effect for nine months after disposition of the appeal if Baxter ultimately prevails.

### 1.    The Appeal Is Likely to Succeed

All of Baxter's asserted patent claims have been now been found invalid by both the jury and the PTO, and the district court's finding to the contrary is plainly erroneous. The two grounds relied on by the district court in casting aside the jury's obviousness verdict and granting JMOL, that the hemodialysis features had not been shown to be in the prior art, and that no "motivation to combine" those features with a touch screen had been proved, are contrary to plainly established— even conceded—fact. And the district court refused to consider the PTO's obviousness determination, which further supports a stay of the injunction order.

The district court's ruling on '027 claim 11 is seriously undermined by its internally inconsistent conclusion that the very same hemodialysis features were shown to be in the prior art as recited in claim 7, but not in the prior art as identically recited in claim 11 because they were not "addressed" again in connection with claim 11. [Ex. I, at 19.] This failure to give weight to the uncontested anticipation of claim 7 in evaluating the obviousness of claim 11 is error and makes it likely the Fresenius will succeed in obtaining reversal on appeal.

The district court's approach to '027 claim 11 carried over to the claims of the '131 and '434 patents. In each case the court ignored the substantial and

uncontested evidence that, except for the touch screen, all the elements of the asserted claims were already in use in prior art hemodialysis machines, ruling that Fresenius' proof of that was somehow inadequate.

Just as with the structure and operation of the prior art hemodialysis machines, the underlying facts on the ultimate issue of obviousness were undisputed. The use of touch screens was already well-known in analogous medical devices. [Ex. K, at 8:21-35; Ex. L, at F298971; Ex. A, at 815:5-17.] And although the district court gave the jury a pre-*KSR* "motivation to combine" instruction on obviousness, a "motivation" was nonetheless established by Dr. Rau's prior art text suggesting incorporation of a touch screen into hemodialysis machines. [Ex. M, at F067208; Ex. A, at 598:23-99:2.]

### 2.    Reexamination Is Likely To Succeed

In addition to the high likelihood that Fresenius will succeed in showing all the asserted claims obvious on appeal, reexamination proceedings on the three patents at issue demonstrate that the PTO is also likely to confirm that the asserted claims are invalid. During reexamination proceedings on the '434 and '131 patents, the PTO has issued final rejections of all asserted claims on multiple grounds, and Baxter has appealed these rejections to the Board. [Exs. N and O.] During reexamination proceedings on the '027 patent, the examiner has also issued a first office action rejection of the asserted claims. [Ex. R.] These repeated

indications from the PTO that all the asserted claims are invalid provide further support for staying the district court's injunction order pending appeal. *See See MercExchange, L.C.C. v. eBay, Inc.*, 500 F. Supp. 2d 556, 586 (E.D. Va. 2007).

### 3.    The Balance of Harms Strongly Favors Fresenius

Because of the high likelihood that Fresenius will succeed in showing the patents-in-suit to be invalid, its burden to show that the balance of harms tips in its favor is correspondingly lower. *Std. Havens*, 897 F.2d at 513. But, in fact, the harm-related factors strongly favor Fresenius. Damages would more than adequately compensate Baxter should the appeal not succeed. If Fresenius is forced to immediately design around Baxter's invalid patents, however, it will be seriously harmed. And the public will be harmed if clinics that are standardized on the 2008K are forced to start purchasing different machines when the injunction takes effect. More than that, the January 1, 2009 effective date does not, contrary to the district court's mischaracterization of Fresenius' statement, guarantee an uninterrupted supply of machines. The public will be put at serious risk with potentially life-threatening consequences if Fresenius is forced to remove its 2008K machines from the market before a redesign receives FDA approval.

First and foremost, Baxter does not even make hemodialysis machines, a fact that the district court did not acknowledge, and is therefore not a "head-to-head competitor" with Fresenius in that market. [Ex. S, at 4.] Baxter stopped

14

manufacturing its own machines in 2005, and is now merely a distributor of machines manufactured and sold by Gambro, though there is no evidence that Baxter is actually selling any Gambro machines. [Ex. W; Ex. X, at 192, 218-19.]

Second, Baxter has never shown any urgency in seeking to stop Fresenius from selling its 2008K machines. Indeed, Baxter has been was well aware of the 2008K machines since 2000 but never chose to file suit—it was Fresenius that filed this declaratory judgment action to clear its name of Baxter's infringement allegations. Even after Fresenius filed suit, Baxter never sought a preliminary injunction, waited until nine months after the district court's JMOL ruling to seek permanent injunctive relief, and even then agreed to wait an additional nine months before the injunction would take effect. Baxter's failure to seek an injunction at the earliest opportunity cuts against any claim that it will be harmed by a further stay of the injunction order pending appeal. *See MercExchange*, 500 F. Supp. 2d at 573 (explaining that if patentee's "true goal was to defend its right to exclude, it would likely have at least attempted to stop [defendant] ... from further improving its foothold on the market during the lengthy litigation period").

Third, Baxter has repeatedly offered to license its patents to Fresenius. The willingness of Baxter to license its patents—albeit for an exorbitant amount of money—cuts against a claim that it will be seriously harmed if the injunction is stayed pending appeal and Baxter is able to collect money damages if it prevails.

*See High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995) (noting that a patentee's offer to license a defendant makes "clear that [the patentee] is willing to forego its patents rights for compensation ... [and] that any injury suffered by [patentee is] compensable in damages"); *Paice LLC v. Toyota Motor Corp.*, No. 2:04-CV-211-DF, 2006 WL 2385139 (E.D. Tex. Aug. 16, 2006). Indeed, Baxter estimates that the ongoing royalty for the fourth quarter of 2007 and the first quarter of 2008, including both hemodialysis machines and unpatented disposables, may be as high as $30 million. With potential damage figures this high if it prevails, Baxter's claim that it will be irreparably harmed in the absence of a stay rings hollow.

The district court did not address these facts, instead basing its analysis of harm to Baxter on unsupported statements about "irreparabl[e] harm to Baxter's reputation and goodwill as an innovator" and citations to the fact that Baxter, like any other medical device company, invests money in research and development. If this supposed "irreparable harm" was enough to obtain an injunction, an injunction would, as the district court seemed to believe, be "all but inevitable" in every case. This is contrary to the law. *See eBay*, 126 S. Ct. at 1841.

In contrast to the lack of harm to Baxter, Fresenius will suffer significant harm if the injunction order is not stayed. First, if the order is not stayed, Fresenius will have to immediately undertake the expensive and disruptive process of

16

designing around Baxter's invalid patents to get a redesigned machine submitted for FDA approval as soon as possible. Contrary to the district court's suggestion, Fresenius cannot simply bring back its non-touchscreen 2008H machine. That machine, the predecessor to the 2008K, was available as a non-infringing alternative at the time of the hypothetical negotiation with Baxter but has long since been discontinued. [Ex. D, ¶ 4.] Further, key electronic parts for the 2008H are obsolete and no longer available and, because the technology in hemodialysis machines has advanced significantly in the fifteen years since the 2008H was introduced, Fresenius would have to incorporate many additional features if it were even possible to reintroduce it today. [*Id.*, ¶¶ 4-7; Ex. X, at 454-55.] The district court was simply wrong to assume that any and all options available to Fresenius when the 2008K was originally developed are still available today, and therefore improperly discounted the harm involved in being forced to redesign the 2008K.

Also, because hemodialysis machines are long-term investments, if clinics are forced to buy a different machine now, they will not be able to simply come back to the Fresenius 2008K machine once Fresenius ultimately prevails. [Ex. D, ¶¶ 4-7.] Being forced to buy a different machine rather than the one a clinic is familiar with may thus harm Fresenius' reputation in the market.

In addition to the harm to Fresenius in the absence of a stay, the public interest also demands a stay of the injunction order. *See Wienberger v. Romeo-*

17

*Barcelo*, 456 U.S. 305, 312 (1982) ("[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."). First, Fresenius' 2008K is a complex, life-sustaining medical device, and if Fresenius is unable to get an FDA-approved design-around on the market by January 1, 2009, the public will be put in the position of losing access to these critical machines. *See Hybritech, Inc. v. Abbott Labs.*, 4 USPQ2d 1001, 1015 (C.D. Cal. 1987) (denying preliminary injunction with respect to test kits for cancer patients). Second, many clinics exclusively use the 2008K machines, and there are significant advantages to this standardization because of the different features and operating instructions for different machines and the amount of training required. If these clinics are forced to introduce a different machine, even a redesigned version of the 2008K, these advantages are lost, raising costs, leaving clinic personnel with less time for patient care, and increasing the risk of error. [Ex. E, ¶¶ 6, 8; Ex. F, ¶ 6.]

Once again the district court ignored these issues in its injunction analysis, focusing instead on the public interest in "healthy, fair competition" and "keeping infringing products off the market." [Ex. S, at 7.] But, where both a jury and the PTO have found the patents-in-suit to be invalid, and the patentee does not even make the patented product, "healthy, fair competition" in fact favors a stay.

18

Weighing the equities affecting the parties and the public, the scale tips firmly in favor of staying the injunction order. Combined with the high likelihood of the asserted claims being shown invalid both on appeal and in reexamination, the district court erred in declining to stay its injunction order pending appeal.[3]

## C.    The Court Should Also Expedite the Appeal

For many of the reasons stated above, it is also appropriate for the Court to expedite this appeal to ensure that it is resolved before January 1, 2009. In the past, this Court has expedited appeals in cases involving injunctions, *see Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295 (Fed. Cir. 2007) (five and a half months from grant of injunction to completion of appeal); *Power Controls Corp. v. Hybrinetics, Inc.*, 806 F.2d 234 (Fed. Cir. 1986) (eight months from grant of preliminary injunction to completion of the appeal), and there is even greater reason to do so here. First, there is a significant public interest in the enjoined medical device. Second, while the appeal is pending, Fresenius will potentially be subject to tens of millions of dollars in damages because of the arbitrary royalty rate set by the district court. The majority of this royalty will be due to sales of unpatented disposable products used with the machines. The jury awarded Baxter $91,000 for collateral sales of these products over a seven year period, yet the district court's imposed royalty on these unpatented products increases potential

---

[3] Fresenius requested that, if the district court granted an injunction, that it be stayed pending appeal. [Ex. T, at 23-24.]

liability by one thousand times.  As surely as the injunction, even the remote possibility of being liable for this draconian royalty will force Fresenius to redesign the 2008K machine before its appeal is heard, to the detriment of clinics and patients.  Indeed, expediting the appeal is surely in both parties' best interests even if the injunction order is stayed—Baxter's to give it the benefit of the injunction and damages as early as possible if it succeeds on appeal, and Fresenius' to halt as soon as possible the destructive force of the order if Fresenius ultimately prevails.  Therefore, Fresenius requests that the Court expedite this appeal as set forth in the attached proposed order.

## IV.    Conclusion

For all the foregoing reasons, Fresenius respectfully requests that the Court grant a stay of the injunction pending appeal and expedite the appeal to ensure completion before January 1, 2009.[4]

April 28, 2008                                      Respectfully submitted,

Michael E. Florey
FISH & RICHARDSON P.C.
60 South Sixth Street, Suite 3300
Minneapolis, MN  55402
Tel: (612) 335-5070
Fax: (612) 288-9696

Counsel for Plaintiffs/Appellants

---

[4] Counsel for Baxter has stated that they will oppose this motion.

20

CERTIFICATE OF FILING AND SERVICE

I certify that on April 28, 2008, I hand delivered the original and four copies to the Court as well as certify that two copies of FRESENIUS' MOTION TO STAY INJUNCTION ORDER PENDING APPEAL AND FOR EXPEDITED APPEAL were served as follows:

Michael J. Abernathy                          Attorneys for Appellees
Bell, Boyd & Lloyd, LLC                      Baxter International, Inc., a
Three First National Plaza                    Delaware Corporation; and Baxter
70 W. Madison St.                              Healthcare Corporation, a
Chicago, IL  60602                             Delaware corporation
Telephone:  (312) 372-1121
Facsimile:  (312) 372-2098


        (VIA FEDERAL EXPRESS)

60496687.doc

21

# EXHIBIT 4

NOTE:  This order is nonprecedential.

# United States Court of Appeals for the Federal Circuit

2008-1306, -1331

FRESENIUS USA, INC.
and FRESENIUS MEDICAL CARE HOLDING, INC.,

Plaintiffs-Appellants,

v.

BAXTER INTERNATIONAL, INC.
and BAXTER HEALTHCARE CORPORATION,

Defendants-Cross Appellants.

Appeals from the United States District Court for the Northern District of California in case no. 03-CV-1431, Judge Saundra Brown Armstrong.

ON MOTION

Before MAYER, SCHALL, and LINN, <u>Circuit Judges</u>.

LINN, <u>Circuit Judge</u>.

## O R D E R

Fresenius USA, Inc. and Fresenius Medical Care Holding, Inc. (Fresenius) move (1) for a stay, pending appeal, of the permanent injunction entered by the United States District Court for the Northern District of California on April 4, 2008 and (2) to expedite the briefing schedule and oral argument.    Baxter International, Inc. and Baxter Healthcare Corp. (Baxter) oppose.  Fresenius replies.

Fresenius filed a declaratory judgment action seeking to invalidate five of Baxter's patents relating to hemodialysis machines.    Baxter counterclaimed for infringement.  After a trial, the jury determined that Baxter's patents were invalid on obviousness and anticipation grounds.  However, the district court set aside that verdict,



agreeing with Baxter that Fresenius had failed to present substantial evidence to support the jury's findings. The district court further ordered a second trial on damages. Following the jury's damages verdict, the district court granted Baxter's motion for a permanent injunction, effective January 1, 2009, and also ordered Fresenius to pay an ongoing royalty of 10% of the sales price for any infringing product sold until the injunction is in place.

Fresenius appeals and moves for a stay of the injunction pending appeal. In deciding whether to grant a stay of injunction, pending appeal, this court "assesses the movant's chances of success on the merits and weighs the equities as they affect the parties and the public." E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co., 835 F.2d 277, 278 (Fed. Cir. 1987); see also Standard Havens Prods. v. Gencor Indus., 897 F.2d 511 (Fed. Cir. 1990). To prevail, a movant must establish a strong likelihood of success on the merits or, failing that, must demonstrate that it has a substantial case on the merits and that the harms factors militate in its favor. Hilton v. Braunskill, 481 U.S. 770, 778 (1987).

Without prejudicing the ultimate disposition of this case by the merits panel, we determine that Fresenius has not met its burden of showing the requisite likelihood of success on appeal. In addition, Fresenius has not demonstrated in the motions papers that the harm factors weigh strongly in its favor. Thus, we deny the motion to stay the permanent injunction pending the disposition of this appeal.

Regarding the motion to expedite the appeal, Fresenius has not shown that the due date for Baxter's brief should be shortened. Fresenius may of course file its own briefs early, thereby significantly expediting the disposition of the appeal. Regarding assignment of the case to a calendar, it is the court's usual practice to schedule a case

2008-1306, -1331                           2

for oral argument promptly after briefing is completed and as soon as space is available on the calendar.  Fresenius has not made a sufficient showing to justify any additional measures to expedite the proceedings, the effect of which would be to shorten the court's time to review the briefs and appendices before oral argument is held.

Accordingly,

IT IS ORDERED THAT:

The motions are denied.

FOR THE COURT

JUN - 2 2008
_____
Date

_____
Richard Linn
Circuit Judge

FILED
U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

JUN - 2 2008

JAN HORBALY
CLERK

cc:   Juanita R. Brooks, Esq.
      William F. Lee, Esq.
s19

# EXHIBIT 5

Juanita R. Brooks, SBN 75934, brooks@fr.com
Todd G. Miller, SBN 163200, miller@fr.com
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
Telephone: (858) 678-5070
Facsimile: (858) 678-5099

Mathias W. Samuel, pro hac vice, samuel@fr.com
Michael E. Florey, pro hac vice, florey@fr.com
Thomas S. McClenahan, SBN 203204, mcclenahan@fr.com
Michael J. Pape, pro hac vice, pape@fr.com
Fish & Richardson P.C.
60 South Sixth Street, Suite 3300
Minneapolis, MN 55402
Telephone: (612) 335-5070
Facsimile: (612) 288-9696

Limin Zheng, SBN 226875, zheng@fr.com
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94053
Telephone: (650) 839-5070
Facsimile: (650) 839-5071

Attorneys for Plaintiffs/Counterclaim Defendants
Fresenius Medical Care Holdings, Inc. and Fresenius USA, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| FRESENIUS MEDICAL CARE HOLDINGS, INC., a New York corporation; and FRESENIUS USA, INC., a Massachusetts corporation,<br><br>        Plaintiffs and Counterdefendants,<br><br>    v.<br><br>BAXTER INTERNATIONAL, INC., a Delaware corporation; and BAXTER HEALTHCARE CORPORATION, a Delaware corporation,<br><br>        Defendants and Counterclaimants. | Case No. C 03-01431 SBA (EDL)<br><br>**FRESENIUS' OPPOSITION TO BAXTER'S RENEWED MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF THE '240 APPLICATION** |

FRESENIUS' OPPOSITION TO BAXTER'S RENEWED MOTION IN
LIMINE TO EXCLUDE EVIDENCE OF THE '240 APPLICATION
Case No. C 03-01431 SBA (EDL)1

## I.     INTRODUCTION

Fresenius' damages expert intends to testify about certain configurations of hemodialysis machines that are non-infringing alternatives to the patents-in-suit.  This type of evidence is relevant because it tends to limit the patent owner's reasonable royalty damages – rather than paying a high royalty for use of the claimed invention, the accused infringer would know that it could switch to using a non-infringing alternative design.  Some of the non-infringing alternatives that Fresenius' expert has relied upon are described in the claims of the abandoned '240 Application, which have repeatedly been rejected as obvious and unpatentable by the United States Patent & Trademark Office.  Since these configurations have never been patented, and indeed cannot be patented, they represent potential non-infringing design around options for Fresenius.

Baxter seeks to exclude this evidence, claiming that it is somehow irrelevant to the issue of damages.  But as this Court has acknowledged, "a key part of the reasonable royalty determination under *Georgia Pacific* is whether the accused infringer had acceptable non-infringing alternatives available to it at the time of the hypothetical negotiation."  [Docket No. 737, at 3.]  Evidence of Fresenius' potential design around options, including those that are based upon the unpatentable and abandoned '240 Application, is therefore highly probative of key damages issues.

Baxter's motion to exclude evidence of the '240 Application, including the Board Opinion, is an attempt to circumvent its burden of proof on damages.  As the patent owner, Baxter bears the burden of proving its damages to the jury.  When faced with Fresenius' evidence of non-infringing alternatives to the patents-in-suit, Baxter has the burden of rebutting that evidence if it hopes to convince the jury that its damages should not be limited by the available design around options.  Baxter can do this by showing that the design around options are not acceptable non-infringing alternatives, or that the design around options are unavailable to Fresenius.  But rather than facing its burden on the merits, Baxter has instead asked the Court to do its heavy lifting – asking the Court to exclude relevant evidence that Baxter would otherwise have to rebut at trial.

1   Baxter's attempt at burden-shifting to the Court is improper.  Therefore, Fresenius

2   respectfully requests that the Court deny Baxter's Renewed Motion *in Limine* to Exclude Evidence

3   of the '240 Application.

4   **II.   ARGUMENT**

5   Baxter seeks to exclude evidence of a final determination by the Board of Patent Appeals

6   and Interferences ("Board Opinion") finding each of the twelve claims of U.S. Patent Application

7   Number 09/711,240 ("'240 Application") invalid and unpatentable as obvious.  Baxter's motion

8   argues that this evidence is irrelevant to the issue of damages, and further, that introduction of the

9   evidence would be prejudicial or require a "'mini-trial' on collateral issues."[1]  None of these

10  arguments is persuasive.

11  **A.   Evidence Of The '240 Application Is Relevant To Damages**

12  It is well-settled that evidence of non-infringing alternatives is relevant to the issue of

13  reasonable royalty damages.  To determine the amount of a reasonable royalty, courts often use a

14  conceptual framework built around a hypothetical negotiation between the patent owner and the

15  accused infringer.  *See Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384

16  (Fed. Cir. 2001).  In this hypothetical negotiation, it is much less likely that the accused infringer

17  as a prospective licensee would agree to a high royalty if it has non-infringing alternatives to the

18  patented technology available as an option.  *See Grain Processing Corp. v. Am. Maize-Prods. Co.*,

19  185 F.3d 1341, 1347, 1351 (affirming an upper limit on reasonable royalty damages as the

20  infringer's cost-difference between producing the patented product and producing a non-infringing

21  alternative product, and noting that "a rational would-be infringer is likely to offer an acceptable

22  noninfringing alternative, if available, to compete with the patent owner"); *see also* 7 Donald S.

23  Chisum, Chisum on Patents § 20.03[3][b][v] (2005) ("[A] willing licensee in a hypothetical

24  negotiation with a willing licensor to set a reasonable royalty would have been less disposed to

25  agree to a high royalty if he had available noninfringing alternatives that were equal or nearly

---

[1]   Baxter also spends considerable time noting that Fresenius did not attempt to introduce this
     evidence as part of its damages case at the previous trial.  However, Baxter does not contend,

1   equal in terms of cost and performance."); *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1571-72

2   (Fed. Cir. 1996) ("[The defendant] would have been in a stronger position to negotiate for a lower

3   royalty rate knowing it had a competitive noninfringing device 'in the wings.'"). Indeed, this

4   Court has already held in this case that "a key part of the reasonable royalty determination under

5   *Georgia Pacific* is whether the accused infringer had acceptable non-infringing alternatives

6   available to it." [Docket No. 737, at 3.]

7          Here, the '240 Application is relevant because, as stated in Professor Rubinfeld's expert

8   report, the claims that were rejected as obvious represent a few of the non-infringing alternatives

9   that Fresenius could have used to design around the patents-in-suit. The subject matter of those

10  claims is not patented by Baxter nor can it be patented because the Patent Office has determined

11  that the claims are obvious. And since neither Baxter nor anyone else owns the abandoned claims

12  of the '240 Application, the claims may not be enforced against Fresenius and therefore represent

13  potential non-infringing alternatives to the patents-in-suit.

14      **B.      The Claims Of The '240 Application Have Repeatedly Been Rejected As Obvious**

15          Baxter has argued that, although both an Examiner and the Board of Patent Appeals have

16  rejected the claims of the '240 Application as obvious, Baxter may still pursue patent protection

17  for the subject matter of those claims. While this may technically be accurate, the reality of what

18  has actually occurred paints an entirely different picture – one that Baxter has conveniently left out

19  of its motion. Regardless of whether the claims of the '240 Application *may* at some point be

20  deemed patentable – an outcome that seems highly improbable given their subsequent history as

21  discussed below – they were not patented as of the time of the hypothetical negotiation, and they

22  are not patented now. Therefore, the unpatented claims of the '240 Application represent a

23  potential non-infringing alternative to the patents-in-suit.

24          Patents are not retroactive. 35 U.S.C. § 154(a)(2) ("[S]uch grant shall be for a term

25  *beginning on the date on which the patent issues* and ending 20 years from the date on which the

26

27  _____

28  nor can it, that Fresenius should be legally precluded from offering additional evidence at this new trial.

FRESENIUS' OPPOSITION TO BAXTER'S RENEWED MOTION IN
LIMINE TO EXCLUDE EVIDENCE OF THE '240 APPLICATION
**Case No. C 03-01431 SBA (EDL)**

application for the patent was filed ... .") (emphasis added). A patent owner cannot enforce its right to exclude until after the patent actually issues. *Gargoyles, Inc. v. U.S.*, 113 F.3d 1572, 1581 (Fed. Cir. 1997); *see also Gayler v. Wilder*, 51 U.S. 477, 493 (1850) ("The inventor of a new and useful improvement certainly has no exclusive right to it, until he obtains a patent. This right is created by the patent, and no suit can be maintained by the inventor against any one for using it before the patent is issued."). As such, whether the Patent Office's finding of obviousness is technically final has absolutely no bearing on whether Fresenius could have used the subject matter of the '240 Application as a non-infringing alternative design. The claims of the '240 Application were not patented at the time of the hypothetical negotiation, they are not patented now, and they will not be patented by the time the jury reaches its conclusion on reasonable royalty damages. Therefore, the claims of the '240 Application have represented potential non-infringing alternatives for Fresenius from the date of first infringement through at least the conclusion of this trial.

Furthermore, there is absolutely no indication that the claims of the '240 Application will ever be patented. Baxter has re-submitted the same rejected claims in three separate applications over the last four years. And the Patent Office has rejected them each time. As many times and as many different ways as Baxter has argued that the claims are patentable, the Patent Office has responded by rejecting the claims as invalid in view of the prior art. The claims are simply not patentable.

As this Court knows, the Patent Office rejected each of the twelve claims of the '240 Application, finding them invalid as obvious. Baxter appealed this rejection, but the rejection was affirmed by the Board of Patent Appeals in the Board Opinion. In its motion, Baxter now argues that this rejection is not final because Baxter filed a continuation of the '240 application within the time allowed.[2] This much is true.

---

[2] Baxter's motion refers to multiple continuations of the '240 Application, but only one of them is relevant to the present motion. The others, including the '322 application and the application that matured into the '730 patent, were each filed two months *before* the Board Opinion and contain different claims and therefore cover different subject matter than that claimed in the '240 Application. Those applications were surely not meant to support Baxter's

1    However, Baxter's motion fails to tell the rest of the story.  Baxter has now re-submitted

2   the same claims that were rejected by the Board not once, not twice, but three additional times.

3   And each time, the claims have been rejected as obvious for the same reasons stated in the Board

4   Opinion.

5    The '526 Application was filed as a continuation of the '240 Application on October 27,

6   2003 – the only continuation of the '240 Application that was filed after the Board Opinion issued.

7   The '526 Application contained the same claims as the '240 Application and also added two more

8   claims.  [Florey Decl. in Opp'n to Baxter's Motions *In Limine* ("Florey Decl."), Ex. A at 7.]  In its

9   preliminary amendment, Baxter itself admitted that there was a "final rejection" of the claims of

10  the '240 Application.  [*Id.*]  Following prosecution of the application, the Patent Office again

11  rejected all of the claims as obvious, including each of the original claims from the '240

12  Application, further noting that it had fully considered Baxter's current and previous arguments,

13  but found them unpersuasive.  [Florey Decl., Ex. B at 7.]  Baxter allowed the '526 Application to

14  go abandoned on November 18, 2004.  [Florey Decl., Ex. C at 2.]

15   The '486 Application was filed as a continuation of the '526 Application.  The prosecution

16  of the '486 Application was much the same and ended with the same result.  Once again, the '486

17  Application contained the same claims as the '240 Application as well as two additional claims.

18  [Florey Decl., Ex. D at 7.]  Again, Baxter admitted in its preliminary amendment that there had

19  been a "final rejection" of the claims of the '240 Application.  [*Id.*]  Following prosecution of the

20  application, the Patent Office once again rejected each of the original claims from the '240

21  Application as obvious, and again noted that it had fully considered Baxter's current and previous

22  arguments, but found them unpersuasive.  [Florey Decl., Ex. E at 5.]  Baxter allowed the '486

23  Application to go abandoned on November 22, 2005.  [Florey Decl., Ex. F at 2.]

24   Baxter then filed the '072 Application as a continuation of the '486 Application.  Again,

25  the application contained the exact same claims as the '240 Application.  [Florey Decl., Ex. G at

26

27   statement that it "is still prosecuting continuation applications, and thus has not abandoned or
    conceded that *the subject matter from the '240 application is unpatentable or 'public
28  property.'*"  [Baxter Motion, Docket No. 918, at 6 (emphasis added).]

FRESENIUS' OPPOSITION TO BAXTER'S RENEWED MOTION IN
LIMINE TO EXCLUDE EVIDENCE OF THE '240 APPLICATION
**Case No. C 03-01431 SBA (EDL)**

7.] In its preliminary amendment, Baxter again admitted that the claims of the '240 Application had been finally rejected. [*Id.*] And once again, the Patent Office rejected each of the claims carried over from the '240 Application as obvious, again noting that it found Baxter's arguments unpersuasive. [Florey Decl., Ex. H at 9.] But this time, Baxter finally decided to change its strategy.

It seems that Baxter has now acknowledged that these claims are just not patentable. After receiving yet another obviousness rejection of the claims from the '240 Application, Baxter has finally decided to give up on the subject matter. On March 8, 2007, Baxter narrowed the claims by adding a new claim limitation – one that requires, among other things, that the screen "track progress of the parameter during treatment by coloring past and future time intervals within the plot of the time-variable profile differently."[3] [Florey Decl., Ex. I at 6.] By narrowing the claims in this manner, Baxter has tacitly acknowledged that the broader claims of the '240 Application are simply unpatentable as obvious.

### C. Evidence Of The '240 Application Is Not A Collateral Issue, Is Not Unfairly Prejudicial, And Is Not A Waste Of Time

As the patent owner, Baxter bears the burden of proving its damages to the jury. *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1029 (Fed. Cir. 1996). Because Baxter bears the burden of proof on damages, Baxter also must rebut any evidence presented by Fresenius relating to its non-infringing design alternatives, which would otherwise serve to limit Baxter's royalty damages. Baxter can rebut this evidence in a number of ways, but instead has chosen to file this motion in an improper attempt to circumvent its burden.

Baxter argues in its motion that evidence of the '240 Application should be excluded under Federal Rule of Evidence 403 "because it would be confusing (and misleading) to the jury, a waste of time, and unfairly prejudicial to Baxter." [Baxter Motion, Docket No. 918, at 6.] As mentioned above, however, evidence of non-infringing alternative design options is highly probative and

---

[3]  The '072 Application is still pending, but the claims with this new limitation have already been rejected. Even if Baxter were to receive a patent on these amended claims, a hemodialysis machine practicing the broader subject matter of the '240 application could still represent an available, non-infringing alternative design around option to the patents-in-suit.

1   goes directly to the analysis of reasonable royalty damages under the *Georgia-Pacific* factors,

2   which is the very focus of this trial.  Evidence of the '240 Application is not a collateral issue.

3           There is also nothing unfairly prejudicial to Baxter about introducing the evidence in the

4   manner suggested by Fresenius and its damages expert.  Evidence of the '240 Application is not

5   being introduced to re-try the validity of the patents-in-suit – it is being introduced to suggest that

6   the '240 Application offers a potential non-infringing design around option that Fresenius could

7   have turned to instead of infringing the patents-in-suit.

8           Furthermore, evidence of the '240 Application as a possible design around option would

9   not require a "mini-trial" on a collateral issue as Baxter would have the Court believe.  As an

10  initial matter, the claims of the '240 Application are necessarily different from the patents-in-suit.

11  The patent statute "precludes a patentee from obtaining more than one patent on the same

12  invention."  *Ortho Pharm. Corp. v. Smith*, 959 F.2d 936, 940 (Fed. Cir. 1992) (citing 35 U.S.C. §

13  101).  Additionally, the doctrine of obviousness-type double patenting precludes the patenting of a

14  second invention that is merely an obvious improvement on the first.  *Ortho Pharm.*, 959 F.2d at

15  940.  The claims of the '240 Application were not rejected as either "same-invention" or

16  obviousness-type double patenting, and therefore must necessarily have contained separate and

17  distinct subject matter from the patents-in-suit.

18          Whether any of the alternative designs from the '240 Application would infringe the

19  patents-in-suit, and therefore not be available as a non-infringing alternative, is a fact issue for the

20  jury to decide.  *See Minn. Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d

21  1559, 1577 ("The existence of a noninfringing substitute is a question of fact."); *see also Teleflex,*

22  *Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1323 (Fed. Cir. 2002) ("A determination of

23  infringement … is a question of fact.").  This type of analysis is inherent in any damages trial

24  where the accused infringer suggests potential design around options and the patent owner tries to

25  discredit those options by arguing that they are not available because they would infringe other

26  patent rights.  It is merely a part of the reasonable royalty analysis.

27

28

FRESENIUS' OPPOSITION TO BAXTER'S RENEWED MOTION IN
    LIMINE TO EXCLUDE EVIDENCE OF THE '240 APPLICATION
    **Case No. C 03-01431 SBA (EDL)**

Baxter also claims that evidence of any design around would require a "mini-trial" for the Court to compare the claims of the '240 Application to the claims of all of Baxter's continuation applications. But except for the '730 Patent, none of these claims can possibly represent a bar against Fresenius practicing the subject matter of the '240 Application because *the applications have not matured into patents*. Baxter's only issued patent on a continuation from the '240 Application does not cover nearly the same scope. The claims of the '730 Patent are facially different and more narrow than the broad subject matter claimed in the '240 Application. Regardless of Baxter's feelings about the propriety of the Patent Office's findings, the subject matter of the '240 Application has never been patented nor will it be. Therefore, it is public property and available as a possible non-infringing alternative to the patents-in-suit.

## III.    CONCLUSION

For the reasons stated above, Fresenius respectfully requests that the Court deny Baxter's Renewed Motion *in Limine* to Exclude Evidence of the '240 Application.

Dated:  October 9, 2007                    FISH & RICHARDSON P.C.


                                           By:  s/Michael E. Florey
                                                Michael E. Florey

                                           Attorneys for Plaintiffs/Counterclaim
                                           Defendants
                                           FRESENIUS MEDICAL CARE HOLDINGS,
                                           INC. AND FRESENIUS USA, INC.

60457940.doc

FRESENIUS' OPPOSITION TO BAXTER'S RENEWED MOTION IN
LIMINE TO EXCLUDE EVIDENCE OF THE '240 APPLICATION
**Case No. C 03-01431 SBA (EDL)**

# EXHIBIT 6



**Reexamining *Inter partes* Reexam**

Beginning in 1981, U.S. patent law set up patent reexamination as an administrative alternative to litigation for addressing patent validity concerns. The idea was to create a less expensive and speedier alternative to decide questions of patent validity. Although the level of scrutiny of the U.S. patent system has risen dramatically in light of the ongoing debate over patent reform, reexamination has received relatively little attention. Recently however, we have observed a number of trends that suggest that it might be time to carefully reexamine patent reexamination, particularly *inter partes* reexamination.

In doing so, we have discovered the following:
- *Inter partes* reexaminations requests are rising rapidly – a 6X increase between 2003 and 2007
- Reexamination, particularly *inter partes* reexamination is not simply used as an alternative to litigation, but an integral part of litigation strategy – more than half (52%) of patents in *inter partes* reexams are known to be in litigation during their reexamination
- Virtually all requests for *inter partes* reexamination are granted – 95% of *inter partes* reexam requests are granted, and this statistic may actually understate the effective grant rate
- To date, there has never been a single *inter partes* reexamination that has gone through the entire reexamination process (including appeal) and made it to completion – only three have ever received a decision by the Board of Patent Appeals and Interferences
- Despite a mandate for "special dispatch", the time required to complete an *inter partes* reexamination is much longer than commonly believed
  - Without appeal, the average pendency period for *inter partes* reexam is 43.5 months, much longer than the 28.5 months reported by the USPTO – a 95% confidence interval would put the pendency between 34 and 53 months
  - Although no *inter partes* reexam has ever been completed after being appealed, the average pendency for appealed *inter partes* reexams is 78.4 months (assuming no rework by the patent office or secondary appeal) - a 95% confidence interval would put the pendency between 5 and 8 years

**Why reexamine *inter partes* reexams?**
Over the last several years, the number of reexamination requests at the USPTO has been rising rapidly. This is particularly true for *inter partes* reexams. The number of requests for *inter partes* reexam had increased 6X from 24 in calendar 2003 to 142 in calendar 2007. (Note: Our analysis is based on calendar years rather than the USPTO's fiscal year.) This increase appears to be a result of the increasing use of reexamination as an integral part of litigation strategy by defendants or potential defendants in patent



litigation.  According to USPTO statistics, more than half (52%) of all patents subject to *inter partes* reexamination are known to be in litigation during the reexamination process.

The story of Microsoft and Avistar is a particularly telling example.  After six months of licensing negotiation, Microsoft has requested reexamination of 24 of Avistar's 29 U.S. patents.  Although Avistar's key patents have previously survived two significant litigations, Microsoft's actions have delayed its licensing program and placed the company into financial distress resulting in a 25% reduction in its U.S. and European workforce.

Although the reexamination statute in the U.S. may have been intended to provide an alternative to litigation, the actual use of reexamination appears to be an augmentation of litigation strategy rather than an alternative.  In many cases, patent litigation in U.S. courts and 337 actions at the International Trade Commission (investigations of unfair trade practices related to IP infringement) run simultaneously with reexamination at the Patent Office.  Simultaneous litigation and reexamination raise serious questions for U.S. courts about whether to wait for the results of a pending reexamination or continue with their court proceedings.

The conclusions so far have been mixed.  In some cases, patent litigation has been stayed pending the results of reexam, while in others, the cases have continued.  Many people will remember for example that Judge Spencer who presided over the contentious patent battle between NTP and RIM over the "Blackberry patents" famously refused to stay the litigation proceedings despite the fact that the PTO had issued an initial rejection of the claims at issue.

These difficult and often critical decisions by circuit court judges and administrative law judges depend heavily on their understanding and expectations of what will happen in the reexamination process at the PTO.  How reliable are initial office actions as a predictor of final results in a reexamination?  How long will the process take?  How often are the patent examiner's finding upheld on appeal?  For judges, these questions are critical in determining whether a request for a stay should be granted.  For litigants, these questions can strongly influence litigation strategy.

*Ex parte* reexamination was established by statute in 1981, and more than 9,000 reexamination requests have been filed with more than 6,000 reexamination certificates issued (signaling the completion of the process).  The *ex parte* reexamination process is well established.  Much less is known about *inter partes* reexams.  Established by statute in November of 1999, the first *inter partes* reexamination was not requested until 2001.  Through mid-April of 2008, there have been 396 requests for *inter partes* reexamination at the USPTO, and only 16 of those have received reexamination certificates.



Given the rising importance of reexaminations in general, and the relative scarcity of information about *inter partes* reexam specifically, we decided to take a closer look to discover what can be learned about this relatively little understood process.

**What did we do?**
To examine the *inter partes* reexamination process, we copied transaction level data for every *inter partes* reexamination from the USPTO's PAIR database. These transactions reveal both the sequence and the timing of each step through the process. The database we created all cases and transactions through April 16, 2008.

We noted and corrected a number of anomalies in the PTO data including:
- Several reexaminations appeared to proceed without the initial "Request for *Inter partes* Reexamination" transaction in the PTO data – we investigated and manually filled in this missing data
- Several reexaminations included references to "*ex parte*" reexamination despite the fact that they were "*inter partes*" reexams – we manually reviewed and resolved each discrepancy
- Duplicate transactions (same reexam number, same transaction, same date) were eliminated – these were generally not errors, but represent instances where the documents were uploaded into the PAIR system in multiple parts

We then extracted the key milestone transactions in the reexamination process and mapped the process and timeline for every *inter partes* reexamination to discover what path each case had taken through the process, and how long each step in the process takes. The results of our analysis are briefly described below, and more fully captured in the attached presentation slides.

**What did we find?**
Requests for *inter partes* reexamination are rising rapidly
As described above, the number of *inter partes* reexamination requests is rising rapidly. In 2007, there were 142 requests for *inter partes* reexams, three times as many as in 2005, and nearly six times as many as in 2003. *Inter partes* reexam requests have risen nearly 90% per year (CAGR) over the last five years.

Nearly all *inter partes* reexamination request are granted
Granting a request for reexamination is not automatic. The standard for granting a reexamination request requires that a "significant new question" of patentability must be presented by the requestor. Since their inception in 2001, there have been 396 requests for *inter partes* reexamination requested at the USPTO. Of these, 354 have reached a decision about whether the reexamination request will be granted. Over this period, ninety-five percent of all *inter partes* reexam requests have been granted. With so few requests being denied (19), we reviewed each case where a reexamination was denied, and found that the effective denial rate may actually be overstated. A number of the



nineteen requests for reexamination that were denied are from a small number of inventions where multiple patent reexams were requested. Still others were not for utility patents, but were request for reexamination of design patents. It is fair to say that virtually all requests for *inter partes* reexamination are granted. Whatever threshold has been established by the Patent Office for determining a "significant new question" of patentability, few requestors have been unable to clear it.

<u>The *inter partes* reexamination process is not linear</u>
By tracing every single *inter partes* reexamination through the process, we were able to discover the path through reexamination that is actually followed by real patents in process. While the majority of patents follow the main sequence (Request → Grant → Non-final Office Action → ACP → Reexam Certificate), some cases skip steps, and others repeat steps multiple times. For example, some reexams skip over multiple steps and proceed quickly to a Reexam Certificate. This happens most often when the patent holder fails to respond to the Patent Office within the statutory timeframe, and the PTO proceeds to issue a certificate. Still other times, patents repeat steps multiple times. About one-quarter of the time *inter partes* reexams include multiple "Non-final Office Actions", and about one-tenth of the time they receive multiple "Actions Closing Prosecution".

<u>One-quarter of all *inter partes* reexam decisions are appealed, but none has ever proceeded through appeal to the end of the process</u>
One of the major challenges in examining the *inter partes* reexam process is that very few cases have proceeded all the way through the process. Through mid-April 2008, only nineteen cases have ever proceeded past the Notice of Right to Appeal. Of these, approximately one-quarter (5 cases - 26%) have been appealed to the Board of Patent Appeals and Interferences (BPAI), one case (~5%) went back for another Action Closing Prosecution, and the remaining 13 cases (68%) moved on to "Intent to Issue a Reexam Certificate".

Of the cases that have gone on to appeal, only three have received a decision by the BPAI. None of the three decisions represents a final decision by the BPAI that can be appealed to the Federal Circuit as in each case, the Board added new grounds for rejection and remanded the cases to the Patent Office for further action. None of the three cases has reached a final Reexamination Certificate, and it has taken 4, 4, and 5 years for the cases to get to the initial BPAI decision.

<u>The average pendency of 28.5 months reported by the USPTO is highly skewed</u>
The USPTO regularly publishes statistics about *inter partes* reexaminations. According to their latest publication (December 31, 2007), the average pendency (Filing date to certificate issue date) is 28.5 months. This calculation is based on only 12 *inter partes* reexaminations that had reached a final certificate by that date. In our analysis which is up to date as of April 16, 2008, we found 16 reexaminations that had reached a final



certificate. Our calculation of average pendency for those cases was only slightly longer at 30.1 months.

However, in carefully examining the 16 cases that have received final certificates, we note that 10 of the completed reexams skipped directly from the "First Non-final Action" to the "Intent to Issue a Reexam Certificate". Upon closer inspection, each of these cases skipped multiple steps because the patent owner failed to respond to the office action. The average pendency of these cases was 24 months, while the average for the remaining six cases that followed the basic process (Non-final Action → ACP → Right of Appeal → Notice of Intent to Issue a Reexam Certificate → Reexam Certificate) was ~39 months. It should be noted that NONE of the cases that have received a final Reexam Certificate have gone to appeal.

While mathematically accurate, the pendency statistic provided by the USPTO is highly misleading. An appropriate reading of the statistic is that the Patent Office takes two years to dispose of a patent through *inter partes* reexam if the patent holder doesn't care to defend its rights. It takes significantly longer to get to a resolution if the patent holder participates in the process.

Average pendency for an un-appealed *inter partes* reexam is more than 3.5 years
Given the small number of cases that have proceeded through the *inter partes* reexam process, a more appropriate way to estimate average pendency is to calculate the time required for cases to proceed through each step in the process and sum them up. We calculated an average time and a 95% confidence interval for each step in the main sequence. Based on our calculations, it takes more than 3 ½ years (43.5 months) for the average case to proceed through the basic reexam process to a final conclusion – this assumes that the case is not appealed to the BPAI or beyond. A 95% confidence interval suggests a range of between 34 and 53 months for average pendency for an un-appealed *inter partes* reexam.

Expected pendency for appealed *inter partes* reexams is at least 6.5 years
*Inter partes* cases that go through the appeal process can be expected to take much longer than the 3 ½ years described above. Calculating average pendency for appealed cases is difficult because as we have noted, there has never been an appealed *inter partes* case that has completed the process. However, if we make a conservative assumption that all cases that go through the appeal process will receive a decision by the BPAI and immediately move to "Intent to Issue a Reexam Certificate", then we can calculate an average expected pendency. The result of this calculation is that average pendency (assuming no "rework" by the patent office and no secondary appeals to the BPAI, the Federal Circuit, or the Supreme Court) is 78.4 months – slightly longer than 6.5 years. A 95% confidence interval suggests an average pendency for appealed cases (again, assuming no rework) is between 5 and 8 years (60-97 months)! Given that the only three *inter partes* reexam cases that have received a BPAI decision all require further "rework" and are subject to further appeal, these estimates may be highly conservative.



According to statute, reexam cases are to be handled with "special dispatch". This means that reexam cases are to receive priority over all other cases. The Patent Office has reportedly set a target of 24 months to complete the reexam process, but so far, the actual time to conclude an *inter partes* reexam is far beyond this target. This can not help but raise significant concern to anyone who is interested in the efficient administration of justice in the U.S. patent system.

**Conclusion**

The *inter partes* reexam process requires special attention by the U.S. Patent Office. At present, the time to complete these cases far exceeds the expectation of "special dispatch" embodied in the patent statute. Federal judges, administrative law judges, and litigants should take special note of these facts as they can significantly impact the progress of patent litigation.

# EXHIBIT 7

The following table includes the 26 Reexamination Proceedings identified in Fresenius' Exhibit K where, as of May 2008, (1) a reexamination certificate was pending or had issued, and (2) claims were cancelled or amended during reexamination.  This information is publicly available at the USPTO's public Patent Application Information Retrieval (PAIR) Database.  The "Reason for Issuance" of the Reexamination Certificate was obtained from the Notice of Intent to Issue *Inter Partes* Reexamination Certificate.

| Reexam No. | Patent Owner | Reason for Issuance |
|---|---|---|
| 1 | Teknor Apex Co. | **Patentee Failed to Respond to Second Office Action** |
| 2 | Andrx Pharm. Inc. | **Patentee Failed to Appeal Right of Appeal Notice** |
| 4 | SRAM Corp. | **Patentee Failed to Respond to First Office Action** |
| 13 | Bongard's Creameries, Inc. | 3rd Party Failed to Appeal Right of Appeal Notice |
| 16 | Xoma Tech., Ltd. | **Patentee Failed to Appeal Right of Appeal Notice** |
| 23 | Kiss Products, Inc. | **Patentee and 3rd Party Failed to Appeal Right of Appeal Notice** |
| 26 | Sram Deutschland GmbH | **Patentee Failed to File Appeal Brief** |
| 27 | Defibtech LLC | **Patentee Failed to Respond to Action Closing Prosecution** |
| 29 | Carnegie-Mellon University | 3rd Party Failed to Appeal Right of Appeal Notice |
| 37 | Board of Regents, Univ. of Texas | Patentee Disclaimed After First Office Action |
| 40 | Taylor Made Golf Co. | **Patentee Failed to Appeal Right of Appeal Notice** |
| 41 | SRAM Corp. | **Patentee Failed to Respond to First Office Action** |
| 55 | Robert Grosz | **Patentee Failed to Appeal Right of Appeal Notice** |
| 56 | Anchor Wall Systems | Patentee Filed Disclaimer After Action Closing Prosecution |
| 59 | Anchor Wall Systems | Patentee Filed Disclaimer After First Office Action |
| 85 | Taylor Made Golf Co. | **Patentee Failed to Appeal Right of Appeal Notice** |
| 95 | Mitsubishi Gas Chem. Co. | **Patentee Failed to Respond to First Office Action** |
| 111 | Bank of America N.A. | **Patentee and 3rd Party Failed to Appeal Right of Appeal Notice** |
| 117 | Baltic Latvian Universal Electronics | **Patentee Failed to Respond to First Office Action** |
| 131 | Instant Live LLC | **Patentee Failed to Respond to First Office Action** |

1

| 132 | Primagen Holding B.V. | **Patentee and 3rd Party Failed to Appeal Right of Appeal Notice** |
|---|---|---|
| 164 | Christiana Industries LLC | **Patentee Failed to Respond to First Office Action** |
| 168 | Anchor Wall Systems | Patentee Disclaimed Before First Office Action |
| 176 | Glcogenesys | **Patentee Failed to Respond to First Office Action** |
| 208 | Pro-Fit Holdings | **Patentee Failed to Respond to First Office Action** |
| 213 | Archer Daniels Midland Co. | **Patentee Failed to Respond to First Office Action** |

# EXHIBIT 8

1    **UNITED STATES DISTRICT COURT**
     **NORTHERN DISTRICT OF CALIFORNIA**
2    **OAKLAND DIVISION**

3

4    FRESENIUS MEDICAL CARE                    No. C 03-1431 SBA
     HOLDINGS, INC., *et al.*,
                                               **ORDER**
5              Plaintiffs,
                                                [Docket No 971]
6        v.

7    BAXTER INTERNATIONAL, INC., *et al.*,

8              Defendants.

9    _____

10         Currrently before the Court is Baxter Healthcare Corporation's ("Baxter") Motion for Entry of

11   Permanent Injunction, or Alternatively, for Imposition of an Ongoing Royalty [Docket No. 971]. After

12   reading and considering the arguments presented by the parties, the Court finds this matter appropriate

13   for resolution without a hearing. For the reasons that follow, the Court GRANTS the Motion for Entry

14   of Permanent Injunction.

15                                  **BACKGROUND**

16         In 2003, plaintiffs Fresenius USA, Inc. and Fresenius Medical Care Holdings, Inc. ("Fresenius")

17   initiated this lawsuit by filing a complaint for a declaratory judgment of non-infringement and invalidity

18   against Baxter related to U.S. Patent No. 5,247,434 ("'434 Patent"), U.S. Patent No. 6,284,131 ("'131

19   Patent"), and U.S. Patent No. 5,744,027 ("'027 Patent") (collectively, "patents-in-suit"). Baxter

20   counterclaimed for infringement of each of the patents.

21         In 2005, the Court granted summary judgment to Baxter that Fresenius infringes Claim 26 of the

22   '434 Patent and Claim 1 of the '131 Patent. After three-plus years of litigation, in June 2006, Fresenius

23   admitted that its 2008K machine infringes the asserted claims of the patents-in-suit. Docket No. 755.

24   The Court then entered a judgment of infringement of those asserted claims. Docket No. 770. The

25   remaining dispute for the jury to resolve was whether Fresenius's 2008K hemodialysis machine

26   infringed upon claims 26 through 31 of the '434 patent, claims 1, 2, 3, 13, 14, 15, and 16 of the '131

27   patent, claims 7, 11, 14, 15, and 16 of the '027 patent, and claims 5 and 7 of the '476 patent. Fresenius

28                                            1

1    asserted that the claims of these patents were invalid either because they were obvious in light of prior
2    art or because they were anticipated by prior art.

3         The jury returned a unanimous verdict on June 30, 2006, finding in favor of Fresenius on all
4    issues submitted to it.  *See* Docket No. 829 .  The jury found that all remaining claims were either
5    invalid as obvious or invalid as anticipated, and that the Fresenius 2008K did not infringe on either
6    claim 5 or 7 of the '476 patent.  Following the jury's verdict, Baxter moved for judgment as a matter
7    of law and for a new trial, arguing that Fresenius had failed to present evidence to the jury that the
8    patents were invalid, On February 13, 2007, the Court granted Baxter's motion for judgment as a matter
9    of law that the patents were valid and ordered a second trial on damages.  Docket No. 874

10        A jury trial for damages owed to Baxter for Fresenius's infringement was held from October 24,
11   2007 to October 29, 2007.  The jury returned a verdict that Fresenius owed Baxter $14,175,000 for
12   Fresenius's past sales of the infringing 2008K machine.  Docket No. 962.  The jury also found that
13   Fresenius owed Baxter damages for sales of the related disposable products (i.e., dialyzers, concentrates,
14   bloodlines, needles, and solutions) in the amount of $91,000.  On November 7, 2007, the Court entered
15   an order reflecting the verdict. Docket No. 965.

16        Baxter has filed post-trial motions for yet another trial, for entry of a permanent injunction, and
17   for an award of damages including prejudgment interest. Fresenius has filed a motion for review of the
18   clerk's taxation of costs.

19                                        **LEGAL STANDARD**

20        "The grant of a patent is the grant of the right to invoke the state's power in order to exclude
21   others from utilizing the patentee's discovery without his consent." *Smith International, Inc. v. Hughes*
22   *Tool Company*, 718 F.2d 1573, 1577 (Fed. Cir. 1983) (citing *Zenith Radio Corp. v. Hazeltine Research*,
23   395 U.S. 100, 135 (1969)).  Congress enacted 35 U.S.C. § 283 to protect this right to exclude.  *Id.*
24   Pursuant to 35 U.S.C. § 283,  injunctions may be granted under the principles of equity to prevent the
25   violation of any rights secured by patent, on such terms as the court deems reasonable." *Id.*  "Without
26   the right to obtain an injunction, the right to exclude granted to the patentee would have only a fraction
27
28                                              2

1  of the value it was intended to have, and would no longer be as great an incentive to engage in the toils

2  of scientific and technological research." *Id.* at 1578.

3        In *eBay Inc. v. MercExchange, L.L.C.*, the Supreme Court directed district courts to apply the

4  well-established four-factor test to requests for injunctive relief in patent cases. *eBay Inc. v.*

5  *MercExchange, L.L.C.*, 126 S.Ct. 1837, 1839 (2006). Under that test, to be awarded injunctive relief,

6  a plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available

7  at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering

8  the balance of hardships between plaintiff and defendant, a remedy in equity is warranted; and (4) that

9  the public interest would not be disserved by a permanent injunction. *Id.*

10  **ANALYSIS**

11        Baxter moves for entry of permanent injunction, or alternatively, for imposition of an ongoing

12  royalty. [Docket No. 971]. Baxter seeks prospective relief; it does not seek to enjoin users of 2008K

13  machines already in the field, or to enjoin those users from purchasing disposables for those machines.

14  Specifically, Baxter has asked this Court to enter an injunction against sales of 2008K machines

15  beginning 9 months after this Court's Order.

16        In *eBay Inc. v. MercExchange, L.L.C.,* the Supreme Court directed district courts to apply the

17  well-established four-factor test to requests for injunctive relief in patent cases. *eBay Inc.*, 126 S.Ct.

18  at 1839. Under that test, to be awarded injunctive relief, a plaintiff must demonstrate: (1) that it has

19  suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are

20  inadequate to compensate for that injury; (3) that, considering the balance of hardships between plaintiff

21  and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved

22  by a permanent injunction. *Id.*

23      **A.**    **Irreparable Harm**

24        As the Supreme Court noted in *eBay*, "[f]rom at least the early 19th century, courts have granted

25  injunctive relief upon a finding of infringement in the vast majority of patent cases." *eBay, Inc.* 126

26  S.Ct. at 1841 (Roberts, J., concurring). Courts routinely find irreparable harm, and therefore grant

27

28  3

1    permanent injunctions where, as here, the infringer and the patentee are direct competitors. *See O2*

2    *Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 2007 WL 869576 at *2 (E.D. Tex. 2007) (granting

3    permanent injunction based on the "high value of intellectual property when it is asserted against a direct

4    competitor in the plaintiff's market"); *Novozymes A/S v. Genencor Int'l, Inc.*, 474 F. Supp. 2d 592, 613

5    (D. Del. 2007) (granting permanent injunction and noting the parties "are head-to-head competitors, and

6    [the patentee] has a right, granted by Congress, not to assist its rival with the use of proprietary

7    technology"). In this case, Baxter and Fresenius are head-to-head competitors in the same market. *See*

8    Oct. 2007 Tr. 168:21-23; June 2006 Tr. 961:4-14; Oct. 2007 Tr. 62:24-63:1. Baxter sells hemodialysis

9    and peritoneal dialysis machines and related disposables, in direct competition with Fresenius. See Oct.

10   2007 Tr. 8:23-9:17. The law favors Baxter's right to the full value of its property, particularly the ability

11   to keep it out of its main competitor's hands. *Muniauction, Inc. v. Thomson Corp.*, 502 F.Supp.2d 477,

12   482-84 (W.D. Pa. 2007). Indeed, the principal value of a patent is the right to exclude arch competitors

13   from making, selling and using an infringing product.

14          Additionally, the harm to Baxter's reputation resulting from Fresenius's wrongful appropriation

15   of Baxter's technology forms a basis for injunctive relief. It is well-established that harm to reputation

16   as an innovator is an injury "not compensable by damages." *Muniauction*, 502 F. Supp.2d at 483 ("such

17   a harm is not compensable in damages, and is irreparable, making equitable relief appropriate"); *Black*

18   *& Decker Inc. v. Robert Bosch Tool Corp.*, 2006 WL 3446144 at *4 (N.D. Ill. 2006) (reputation as an

19   innovator harmed by continued selling of infringing product); *Wald v. Mudhopper Oilfield Servs., Inc.*,

20   2006 WL 2128851 at *5-6 (W.D. Okla. 2006) (patentee's "reputation for innovation" was damaged as

21   a result of defendant's infringement).

22          Allowing Fresenius to continue to infringe would irreparably harm Baxter's reputation and

23   goodwill as an innovator, threaten Baxter's extensive investments in research and development, and

24   potentially encourage other companies to infringe Baxter's intellectual property. The evidence at trial

25   showed that Baxter annually invests over half a billion dollars each year on research and development,

26   purchases new technology to expand its reach into new markets, and spends tens of millions of dollars

27

28                                                    4

1  to license technology from other companies.  *See* Oct. 24, 2007 Tr. 169:5-170:9; Oct. 25, 2007 Tr.

2  12:17-19. This investment will be largely for naught, and Baxter's reputation as an innovator and the

3  associated goodwill will be tarnished, if Fresenius, Baxter's arch-rival in the renal field, is allowed to

4  market and sell a product that Baxter, and not Fresenius, invented. Accordingly, this factor favors an

5  injunction.

6             **B.**      **Inadequacy of Monetary Damages**

7        Courts have frequently found that "monetary damages are not an adequate remedy against future

8  infringement because 'the principal value of a patent is its statutory right to exclude.'" *Telequip Corp.*

9  *v. The Change Exchange*, 2006 WL 2385425 at *4-5 (N.D.N.Y. Aug. 15, 2006) (citing *Honeywell Int'l*

10  *Inc. v. Universal Avionics Sys. Corp*., 397 F. Supp.2d 537, 546 (D. Del. 2005)); *see also Boehringer*

11  *Ingelheim Vetmedica v. Schering-Plough*, 106 F. Supp.2d 696, 703 (D.N.J. 2000) ("Where there is no

12  question of future infringement and infringement and validity have already been determined, monetary

13  damages are generally considered inadequate in patent cases.") (emphasis added).  As one court recently

14  explained: "[i]f plaintiff cannot prevent its only competitor's continued infringement of its patent, the

15  patent is of little value." *Muniauction*, 502 F. Supp.2d at 482.

16        Here, the loss of goodwill, reputation for innovation, the legal right to exclude, including the

17  right to control the terms of any licensing arrangement, are all forms of irreparable injury that cannot

18  be easily and readily quantified through a simple monetary award.  This factor favors an injunction.

19             **C.**      **The Balance of Hardships**

20        The evidence Fresenius offered at trial that it has numerous, easily-implemented alternatives to

21  the patented technology supports a finding that the balance of hardships tips in Baxter's favor.

22  Fresenius's CEO has conceded that "there are a lot of ways to approach data input" and an injunction

23  would not be a "big issue."  Mot for New Trial, Ex. 2. Fresenius' lead engineer even listed some of the

24  many inexpensive, non-infringing alternative designs readily available to Fresenius, such as "a mouse,

25  a touch pad, a keyboard, so on and so forth."  *See* Oct. 26, 2007 Tr. 472:4-9; *see also* June 2006 Tr.

26  390:3-9.  Additionally, Daniel Rubinfeld, Fresenius' damages expert, opined that a "design around" in

27

28                                              5

1    the year 2000 would have cost between $200,000-$1,000,000 and take about six to nine months to

2    implement.   Docket No. 452, Exhibit 1, Rebuttal Expert Report of Daniel L. Rubinfeld,   219.

3    Fresenius's Chairman testified that a touch screen was only $40 less expensive than using a mouse,

4    keyboard, or scratchpad. Oct. 26, 2007 Tr. 503:24-504:22; *see also* Oct. 25, 2007 Tr. 199:13-17. Based

5    on these admissions, Fresenius cannot be heard to now argue that implementing  another input device

6    would cause it undue hardship or disadvantage. *Muniauction*, 502 F. Supp.2d at 484 (W.D. Pa. 2007)

7    (rejecting hardship arguments where "[a]t trial, defendants presented numerous low-cost, easily executed

8    replacements for the [infringing] system").

9            Additionally, in cases where the infringer is capable of selling non-infringing items, the balance

10   of hardships favors the patentee. *MGM Well Servs., Inc. v. Mega Lift Sys. LLC*, 505 F.Supp.2d 359, 379

11   (S.D. Tex. 2007).  Fresenius repeatedly argued that the 2008H is an "excellent machine" and performs

12   hemodialysis just as well as the 2008K. *See* Oct. 26, 2007 Tr. 462:3-463:3; June 2006 Tr. 263:12-264:4;

13   310:24-311:21.  Having relied upon the 2008H as its "non-infringing alternative" in this litigation,

14   Fresenius cannot now disavow that stance and claim hardship in being made to rely on that machine.

15           Finally, as Baxter rightly points out, any alleged hardship Fresenius claims in having to

16   substitute  "a mouse, a touch pad, [or] keyboard" on the 2008K machine will be of its own making. *See*

17   Oct. 26, 2007 Tr. 472:4-9.]. Fresenius stipulated in June of 2006 that it was infringing at least two of

18   the patents, and has been apprised since February 2007 of the Court's determination that it had failed

19   to present sufficient evidence at trial that the patents are invalid. *See* Docket Nos. 370, 874. Although

20   it has had over a year to take commercially reasonable steps to redesign its machine, Fresenius has

21   apparently taken no action  to ease any hardship it may suffer as a result of an injunction. *See*

22   *Windsurfing Int'l, Inc. v. AMF*, Inc., 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) ("[o]ne who elects to

23   build a business on a product found to infringe cannot be heard to complain if an injunction against

24   continuing infringement destroys the business so elected."); *Smith & Nephew v. Synthes*, 466 F. Supp.

25   2d 978, 984 (W.D. Tenn. 2006) (finding hardship for loss of sales and for ceasing operations is not

26   sufficient because they are direct consequences of the illegal patent infringement).  Indeed, the Court

27

28                                                         6

finds it somewhat bewildering that, having admitted to infringing the patents nearly two years ago and having known for at least a year that an injunction was all but inevitable, Fresenius has apparently done nothing to implement any alternative to the 2008K. It is Fresenius's burden, and not Baxter's, to taste the bitter fruit of its own inaction. This factor therefore favors an injunction.

> ### C.     Whether the Public Interest Would Not Be Disserved By Granting A Permanent Injunction

Inherent in the patent right is the right to exclude others from violating the patent during its term. The Federal Circuit has repeatedly emphasized the importance of the right to exclude: "Infringement having been established, it is contrary to the laws of property, of which the patent law partakes, to deny the patentee's right to exclude others from use of his property." *Richardson v. Suzuki Motor Co.*, Ltd. 868 F.2d 1226, 1246-47 (Fed. Cir. 1989). Moreover, the Federal Circuit has observed that the public interest is clearly served by healthy, fair competition in the dialysis marketplace, which will be achieved by keeping infringing products off the market. *TiVo*, 446 F. Supp.2d at 670.

Numerous courts have granted permanent injunctions in cases involving medical devices where, as here, there were alternative products already on the market or available to the infringer. *See Innogenetics, N.V. v. Abbott Labs.*, 2007 U.S. Dist. LEXIS 3148, at *1-2 (W.D. Wis. Jan. 12, 2007) (granting permanent injunction, where "other diagnostic techniques exist[ed] and would suffice, even if they are not as effective as the patented technique."); *Smith & Nephew*, 466 F. Supp. 2d 978 (granting permanent injunction enjoining sale of medical related product where, among other things, similar products were available on the market).

Fresenius' chief argument against the issuance of an injunction is premised upon concerns for patient safety. Specifically, Fresenius points to: (1) the annual demand for dialysis machines; (2) the lack of proof that other suppliers can meet customer demand; (3) Fresenius' alleged inability to market the 2008H; and (4) the fact that other hemodialysis machines allegedly lack features found in the 2008K. Opp'n at 6-13. All of these concerns, however, are fully addressed by Fresenius's concession that it can implement a redesign of the 2008K in nine months; Fresenius states it "could conceivably have a non-

1   touchscreen replacement for the 2008K designed, validated, and if necessary submitted for FDA

2   approval, within 9 months." Opp'n at 10 n.5. Fresenius also concedes that allowing it nine months to

3   redesign "will *guarantee* an uninterrupted supply of machines to the market." *Id.* (emphasis added).

4   Courts have granted injunctions for medical devices with a transition period  in cases where public

5   health concerns exist. *See, e.g., Shiley, Inc. v. Bentley Labs., Inc.,* 601 F. Supp. 964, 971 (C.D. Cal.

6   1985) (granting injunction for medical device with transition period and increased royalty rate).

7          Additionally, as Baxter points out, Fresenius is now singing a far different tune as to the

8   importance of the patented touch screen and the ease of a design-around than it did to the jury during

9   the trial. During the trial, Fresenius argued that the patented touch screen was simply a piece of plastic

10  "slapped [] on a hemodialysis machine," *see* June 19, 2006 Tr. 148:15-18, and that "[i]f you removed

11  this piece of plastic you could still control the entire machine using these buttons." Oct. 24, 2007 Tr.

12  148:23-25. However, after employing this argumentative strategy at trial, apparently to some success,

13  it now intimates -- but does not explicitly state, perhaps out of a desire to avoid straightforwardly

14  contradicting the representations it made at trial -- that if Fresenius is forced to produce a machine

15  without the touch screen its business will be destroyed and tens of thousands of hemodialysis patients

16  will suffer as a result. However, this parade of horribles is belied by Fresenius's own footnoted

17  concession that  allowing it nine months to redesign "will guarantee an uninterrupted supply of

18  machines to the market." Opp'n at 10 n.5. Thus, once Fresenius's public-interest bluster is put to the

19  side, it is clear that Fresenius agrees -- and is in fact on record as agreeing -- that a design around can

20  be relatively quickly implemented.

21                                                                     **CONCLUSION**

22         Accordingly, Baxter's Motion for a Permanent Injunction [Docket No. 971] is GRANTED.  This

23  matter is referred to a magistrate judge to enforce all provisions as set forth as follows:

24         IT IS HEREBY ORDERED, subject to the conditions relating to the transition period as

25  articulated below, that the plaintiffs Fresenius Medical Care Holdings, Inc. and Fresenius USA, Inc.

26  (collectively "Fresenius"), any of their subsidiaries, and their officers, agents, servant, employees, and

27

28                                                                               8

attorneys, and those persons in active concert or participation with any or all of them who receive actual notice of this Permanent Injunction (all of said individuals and entities being referred to herein as the "Fresenius Parties") are hereby permanently enjoined from infringing or inducing the infringement of claims 1-3 and 13-16 of U.S. Patent No. 6,248,131 ("the '131 Patent"); claims 26-31 of U.S. Patent No. 5,247,434 ("the '434 Patent"), and claim 11 of U.S. Patent No. 5,744,027 ("the '027 Patent") (all of said patent claims being referred to herein as "Asserted Claims" and all of said patents referred to herein as "Patents-In-Suit"), until the expiration of the Patents-In-Suit, by:

(a)     making, using, selling, and/or offering to sell in the United States the 2008K hemodialysis machine, any other products that meet all the limitations of the Asserted Claims or any product not more than colorably different from the 2008K hemodialysis machine (collectively referred to herein as "Infringing Products"); and

(b)     assisting others in making, using, importing, selling and/or offering to sell in the United States any Infringing Products.

Nothing in paragraphs (a) and (b) above prevents the Fresenius Parties from continuing to use 2008K machines that were already in the field or sold to customers before the date of this Permanent Injunction consistent with the other provisions of this Permanent Injunction. Nothing in this Permanent Injunction prohibits Fresenius from making, using, selling or offering for sale its 2008H hemodialysis machine or any other hemodialysis machine that does not infringe the Patents-In-Suit.

IT IS FURTHER ORDERED that the injunction against the activities listed in paragraphs (a) and (b) above shall become effective on January 1, 2009.  For purposes of this Permanent Injunction, the period from the date of the jury's verdict until January 1, 2009 shall be known as the Transition Period.     IT IS FURTHER ORDERED:

(a)     Fresenius shall pay to Baxter an ongoing royalty of 10% of the sales price for any Infringing Products that are sold during the Transition Period;

(b)     Fresenius shall pay a royalty of 7% of the sales price for all Disposable Products linked to sales of Infringing Products from November 7, 2007 until expiration of the Patents-In-Suit.  For

1  purposes of this Permanent Injunction, Disposable Products include dialyzers, concentrates, bloodlines,

2  fistula needles, spare parts and service;

3       (c)     Fresenius shall provide payment to Baxter of any royalties due under paragraphs (a) and

4  (b) on a quarterly basis.  All royalty payments shall be accompanied by a report indicating the number

5  of units sold and the sales price for all Infringing Products and Disposable Products;

6       (d)     Payment not made within the date due under paragraph (c) shall accrue interest at the rate

7  of 10% compounded monthly; and

8       (e)     Baxter shall have the right to a full accounting, conducted by an independent third-party,

9  at Baxter's own expense and upon reasonable notice, to assess Fresenius' compliance with any of the

10 terms contained in this Permanent Injunction.

11      Nothing in this Permanent Injunction shall prohibit the Fresenius parties from engaging in the

12 design, development or testing of any product which does not infringe the Patents-In-Suit.

13      IT IS SO ORDERED.

14

15 Date:  3/21/08

                                    _____

16                                       Saundra Brown Armstrong
                                      United States District Judge

10

# EXHIBIT 9

1

2

3    UNITED STATES DISTRICT COURT

4    NORTHERN DISTRICT OF CALIFORNIA

5

6

7    PROCTER & GAMBLE CO.,

8            Plaintiff,                          No. C 08-0930 PJH

9        v.                                      **ORDER GRANTING
                                                 MOTION TO STAY**
10   KRAFT FOODS GLOBAL, INC.,

11           Defendant.
     _____/
12

13          Before the court is defendant's motion to stay the instant action.  The action was

14   originally transferred to this District from the Western District of Wisconsin on February 13,

15   2008, and was subsequently reassigned to the undersigned after the case was deemed

16   related to an earlier-filed case already pending in this court, Procter & Gamble v. Kraft

17   Foods Global, Inc., C 07-4413 PJH.  Defendant Kraft Foods Global, Inc. ("defendant")

18   seeks to stay the action on grounds that the underlying patent in the case, U.S. Patent No.

19   7,169,419 ("the '419 Patent"), is closely related to U.S. Patent No. 7,169,418 ("the '418

20   Patent"), which is the subject of pending ex parte and inter partes reexamination

21   proceedings before the PTO and BPAI.  Plaintiff Procter & Gamble Co. ("plaintiff")

22   vigorously opposes defendant's request.

23          Having read the parties' papers and carefully considered their arguments and the

24   relevant legal authority, and good cause appearing, the court hereby GRANTS defendant's

25   motion to stay, for the following reasons:

26          First, the court finds the '419 Patent at issue here sufficiently similar to the '418

27   Patent that a stay is justified.  Both patents were issued the same day, are directed to

28   plastic packaging systems for roast and ground coffee, relate to the same provisional

United States District Court

For the Northern District of California

1    patent application, and contain specification and claim language that is substantially similar.

2    See Declaration of Evette D. Pennypacker ISO Mot. Stay ("Pennypacker Decl."), Exs. B, J.

3    As such, there is a strong likelihood that final, binding results of the reexamination

4    proceedings at issue in connection with the '418 Patent – which contemplate final

5    decisions by both the PTO and the Federal Circuit in connection with ex parte and inter

6    partes reexamination – would have an effect on issues before the court relating to the '419

7    Patent, and in particular, claim construction.  As the court noted previously when it granted

8    a stay of proceedings in the related case pending reexamination of the '418 Patent, this

9    conclusion is particularly true if some or all of the claims at issue in the '418 Patent are

10   ultimately found to be invalid, or are narrowed.

11          Second, the above concerns, coupled with the time intensive nature of the litigation

12   involved with respect to both the '418 and '419 Patents, also counsel in favor of a stay.

13   Both the instant action based on the '419 Patent, and the related action based on the '418

14   Patent, should be heard together, in order to best serve the interests of judicial efficiency.

15   Thus, a stay of the instant action, in view of the stay already imposed in the related action,

16   is appropriate.  A stay here also ameliorates the court's concerns over the duplicative

17   litigation that could result from allowing the present action to go forward before the earlier

18   filed but closely related litigation, as well as the court's concerns over the potentially

19   preclusive effect of issues decided here upon the earlier-filed litigation.

20          In so ruling, however, the court is not unmindful of plaintiff's arguments with respect

21   to the undue prejudice that a stay would impose upon plaintiff – particularly in view of the

22   suggestion that the full completion period for inter partes reexamination proceedings is 5 to

23   8 years.  To that end, the court finds that some limited deposition discovery, in the form of

24   30(b)(6) depositions, for example, is appropriate to mitigate the potentially prejudicial

25   effects of a stay, notwithstanding the imposition of a stay in this case.  Such discovery must

26   be limited, however, to those background matters regarding the development of the

27   products at issue, which are particularly at risk for diminishing recollections by

28

2

Case 3:08-cv-02389-PJH   Document 61   Filed 08/15/2008   Page 3 of 3

1   knowledgeable witnesses – e.g., information relating to the drafting of the patents, and

2   background information regarding product design and functionality.  The parties are

3   instructed to meet and confer with respect to proposed limited discovery, and to present a

4   stipulated proposal to the court, no later than September 15, 2008.  If the parties are

5   unable to agree on a stipulated proposal, they are instructed to contact the courtroom

6   deputy for the undersigned, in order to request that a further case management conference

7   be scheduled.

8       In sum, defendant's motion to stay is GRANTED, pending completion of both the

9   pending ex parte and inter partes reexamination proceedings related to the '418 Patent.

10   The parties are instructed, as in the related action, to submit status reports to the court

11   every 6 months, apprising the court of the status of the pending reexamination

12   proceedings.  Upon final exhaustion of all pending reexamination proceedings including

13   any appeals, the parties shall jointly submit to the court, within one week, a letter indicating

14   that all appeals have been exhausted, and requesting a further case management

15   conference as soon as possible.

16

17   **IT IS SO ORDERED.**

18   Dated: August 15, 2008

19   _____
     PHYLLIS J. HAMILTON
20   United States District Judge

21

22

23

24

25

26

27

28

United States District Court
For the Northern District of California

3